# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT, OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM HOWE, et al, | ) | CASE NO: 5:06 CV 2779 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN ADAMS |
| | ) | Magistrate Judge James Gallas |
| CITY OF AKRON | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Dennis R. Thompson #030098
tmpsnlaw@sbcglobal.net
Christy B. Bishop #0076100
bishopchristy@gmail.com
Thompson & Bishop
2719 Manchester Road
Akron, Ohio 44319
330-753-6874
330-753-7082 (facsimile)

ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**

I.      INTRODUCTION                                                                  1

II.     STATEMENT OF THE FACTS                                                        2
        A. Organization of AFD                                                        2
        B. Promotions                                                                 3
        C. Promotional examinations                                                   4
                1. Preparation of the examinations                                    4
                        a. Job analysis                                              5
                        b. Test construction                                         7
                2. Administration of the promotional examinations                    11
                3. Scoring of the promotional examinations                           13
                4. Results of the promotional process                                17
                5. Efforts by Plaintiffs to obtain documents                         19

III.    LAW AND ARGUMENT                                                              20
        A.  Contrary to Akron's confusing contentions, all of Plaintiffs'            20
            claims are within the applicable statutes of limitations, in each
            of their federal and state claims.
                1.  Plaintiffs meet Title VII and ADEA limitations periods           20
                    for their disparate impact and disparate treatment claims.
                2.  At the earliest, the promulgation of the eligibility list        21
                    in April 2005 was the date of accrual.
                3.  It is reasonable to use the expiration of the list               23
                    in this instance to apply the limitations period,
                    based on the City's use of the "Rule of Three"
                    promotional process.
                4.  The City of Akron deliberately withheld the testing             24
                    documents that might indicate to Plaintiffs that the process
                    was actually *discriminatory,* and, thus, (*arguendo*),
                    the doctrine of equitable tolling applies in this case.
                5.  Plaintiffs' Ohio race discrimination claims under               25
                    R.C. 4112.02 and 4112.99 are timely filed under the
                    6-year statute of limitations.
                6.  Plaintiffs' Ohio age claims are timely under R.C. 4112.14       26
                    and 4112.99; in addition, Plaintiffs are not required to elect
                    "remedies" between the two statutes at this time, due
                    to pending case law in the Ohio Supreme Court.

        B. DISPARATE IMPACT                                                          27
                1. Analytical framework for disparate impact                         27
                2. "Reverse" Discrimination – Captain's Test                         29
                3. Expert Witnesses                                                   29
                4. Prima Facie Case                                                   30
                5. 4/5s Rule                                                          31

i

# TABLE OF CONTENTS

6. The promotional selection process in issue   34

7. Burden shifts to Akron to prove that the selection process   35
has a manifest relationship to the employment, i.e., the
promotions

   a. Content Validity   35

8. ADEA

   a. Plaintiffs have set forth a prima facie case of age   35
discrimination under ADEA and Ohio law, and Akron
has not even addressed its burden of persuasion in
proving the examination results fit into a Reasonable
Factor Other than Age.

C.   PLAINTIFFS' DISPARATE TREATMENT CLAIMS   39

1. Defendant Akron has failed to carry any of its burdens for   39
summary judgment on plaintiffs' claims of disparate
treatment under Title VII, ADEA and Ohio claims.

2. The ageist comments in this case are admissible, and not   42
"hearsay," regardless of whether they are direct evidence or
circumstantial.

3. Section 1983, Equal Protection, and "Class of One"   46

   a. Akron's own affidavits establish a custom, practice   46
or policy underlying the City's consistent use of
promotional examinations that affected the classes of
employees including the Plaintiffs.

# TABLE OF AUTHORITIES

**Federal Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 132 L. Ed. 2d 158,
    115 S. Ct. 2097 (1995)         47

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)    27, 30

*Amini v. Oberlin College*, 259 F.3d 493, 501 (6th Cir. 2001)  24

*Ash v. Tyson Foods, Inc.,* 126 S.Ct. 1195 (2006)    45

*Bazemore v. Friday's* 478 U.S. 385, 92 L.Ed.2d 315, 106 S.Ct. 3000 (1986)  31

*Black v. Akron,* 831 F.2d 131 (6th Cir. 1987)    32, 34

*Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007).  42, 43

*Cadmus v. Aetna Cas. & Sur. Co., 1996 U.S. App. LEXIS 29443,
1996 WL 652769 (6th Cir. Nov. 7, 1996)*    30

*Carver v. Branch*, 946 F.2d at 454-55    42

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)    40

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)  42

*Connecticut  v. Teal,* 457 U.S. 440 (1982)    30

*Cotter v. City of Boston*,  323 F.3d 160 (3rd Cir. 2003)  34

*County of Washington v. Gunther,* 452 U.S. 161 (1981)  45

*Cox v. City of Memphis,* 230 F.3d 199 (6th Cir. 2000)  21

*Duncan v. Fleetwood Motor Homes of Indiana, Inc.,* 518 F.3d 486
    (7th Cir. 2008)    42

*Dunlap v. TVA,* __ F.3d __, 102 FEP Cases 1538 (6th Cir. 2008), (No. 07-5381) 41

*EEOC v. Joint Apprenticeship Comm. Of the Joint Indus. Bd. Of
    the Elec. Indus.*, 186 F.3d 110 (2nd Cir. 1998)  34

*Essex Ins. Co. v. Merrill*, 1995 U.S. App. LEXIS 35494,(6th Cir. 1995),  40, 42

*Fickling v. New York State Dep't. of Civil Service*, 909 F.Supp.
    185 (SDNY 1995)                                            36

*Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527 (5th Cir. 1980)    29

*Golden v. Town of Collierville*, 167 Fed. Appx. 474 (6th Cir. 2006)    29

*Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008)    43

*Gonzalez v. Galvin*, 151 F.3d 526 (6th Cir. 1998)    29, 37

*Griggs v. Duke Power Co.,* 401 U.S. 424 (1971).    27

*Guardians Ass'n of the New York City Police Dept. v. Civil Service
    Comission* 630 F.2d 79 (2nd Cir. 1980).    36

*Isabel v. City of Memphis*, 404 F.3d 404 (6th Cir. 2005)    30, 31

*Johnson v. City of Memphis*, 355 F.Supp. 2d 911 (W.D. Tenn. 2005)    30, 32

*Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45 (6th Cir. 1994)    31

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000)    47

*Lewis v. City of Chicago*, 528 F.3d 488, 494 (7th Cir. 2008)    25

*Luke v. City of Cleveland*, US District Court Case No.: 1:02 CV 01225    30

*Lusardi v. Lechner*, 855 F.2d 1062, 1077 (3rd Cir. 1988)    22

*Henry v. Milwaukee County*, 539 F.3d 573 (7th Cir. Wis. 2008)    39

*Meacham v. Knolls Atomic Powers Lab*, 2008 LEXIS 5029; 76 U.S.L.W 4488    39

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-695 (1978)    46

*Nash v. Consolidated City of Jacksonville,* 895 F. Supp. 1536 (M.D. Fla. 1995)    28, 42

*Naton v. Bank of California,* 649 F.2d 691 (9 Cir. 1981)    22

*New York Transit Authority v. Beazer*, 440 U.S. 568 (1979)    30

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998)    45

*Parson v. Kaiser Aluminum & Chem. Corp.*, 575 F.2d 1374 (5th Cir. 1978)          28

*Phillips v. Cohen*, 3 Fed. Appx. 212 (6th Cir. Ohio 2001)          21, 31

*Philips v. Cohen*, 400 F.3d 388 (6th Cir. 2005)          30

*Police Officers for Equal Rights v. City of Columbus,* 916 F.2d 1093
     (6th Cir. 1990)          28

*Robinson v. Runyon,* 149 F.3d 507 (6th Cir. 1998)          43

*Ross v. City of Gerard,* 194 F.3d 1313          47

*Smith v. City of Jackson,* 544 U.S. 228 (2005)          38

*Sprint v. Mendelsohn*, __ U.S. __, 128 S.Ct. 1140 (2008)          43

*Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002)          34

*Sutherland v. Michigan Dept. of Treasury,* 344 F.3d 604 (6th Cir. 2003)          29

*Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058 (2nd Cir. 1990), *cert denied,*
499 US. 193  (1991)          22

*Walker v. Russell*, 1997 U.S. App. LEXIS 2326, 4-5 (6th Cir. 1997)          42

*Washington v. Davis*, 426 U.S. 229, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1976).          29

*Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S. Ct. 2777,          31
     101 L. Ed. 2d 827 (1988)

*Williamson v. Ga. Dept. of Human Resources & Georgia Regional Hospital*,
     150 F. Supp.2d 1375 (D. Ga. 2001)          40, 42

*Wilson v. City of Zanesville*, 954 F.2d 349 (6th Cir. 1992)          40, 42

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982)          24

**State Cases**

*Camardo v. Qualchoice, Inc.*, 2005 Ohio 1860          26

*Cosgrove v. Williamsbsurg of Cincinnati Mgmt.Co.*, 70 Ohio St. 3d 281 (1994)          25

*Leininger v. Pioneer Natl. Latex,* 115 Ohio St. 3d 311, 2007-Ohio-4921          26

*Meyer v. UPS,* 174 Ohio App. 3d 339, 348 (Ohio Ct. App., 2007)          26

*Morris v. Kaiser Engineers, Inc.*, 14 Ohio St.3d 45  (1984)          26

**Federal Statutes**

42 U.S.C. 1983          46

**State Statutes**

O.R.C. 4112.02          26

O.R.C. 4112.99          26

O.R.C. 4112.14          26

**Evidence Rules**

Fed. R. Evid 801(D)(2)(d)          44

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT, OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM HOWE, et al, | ) | CASE NO: 5:06 CV 2779 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN ADAMS |
| | ) | Magistrate Judge James Gallas |
| CITY OF AKRON | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiffs are all firefighters employed by the City of Akron Fire Department

("AFD").  Each of them underwent the promotional testing process for either the ranks of

Lieutenant or Captain.   When each of them studied for the promotional examinations for

the ranks of Lieutenant and Captain in December, 2004, they were not aware that the

examination would fail to conform to fundamental testing requirements, including: 1) that

the examinations omitted the most critical and important aspects of the jobs for which

they were being tested; 2) the examinations included questions relating to  tools that AFD

does not use; 3) that the examinations relied upon outdated and largely irrelevant

Standard Operating Guidelines ("SOG"'s), which AFD does not use or enforce; 4) that

there were numerous questions relating to units that required specialty training and

certification, none of which are required to hold either rank; 5) that there would be a

written work sample at the rank of Lieutenant requiring a response that no AFD

Lieutenant is ever required to perform; 6) that the incident command assessment exercise

1

at the rank of Lieutenant would involve a scenario that no AFD Lieutenant would ever encounter; 7) that there was wide variance in the assessment exercise administration among the candidates, rendering their value as an assessment device as worthless; 8) that there were widespread and inexplicable scoring variances and errors made by the testing consultant, and 9) that numerous test answers and test documents would become inexplicably "missing" and to this date are unaccounted for.

## II.        STATEMENT OF THE FACTS

### A. Organization of AFD

At all times pertinent to this litigation, AFD is a paramilitary organization comprised of approximately 390 members. AFD's rank progression is:  firefighter/medic, Lieutenant, Captain, District Chief, Deputy Chief, Chief.  (Bunner Tr. 9).  Firefighters in AFD are also required to be certified paramedics and serve as paramedics for at least 8 years, hence the term "firefighter/medic".  The city is divided into geographic districts.

The "line" is AFD's suppression  companies are assigned to stations, which are designated numerically.  (Bunner Tr. 13).   A company is generally assigned to an apparatus, which is a fire truck or medical unit (an ambulance, or "med unit'), as AFD operates both fire and med units.

AFD operates what are known as "combo units", which is where certain stations have both an engine and a med unit with the same crew assigned to each.  When either the med unit or the engine is out on a call, the other apparatus is taken out of service for the duration.  Should another call arrive during the absence of the crew, then the nearest adjacent station would be dispatched to respond.

The vast majority of AFD's runs –over 85% -- are medical and not fire. This is a nationwide trend that has evolved over the past 20+ years in fire emergency response services.

Suppression operates with 3-24 hour shifts ("A", "B", or "C") with each company composed of 3 crews over those 3 shifts. The company officer on the line is the Lieutenant assigned to the company on any given shift. (Bunner Tr. 33-34). Captain's are responsible for several companies within a district. District Chiefs and Deputy Chiefs are largely administrative, assigned to various positions in the AFD bureaucracy.

AFD also has several specialty units and bureaus. These include the Dive Team, TROT (rescue), SWAT medic, Fire Prevention Bureau, HAZMAT and Arson Bureau. (Bunner Tr. 13-14). Most of these require state certifications and additional training, such as the Dive Team, FPB, HAZMAT, Arson and paramedic (Bunner Tr. 14-21).

There is no requirement within AFD that any officer be certified as to any specialty unit or be a paramedic. (Bunner Tr. 21-22, 37-38). Indeed, Chief Bunner has never served in any specialty unit in AFD, even as a paramedic. (Bunner Tr. 22, 37).

**B.      Promotions**

Akron promotes AFD personnel via a promotional process. (Miller Decl.,Doc. 80-36; Robinson Decl., Doc. 80-38). The first step in the process is the preparation, administration and scoring of a promotional examination. This is a function of the City Personnel Department and is done according to the Civil Service Rules. Historically, the tests have been a combination of written examinations and assessment center exercises which are prepared, administered and scored by a third-party consultant.

The minimum qualifications for a promotional candidate are the following: 4 years overall seniority; 1 year in rank; 2 successive satisfactory performance ratings. (Ex. 11).

If a promotional candidate receives a minimum passing score (70), additional points are awarded according to seniority on the job (1 point per year for a maximum of 10 points).  After the award of the seniority points, the candidates are rank ordered in descending order to create an eligibility list.  Historically, seniority points are only a factor at the rank of Lieutenant.  Generally, only those firefighters with more than 10 years service ever are eligible to take a promotional examination for the rank of Captain and above. This is due to the relative infrequency of the promotional examinations.  An eligibility list remains in effect for 2 years from the date of its certification.

From the eligibility list, candidates are selected using a Rule of 3.  If any given candidate is passed over 3 times, then they can be removed from the eligibility list.  As a result, it is virtually impossible to know who will – and will not – be promoted until after the expiration of any given eligibility list.

Primarily due to the size of AFD, any given firefighter may have only 2-3 promotional opportunities over their entire career.  (Combs Tr. 36).

C.     **2004 Promotional Examinations**

1.     **Preparation of the examinations**

Akron's Civil Service Commission conducted promotional examinations for the ranks of AFD Lieutenant and Captain in December, 2004.  The tests were prepared administered and scored by EB Jacobs, LLC, a testing consultant; Dr. Rick Jacobs, an industrial/organization psychologist, is the principal of the company.

While Jacobs was contracted with to prepare, administer and score the promotional examinations, he created virtually no project log documenting the progress of the test development along the way.  (Jacobs Tr. 45-46, 97).  Therefore, there is no comprehensive record regarding any aspects of the test development, administration or scoring.  There is no documentation of the review process used within Jacobs, or of the personnel assigned to which tasks.  (Jacobs Tr. 97).  Nor is there any documentation as to alternative measures considered by Jacobs.  (Brink Decl. ¶92).  Documentation is also lacking  relating to the plethora of scoring changes and inconsistencies as to both examinations.  (Snyder Decl. ¶29, 30).

a.      **Job Analysis**

All promotional examinations start with a job analysis; it is the foundation upon which all such tests are built.  (Jacobs Tr. 28; Brink Decl. ¶89).  In this case, Jacobs performed a "streamlined" job analysis for the two AFD examinations, using its own canned task analysis as its primary resource.  (Jacobs Tr. 86-87, 156; Ex. 12; Brink Decl. ¶84, 86).   Using these canned task analyses, a representative from Jacobs arrived in AFD on one November, 2004, day to conduct its "streamlined" job analysis.

This was done by the Chief selecting 6 individuals of rank to serve as subject matter experts ("SME's") for each rank being tested; this was an insufficient number of SMEs to use for these tests.[1]  (Brink Decl. ¶85).  No care at all was taken in the selecting of the SMEs, who were haphazardly chosen by the Chief on the date of the assigned meeting with Jacobs.  (Hiltbrand Tr. 26-27).[2]  None of them knew what they were

---

[1] For these examinations, it was Chief Charles Gladman, since deceased.
[2] Edward Hiltbrand is a Deputy Chief for AFD and was an SME for the rank of Captain.  (Hiltbrand Tr. 5-6, 27; Ex. 13).

5

supposed to be doing or had any information prepared relating to the position for which they were serving as SMEs prior to their selection as a SME.  (Hiltbrand Tr. 26-27).

Hiltbrand testified that he didn't "remember doing what they said we did all day long" and that his mind was on many other things at the time.  (Hiltbrand Tr. 27-28). Chief Combs, another identified SME,  had little recollection of the SME meeting and could not even recognize the task lists from which they purportedly worked.  (Combs Tr. 46-48).[3]  Supposedly, all the SME's did was sit with a Jacobs' representative to go through its canned task analysis, lining out and adding things that the SME's identified as pertaining to AFD.

The quality of Jacobs' job analysis is reflected by the fact even after preparing his final report and expert report, he still could not identify one core value for either officer rank for which he was testing that AFD viewed as essential.  (Jacobs Tr. 16-17).  Jacobs also did not know, for example, what the minimum qualifications were for any given candidate to be eligible to be promoted.  (Jacobs Tr. 31-32).  Nor did Jacobs know how performance evaluations were used in the selection process.  (Jacobs Tr. 32).

Finally, Jacobs identified 12 abilities he claims were derived from its job analysis. However, other sources, including the U.S. Dept. of Labor's O*NET, lists 20 skills and abilities for municipal firefighters.  (Brink Decl.¶88).  Using only 12 abilities is insufficient and makes it "impossible to conclude that a representative sample of abilities" is being assessed by thee examinations due to lack of definition for the entire job domain.  (Brink Decl. ¶88).

Jacobs then asserts that it weighted the tasks into ratings of importance using a weighting scheme relating to tasks and importance drawn from its partial-day SME

---

[3] Combs is a  Deputy Chief for AFD.

interaction.  Typically, test component weights are determined after completion of the job analysis.  (Brink Decl. ¶90).  In this case, however, Jacobs determined how he was going to weight the test components even before conducting its job analysis.  (Brink Decl. ¶90; Snyder Decl. ¶¶15, 16).

**b.**  **Test Construction**

It was from this job analysis that Jacobs constructed the tests, supposedly deciding on the structure of the examination and the weights assigned to each component unique to AFD.

The Lieutenant's examination had the following components: 1) technical knowledge examination of 100 multiple-choice items; 2) a written work sample; 3) incident command oral assessment exercise; and 4) subordinate conference oral assessment exercise.

The Captain's examination had the following components: 1) technical knowledge examination of 100 multiple-choice questions; 2) incident command oral assessment exercise; 3) subordinate conference oral assessment exercise; and 4) group conference oral assessment exercise.

Review of the actual documents that were first provided as discovery, however, revealed that little of Jacobs' work was unique to AFD at all.  Like the job analysis, the test construction was also canned, taken right off the shelf from Jacobs own prefabricated format.  For example, the score sheets were pre-printed forms – to the point of having a pre-printed form number -- which identified the various components that were supposedly specifically designed for AFD.  (Jacobs Tr. 105-106).  In fact, one of the

7

dimensions Jacobs used to assess Lieutenant candidates on the written work sample was "Oral Expression." (Chapman Tr. 85-86).

In reality, Jacobs was fitting AFD into its preconceived notions of what a promotional examination should be rather than constructing an examination based upon the specific characteristics and needs of AFD.

Not surprisingly, the output reflected the shoddy and superficial depths of the job analysis. Jacobs admitted that in testing, the axiom of "garbage in, garbage out" applies. (Jacobs Tr. 39). In other words, the test can be no better than its job analysis. This case presents a classic example of this axiom in action. This is demonstrated by abundant evidence.

First, the actual content of the technical knowledge examination indicated a complete lack of understanding of the duties of either rank. For example:

• Jacobs included numerous questions relating to specialty units, like the Dive Team or FPB. (see, e.g. Howe Tr. 106; Reed Tr. 55-64). As noted above, There is no requirement within AFD that any officer be certified as to any specialty unit or be a paramedic. (Bunner Tr. 21-22, 37-38). Moreover, no Lieutenant or Captain can supervise any of these units unless they are assigned to them. (Hiltbrand Tr. 63; Feeman Tr. 45-46; Gaiser Tr. 12-15; Reed Tr. 53). Jacobs did not know that no officer in AFD was required to have any specialized unit certification in order to hold rank. (Jacobs Tr. 47-49). Plaintiffs each testified that questions relating to these specialized units have no value in measuring the abilities of a prospective officer. (See, e.g. Santee Tr. 59; Howe Tr. 107; Triola Tr. 60).

• the inclusion of questions on both ranks' tests relating to tools that AFD does not

use or maintenance procedures that no officer is required to perform.  (Howe Tr. 68;
Reed Tr. 55; Crawford Tr. 15, 33).  Testing for tools not used by AFD was nothing more
than a reading comprehension test.  (Combs Tr. 41).  Plaintiffs each testified that
questions relating to tools AFD have no value in measuring the abilities of any
prospective officer.  (See, e.g. Santee Tr. 58-59; Crawford Tr. 66).

•       the technical knowledge test did not include a single question from the Rules &
Regulations of AFD, even though knowledge of the Rules & Regulations is of critical
importance in the performance of the duties of either rank.  (Combs Tr. 38; Snyder Decl.
¶39; Gaiser Tr. 75; Howe Tr. 13-14).  This is a pretty big miss.  The omission was
apparently a failure of AFD to provide the Rules & Regulations to Jacobs, but no
explanation has been provided as to how Jacobs' missed this, if its job analysis was really
adequate.  (Howe Tr. 49-50).  Indeed, previous promotional examinations had 10-12
questions drawn from the Rules & Regulations.  (Howe Tr. 14).

•       the use of a written work sample as part of the Lieutenant's test was included
supposedly based upon the job analysis.  (Jacobs Tr. 94-96).  However, no Captain nor
Lieutenant candidate has ever been required to write such a document in their entire
careers at AFD, which has no internal communications forms nor requirements at all.
(Feeman Tr. 45; Schueller Tr. 51, 56, 63-64; Santee Tr. 60; Reed Tr.68).  In fact, most
communications are oral or via e-mail.  (Schueller Tr. 64; Santee Tr. 71).  When advised
that no AFD Lieutenant ever has to write a memorandum such as the one included in his
examination, Jacobs responded: "I don't care."  (Jacobs Tr. 101).

•       the incident command scenario for the Lieutenant's examination was far beyond

what a company officer would experience on AFD, as testified by virtually every Lieutenant candidate. (See, e.g. Santee Tr. 61-62; Chapman Tr. 23; Reed Tr. 20). In fact, the scenario actually administered in the Lieutenant's test was the very one reviewed by Chief Hiltbrand that was supposed to be administered for the rank of Captain. (Hiltbrand Tr. 25, 58).[4] Even more incredible is that the scenario actually presented facts that violated AFD's own Standard Operating Guidelines (SOGs). (Chapman Tr, 24-25).[5]

• the technical knowledge test had but "a couple"of questions relating to incident command of medical responses – even though medical responses constitute 85% of the active runs for AFD. (Gaiser Tr. 64). Moreover, there were several questions that were asked were medical treatment questions, which are not issues for any company officer – who does not even have to be a paramedic to hold rank. (Gaiser Tr. 16-20; Howe Tr. 121; Reed Tr.56-57; Crawford Tr.70). No explanation has been provided as to how the job analysis justified so few multiple-choice questions – mostly treatment related, at that - when medical runs comprise 85% of the operational runs of the department. Jacobs was not aware of AFD's actual run experience, or even that AFD operated combination units. (Jacobs Tr. 91-92).

• The SOGs themselves were "old" and needed "overhauled." (Snyder Decl. ¶36, 37; Hiltbrand Tr. 61-62). As such, they are seriously out of date and often incorrect or contain contradictions, including many provisions that simply do not apply to AFD. (Feeman Tr. 47-48; Harvey Tr. 83-84; Howe Tr. 68; Snyder Decl.¶¶36, 37). In fact, the SOGs were largely plagiarized from outside reference materials several years ago and

---

[4] There was only one restaurant fire incident command scenario administered – and that was at the rank of Lieutenant -- the scenario that all the Lieutenant candidates assert as being more towards a higher rank.
[5] Brenda Chapman is assigned to AFD's Training Academy.

have never been seriously revised since.  (Howe Tr. 119-120). Jacobs was not aware of this, but admitted that this would "compromise" the exam. (Jacobs Tr. 68).  Plaintiffs expressed repeatedly how questions relating to outdated or unused SOGs have no value in determining who would be an effective officer.  (see, e.g. Schueller Tr. 58-59).  And again, no explanation has been provided as to how Jacobs missed this in its job analysis.

In reality, the test questions had little to do with the job analysis at all.  All the questions were drawn from a reference material list that was developed independently of and prior to the job analysis.  (Hinish Decl.; Combs Tr. 11).  The  reading list for the 2004 Captain's examination was little more than an updated copy of the reference list used for the Captain's examination administered 7 years earlier.  (Howe Tr. 107-108; Gaiser Tr. 57-58; Exs. 9, 10).

In short, this is what "garbage out" looks like – and it flowed directly from the slip-shod job analysis performed by Jacobs, or the "garbage in."  As repeatedly testified by Plaintiffs, the content of these promotional examinations comprised 5-10% of the overall content of the job for each rank tested.  (See, e.g., Harvey Tr. 84-85;  Feeman Tr. 56-57;  Howe Tr. 122-123; Triola Tr. 75; Crawford Tr. 15).

**2.      Administration of the promotional examinations**

But the defects of the promotional examinations do not end with the specific content of the examinations, but there are serious flaws in the  administration of the examinations, as well.  Specifically, the oral assessment exercises were permeated with inconsistencies and errors.

 Jacobs supposedly trained as the oral assessors over a day immediately prior to the examination – and it is upon this "training" that Jacobs exclusively relies to justify its

reliance upon these exercises as valid.  (Jacobs Tr. 116). Other than practice, there was no other quality assurance performed by Jacobs at all to ensure that the assessment exercises were being administered consistently or properly.  (Jacobs Tr. 116).

In fact, the assessment exercises were administered so radically different between candidates so as to cast whatever value they could have possibly had intro oblivion. Plaintiffs testified at length about their individual experiences in the assessment exercises, examples of which are presented below.  The actual exercises cannot be presented for review, since none of the oral assessment exercises were recorded in any manner, thereby making it impossible to verify the performance of any given candidate or the assessors. (Howe Tr. 37).

Regarding the subordinate conference at both ranks:

• preparation time for the candidates varied widely during the administration of the examination, with some candidates going in immediately after being taken to the waiting room while others had as much as 20 minutes additional time to prepare.  (Triola Tr. 30-33; Crawford r. 37).

• some role players were very forthcoming with the information to the candidates, while others provided little or no information at all. (Snyder Decl. ¶44-46; See, also e.g. Schueller Tr. 54-55;  Gaiser Tr. 42-44; Triola Tr. 14-15; Reed Tr. 27-28).

• some assessors did not even come close to the script provided by Jacobs for the performance of the exercises, instead freelancing responses to the candidates to the point that one role player blurted out during one candidate's assessment that the subordinate's wife was having an affair "with the milkman." (Snyder Decl. ¶40-43; Gaiser Tr. 42-44).

Regarding the group exercise at the Captain's test, the following occurred:

12

• preparation time for the candidates varied widely during the administration of the examination, with some candidates going in immediately after being taken to the waiting room while others had as much as 20 minutes additional time to prepare.  (Gaiser Tr. 47-49; Elie Tr. **).

• some candidates experienced groups that responded to them, others had groups which were totally uncooperative to the point of incessantly arguing between and among them.  (Carr Tr. **; Howe Tr. 18-20;  Triola Tr. 14-15).

• Like with the subordinate conference, some assessor groups failed to adhere to the script that Jacobs had provided to them for conducting the exercise.  (Snyder Decl. ¶¶40-41; Howe Tr. 20).

Regarding the written work sample and assessment exercises, the time to complete this exercise was reduced or changed on the date of the examination. (Chapman Tr. 66; Reed Tr. 72; Crawford Tr. 22-23).  This caused difficulties for several candidates, who had practiced – per Jacobs own instructions – applying the time constraints originally stated for that exercise.  (Santee Tr. 63; Reed Tr. 72-73; Crawford Tr. 23).  As with the other assessment exercises, time allotted for each candidate varied, as well.  (Reed Tr. 26).

Moreover, the structure of the exercises was changed on the date of the examinations, decreasing the amount of time that each candidate had to respond to questions being asked by the assessors.

**3.    Scoring of the promotional examinations**

The scoring of the examinations revealed numerous errors and inconsistencies. First, documents relating to several candidates have been simply lost by Jacobs –

apparently fairly soon after  the administration of the examinations.  (Carr Decl. ¶¶ 9-13).

Therefore, there is just no way in which Jacobs or any expert witness can confirm any the

overall results claimed by Jacobs.[6]  When there is lost data and records that renders

statistical evidence unverifiable, as in this case, genuine fact issues are raised that make

the question of disparate impact inappropriate for summary judgment.  *Phillips v. Cohen*,

400 F.3d 388, 401 (6th Cir. 2005).

Second, after the examinations had been administered but before they were

scored, Jacobs sought the demographics for the entire list of AFD promotional

candidates. (Snyder Decl. ¶10, Ex. A).  Jacobs identified those demographics as race,

gender, possibly age or seniority. (Jacobs Tr. 194).  To this date, the City's response to

this e-mail remains unproduced.[7] (Carr Decl. ¶11).

Third, even in the documents provided, however, several disturbing trends were

discovered.  Many of the assessor ratings on the ratings forms were changed.  (Snyder

Decl. ¶27-30, 32; Reed Tr. 82).  Many of the ratings on the individual assessor rating

sheets, for example, did not correspond to the ratings gridded on the optical scanned

scoring sheets for that candidate – in some cases differing by several points.  (Snyder

Decl ¶31; Carr Decl ¶15-22).  Other than complete speculation as to how this occurred,

Jacobs had no explanation for this phenomenon.  (Jacobs Tr. **).  Among the assessors in

the same panel for the same candidates on the same exercise, there were many disparities

in ratings – by as many as 3 or more points and in some cases 6 points.  (Carr Decl. ¶14-

---

[6] Plaintiffs are entitled to an adverse inference relating to these missing documents.  See, *Clay v. UPS, Inc.*
(6th Cir. 2006)
[7] Although Stacey Doty avers in her declaration that she only provided information relating to race and
gender.  Without the actual document, this testimony is nothing more than self-serving puffery.
Regardless, Plaintiffs are entitled to an adverse inference relating to these missing documents, as well.  See,
*Clay v. UPS, Inc.*  (6th Cir. 2006).

17, 24-27; see, also e.g. Schueller Tr. 53; Santee Tr. 64, 70; Reed Tr. 74-77).  Some of the comments used by assessors on the same panel in evaluating candidates on the same exercise were diametrically opposed. (Carr Decl. ¶¶14-17, 32-34; see, also e.g. Santee Tr. 64;  Howe Tr. 36-37;).  In many cases, the identical assessor comments ascribed to different candidates were rated with different scores for each respective candidate. (Carr Decl. ¶¶14-17, 24-25).  Some scoring sheets among several candidates were virtually identical.  (Carr Decl. ¶¶14-17, 28, Decl. Ex. E).  Some Oral Feedback forms had gridded responses that did not even exist for these examinations.  (Carr Decl. ¶¶14-17, 29, Decl. Ex. E).

Moreover, some ratings received by candidates were incomprehensible.  For example, in the incident command scenario for Captain, at one point they candidate is advised that they have a firefighter trapped in the fire.  With a person trapped, the fireground tactics change from defensive to offensive.  (Crawford Tr. 63-64).  Yet, the two highest ranking candidates both remained inexcusably defensive in this critical command decision – receiving high marks for the exercise.  (Crawford Tr. 65-66; Carr Decl. ¶36-39).

Unexplained in all this is how any of this could occur if the assessors were actually trained and performed as Jacobs claims.  And, of course, with no video or audio recording, there is simply no way to verify anything.  (Reed Tr. 77).

But the scoring irregularities did not end there.  After doing its initial scoring, it is undiputed that Jacobs then normed (or in the vernacular of statisticians, "standardized") the scores for the assessment exercises to adjust for group differences between assessor panels.  (Snyder Decl. ¶34).  According to Jacobs, he did this because one assessor panel

15

consistently scored its candidates higher than the other panels and the norming (standardizing) smoothed this difference.  (Jacobs Tr. 112).  There are many flaws with the logic used by Jacobs to justify this extraordinary manipulation of the scoring data.

First, it is undisputed that candidates were not scored per assessor panel.  (Snyder Decl. ¶34).  Instead, all the ratings for each candidate on a particular dimension across all the exercises were combined and then scored.  This means that there were no less than 9 assessor ratings for each dimension that were combined for each candidate; the actual panel or oral exercise involved was simply a non-factor in this process.

Moreover, if the assessors were truly independent, then there is absolutely no justification for norming the scores among the panels.  (Brink Decl. ¶96-99).  By so doing, Jacobs improperly downgraded the scores of dozens of candidates who, he claims, were independently rated using the same criteria as all other candidates, regardless of panel.

Therefore, norming the scores among panels is facially nonsensical.

But, this is compounded by Jacobs own assertions as to the purported independence of the assessors.  Jacobs claims that the inter-rater reliability among his assessors was very high based on a purported inter-rater reliability in excess of .9.[8]  For the inter-rater reliability statistic to be used with any degree of confidence, one of the "most important" assumptions is that the assessors be truly independent, that is, "were influenced in no way by the other rater."  (Johnson Tr. 163; Brink Decl. ¶97).  Ideally, independence requires that the assessors be "blinded," i.e. not even aware of the other raters' assessments.  (Johnson Tr. 9-11).  That is a huge stretch in this case, as the

---

[8] Inter-rater reliability is a statistic used to determine reliability among various raters, or in this case assessors.  As with most statistics, it ranges from 0 to 1, with 0 being low and 1 being high.

assessors sat together at the same table in the same room at the same time while making their supposedly independent ratings for each candidate after each exercise.  (Johnson Tr. 8-11; Brink Decl. ¶96).

There is evidence that, in fact, the assessors did affect each other's ratings as reflected in the hundreds of rating changes made by someone on the rating sheets; there is no documentation as to who made the changes, why or when.  (Snyder Decl. ¶27-30; Howe Tr. 34-35).  And, of course, Jacobs' norming of the scores indicates that he truly does not believe that the assessors were independent at all.

 Second, there are basic assumptions that must exist before standardization of any test scores is appropriate; these are: 1) that there in fact was a random assignment of candidates to the groups; 2) that all the group means are equal on a particular dimension; and 3) any deviation from the true scores is attributed to the assessor's input.  (Johnson Tr. 164-165).  In order to determine whether norming (standardization) of the scores was appropriate, then, Jacobs would have had to conduct some investigation into the scoring anomalies among the assessor panels to test the validity of the assumptions.  (Johnson Tr. 165).  There is no evidence in either the data sets Jacobs provided nor any of his reports that he performed any such investigation.  (Johnson Tr. 165).  As a result, Jacobs' standardization of the assessment exercise scores in this case amounted to nothing more than "a guess."  (Johnson Tr. 165).

As a result, the inter-rater reliability statistic cited by Jacobs as demonstrating the reliability of the results of the assessor's ratings is, at best, "suspicious", i.e., of questionable reliability.  (Johnson Tr. 164).

**4.      Results of the Promotional Process**

At the Captain's rank, 3 of the top 10 candidates had never served as a company officer in AFD.  (Green Tr. 63-64).  Moreover, of the top 10 candidates, 5 were black even though only 9 blacks in total had taken the Captain's examination.

At the Lieutenants rank, just the opposite effect was observed, with blacks being disproportionately ranked lower than their white counterparts.

At both ranks, younger and less senior candidates were ranked higher as a group than those candidates over 40 with longer seniority.

It is not possible to ascertain adverse impact from an examination until after all the promotions – i.e. selections -- from any given examination have been made.  (Jacobs Tr. 150-151).  In this case, the expiration date of each rank's promotion eligibility list was on April 5, 2007

Using Akron's data (Defendant's Brief, p. 5), here are the pertinent selection rates for each group involved in this litigation:[9]

*Lieutenant:*                                      *Captain:*
    Black:  15%                                      Black: 55.6%
    White: 30.8%                                     White: 21.8%
    40+: 19.4%                                       40+: 27.8%
    Under 40: 33.3%                                  Under 40: 40%

Comparison of the pertinent selection rates reveals the following selection rate comparison ratios, again using Akron's data and using the group with the highest selection rate as the denominator:[10]

---

[9]  Selection rates are computed taking the total number of the group promoted divided by the total number of the group who participated in the promotional examination process. *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005), citing  *Connecticut v. Teal, 457 U.S. 440, 448, 73 L. Ed. 2d 130, 102 S. Ct. 2525 (1982)* ("In cases involving promotion policies, the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group.")

| *Lieutenant:* | | | *Captain:* | | |
|---|---|---|---|---|---|
| Black/white | | 48.7% | White/black: | | 39.2% |
| 40+/Under 40: | | 58.3% | 40+/Under 40: | | 69.5% |

Akron promoted 28 Lieutenants and 12 Captains from the respective eligibility lists.  For the rank of Captain, the 3 candidates who had never served as a company officer, that is, commanded a line unit, were promoted.  (Green Tr. 63-64).  This serious lack of experience immediately showed up after the promotions, with one of the newly promoted Captains sleeping through a run and another who did not know the equipment on the apparatus and even tried to use a thermal imager as a gas detector on a response scene.  (Howe Tr. 115-116; Triola Tr. 54-56).  In fact, on his first day as a Captain the top ranked Captain candidate asked a Lieutenant he had outscored on the promotional examinations "how do you do this company officer thing?"  (Crawford Tr. 39).  Another Captain promotee expressed his angst at having to fill in as a company officer because "I don't know what I'm doing."  (Crawford Tr. 40-41).

Had Akron simply selected candidates for promotion at random from among the qualified personnel, it would probably have done the same or better than selecting candidates from the eligibility lists.  (See, e.g. Schueller Tr. 59;  Gaiser Tr. 93-94; Chapman Tr. 89).

**5.     Efforts by Plaintiffs to obtain documents**

Plaintiffs Bradley Carr and William Howe almost immediately started inquiring about the promotional examinations after the posting of the eligibility lists.  To this end, Carr made public records requests in June, September  and October 2005.  (Carr Decl. 5-8; Exs. 4, 5, 6).  While Akron initially turned over some documents, it simply refused to

---

[10] Comparisons in selection rates compare the selection rate of the group with the highest selection rate to that of the comparison group, in this case, by race and by age.  For example, at the Lt. rank, the selection rate for blacks was 48.7% as that of the white participants.

respond to the last 2 requests and failed to produce the critical documents relating to test construction. (Carr Decl. ¶6-7).

Ultimately, Carr filed an original action in mandamus in the Ohio Supreme Court to obtain the records as public records.  (Ex. 7).  The Supreme Court ruled that the records sought were not public records – so they remained sequestered from the Plaintiffs.

In January, 2006, Plaintiffs Carr, Howe and Elie each filed charges of race and age discrimination with the EEOC – within 300 days from the posting of the eligibility lists.  These charges were filed individually and on behalf of all others similarly situated. (Exs. 1, 2, 3).

These same Plaintiffs filed their action in Summit County Court of Common Pleas alleging state law claims only in April, 2006, seeking a TRO to prevent further promotions from the lists.  During that hearing, Akron again failed to produce testing documents.  The trial court denied this motion after Akron asserted that the Plaintiffs had an adequate remedy at law – specifically, promotion with back pay.

## III. LAW AND ARGUMENT

**A.**     **Contrary to Akron's confusing contentions, all of Plaintiffs' claims are within the applicable statutes of limitations, in each of their federal and state claims.**

**1.**     **Plaintiffs meet Title VII and ADEA limitations periods for their disparate impact and disparate treatment claims.**

Under both Title VII and ADEA, the underlying question on statute of limitations is how to determine <u>when</u> the claims accrued. – i.e., when, through the exercise of due diligence, the putative plaintiff knew or should have known that he or she had been

discriminated against.  *See, e.g.*, *Phillips v. Cohen*, 3 Fed. Appx. 212 (6th Cir. Ohio

2001), No. 994501, January 22, 2001 ("*Phillips I*").[11]

Here, there are three possible dates of accrual: 1) the exam itself,  2) the

promulgation of the eligibility list four months later, or 3) the date of the expiration of the

eligibility list.  The City attempts to argue that the date of the exam itself was the

triggering event.  There is not a single case to support this notion.  It must be remembered

that Plaintiffs are arguing under disparate impact that the testing processes s at issue

*resulted* in discrimination, and the standard for any accrual/triggering event is when

plaintiff should reasonably have known he was being discriminated against through due

diligence.  When should Plaintiffs reasonably have known the tests had adverse impact?

## 2.     At the earliest, the promulgation of the eligibility list in April 2005 was the date of accrual.

Akron's own case, *Cox v. City of Memphis,* 230 F.3d 199 (6th Cir. 2000), which

was a disparate <u>treatment</u> case in which the plaintiffs knew of cheating and intentional

discrimination <u>before</u> the promotional exam, supports Plaintiffs' position.  In *Cox,* the

Court held that the triggering event was not until the eligibility list was promulgated.  In

other words, even if one suspects problems in testing and scoring, one cannot have a

reasonable suspicion of actual discrimination until the list is actually promulgated, at the

very earliest.  *Id.  See, also, Philllips v. Cohen,* 400 F.3d at 397-398 ("*Phillips II*") (in a

disparate-impact promotional setting, the examination process is required for court

scrutiny).

---

[11] Note: *Phillips v. Cohen* comprised two separate disparate impact decisions.  The reported case of *Phillips v. Cohen,* 400 F.3d 388 (6th Cir. 2005), relied on extensively by Plaintiffs, is referred to as "*Phillips II*".  Moreover, all of the cases the cases also seem to distinguish between disparate impact and disparate treatment.  Every case relied on by Akron involved disparate treatment, and not disparate impact.

It is undisputed that Plaintiffs Howe, Carr, and Elie filed their charges timely after the promulgation of the eligibility list – and used the promulgation of the list as the "date" of discrimination.  (Exs. 1,2,3).  Moreover, these three individuals filed "on behalf of themselves and all other similarly situated."  Thus, each examination -- and each Plaintiff -- within the respective disparate impact classes also was included in the timely charges of discrimination.[12]

Akron has even conceded in its evidence that the "examinations" at issue were not single events, but an entire process.  See Affidavit of Ruth Miller, Doc. 80-36, noting the arduous process of examination, then review, then scoring, then appeals, then final computations, then final report by tester.  This is illustrated well by the fact that Akron and E.B. Jacobs took nearly four months to actually generate an eligibility list.

Thus, there can be no question that all of the Plaintiffs were timely filed, under the "single filing rule."  *See, e.g., Lusardi v. Lechner*, 855 F.2d 1062, 1077 (3rd Cir. 1988) (individuals can rely on the named plaintiff's timely charge if the charge give notice of potential class discrimination); *Naton v. Bank of California,* 649 F.2d 691, 697 (9 Cir. 1981) (same). [13]

The lone issues are whether Akron had "notice" of the potential claims, and that the plaintiffs relying on the single charge must have been affected by the same discrimination that the original filing plaintiff had endured.  See *Tolliver v. Xerox Corp.*,

---

[12] Howe and Carr, Caucasian Lieutenants, filed timely charges on age and race in the Captain's exam; Elie, an African-American Firefighter, filed his charge alleging race and age discrimination in the Lieutenant's exam.  Thus, each Plaintiff and each examination has been properly exhausted administratively.
[13] A class action need not be filed in order to be preserved; any individual in the charge class can rely on it. *Id.*

918 F.2d 1052, 1058 (2nd Cir. 1990), *cert denied,* 499 US. 193  (1991).  Both are clearly

met here.

### 3.    It is reasonable to use the expiration of the list in this instance to apply the limitations period, based on the City's use of the "Rule of Three" promotional process.

There is almost no case law on point that discusses what is the date of accrual for

disparate impact promotional examination cases.  The Sixth Circuit has noted there is a

dearth of case law, and applies it in the disparate <u>treatment</u> context only.  See *Cox,* 230

F.3d at 203-204 (declining to apply a "continuing violation" theory to a disparate-

treatment case where the plaintiffs knew of <u>discrimination prior to the exam</u>, and also

acknowledging that there was no law on point at that time in such case-by-case

determinations).

The doctrine of "continuing violations," as explained in *Cox*, cannot be used to

remedy mere effects of a single past discriminatory act.   In *Cox,* as in any other case

found by Plaintiffs to address the issue, the issue was not disparate impact, but treatment.

More importantly, the case involved *rank ordering.*  Such is not the case here.   In this

case, Akron relies, by charter, on the "Rule of Three" promotional system, as set forth in

the EEOC charges of every Plaintiff, as well as in all of the complaints at issue and

documents proffered by Akron.  (Exs. 1, 2, 3).

Unlike rank-ordering the "Rule of Three" involves subjectivity and interviews.  It

is explained in the affidavit of Ruth Miller and elsewhere in Akron's proffered records.

Unlike rank ordering, the Rule of Three injects a question of subjectivity, and it is not

apparent to any candidate that s/he is even going to be considered for promotion,

regardless of his or her score in the examination process or rank on the eligibility list.

23

In short, the required 4/5[th] s Rule showing discrimination *could not* be determined until after the promotions had all been made off the list, which cannot be known until after the list expires.

**4.      The City of Akron deliberately withheld the testing documents that might indicate to Plaintiffs that the process was actually *discriminatory,* and, thus, (*arguendo*), the doctrine of equitable tolling applies in this case.**

As shown above, because Plaintiffs Howe, Carr and Elie filed on behalf of themselves and all others, all federal discrimination claims at issue are preserved. Regardless, they would be entitled to equitable tolling under these circumstances.

The Supreme Court has held that the 300-day period of limitations for filing a charge with the EEOC "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  According to the Sixth Circuit:

> In determining whether the equitable tolling of the EEOC filing period is appropriate in a given case, we have consistently taken into consideration the following five factors:
> 1) lack of notice of the filing requirement;
>  2) lack of constructive knowledge of the filing requirement;
>  3) diligence in pursuing one's rights;
>  4) absence of prejudice to the defendant; and
>  5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement for filing his claim. ****
> The five factors considered in deciding whether to equitably toll a limitations period are not comprehensive, nor is each of the five factors relevant in all cases. The decision whether to equitably toll a period of limitations must be decided on a case-by-case basis.

*Amini v. Oberlin College*, 259 F.3d 493, 501 (6th Cir. 2001) (citations omitted).

It is undisputed in this case that Plaintiffs, after seeing some persons lesser qualified being promoted per the "Rule of Three," sought no less than three public records requests from Akron, filed a TRO action in 2006 in state court to halt further promotions, and also filed an action in mandamus in the Ohio Supreme Court to attempt

to unearth the records that might show the test was tainted and do due diligence to establish a prima facie case of discrimination in disparate impact. (Exs. 4, 5, 6, 7).

Although one need not anticipate a defendant's defenses in a lawsuit or charge, one must still have the diligence to anticipate a prima facie case.  See, e.g., *Lewis v. City of Chicago*, 528 F.3d 488, 494 (7th Cir. 2008) ("To file a [discrimination] suit, you need only have a prima facie case").

The City could have cooperated in producing records or entering a protective order, but declined to do so.  Thus, it cannot claim prejudice or argue that Plaintiffs did not first attempt to exercise due diligence in determining if there was actual discrimination.  It is axiomatic that under a "Rule of Three" promotional system with ongoing and subjective interviewing processes, one cannot establish a prima facie case until the promotional process is completed.   Moreover, it is irrelevant that the City in fact promoted according to rank order of candidates on the list; the law does not require the plaintiffs to be clairvoyant, and Akron admits it employed the Rule of Three, despite the rank-ordering of promotions in this particular year.

 Thus, equitable tolling would apply in this situation, even had Plaintiffs not timely filed otherwise.  Regardless, their discrimination claims are timely under any analysis.

**6.      Plaintiffs' Ohio race discrimination claims under R.C. 4112.02 and 4112.99 are timely filed under the 6-year statute of limitations.**

Akron does not take issue that Plaintiffs are entitled to file disparate impact and treatment claims under R.C. 4122.02 and 4112.99.  For race claims, whether treatment or impact, the statute of limitations is six years.  See *Cosgrove v. Williamsbsurg of*

*Cincinnati Mgmt.Co.*, 70 Ohio St. 3d 281 (1994). This fact cannot be – and is not – disputed under any applicable Ohio law.

**7.      Plaintiffs' Ohio age claims are timely under R.C. 4112.14 and 4112.99; in addition, Plaintiffs are not required to elect "remedies" between the two statutes at this time, due to pending case law in the Ohio Supreme Court.**

It is undisputed that Ohio R.C. 4112.14 affords a six-year statute of limitations. *See  Morris v. Kaiser Engineers, Inc.*, 14 Ohio St.3d 45  (1984), para.2 of the syllabus; *Camardo v. Qualchoice, Inc.*, 2005 Ohio 1860 (Ohio Ct. App., Cuyahoga County Apr. 1, 2005) (same).  Thus, under R.C. 4112.14, Plaintiffs' claims are timely.

Moreover, Plaintiffs need not "elect" remedies between 4112.14 and/or 4112.02 and 4112.99 at this time.   Currently, R.C. 4112.99 has a six-year statute of limitationsa nd provides full remedies.  However, as noted in footnote 4, this issue is now before the Ohio Supreme Court.

In *Leininger v. Pioneer Natl. Latex,* 115 Ohio St. 3d 311, 2007-Ohio-4921, the Supreme Court of Ohio stated that section 4112.99 affords full remedies for age discrimination and <u>is not subject to the election scheme</u> for other age claims found in R.C. 4112.08 (which only requires election in age claims between 4112.05, 4112.02 and 4112.14).  It stands alone, and nothing prevents Plaintiffs from filing pursuant to it *and* 4112.14 *or* 4112.02.

Other courts, relying on *Leininger,* have found both a six-year statute of limitations, full remedies, and no requirement of election under R.C. 4112.99 for age. See, e.g., *Meyer v. UPS,* 174 Ohio App. 3d 339, 348 (Ohio Ct. App., 2007).[14]

---

[14] *Meyer* is currently up on appeal, on a grant of *certiorari*, before the Ohio State Supreme Court:  *Meyer v. UPS*, 118 Ohio St. 3d 1432 (2008).  Briefing in that case is ongoing, and oral arguments have not yet been made.  Thus, regardless of any other provision, election is not required at this time, until *Meyer*  is decided and the Supreme Court and rules that either election is required under 4112.99, or not for age claims.  Thus,

Further, while Plaintiffs admit the plain language of both R.C. 4112.08 and

4112.14 require an election between those two statutes, there is no specification of

precisely <u>when</u> the election must be made.  Because R.C. 4112.08 requires that the

Chapter be construed liberally, then pending the decision in the Ohio Supreme Court in

*Meyer*, Plaintiffs should be required to elect between any of these statutes <u>only</u> after the

Court has determined with finality the issues at hand.

This is the prudent road, particularly since age claims in Ohio are analyzed
similarly under the law.  The lone question in the election issue is <u>remedies</u>.  Plaintiffs
respectfully suggest that this election be delayed until there is more certainty in the law,
which is pending.  Delay at this stage protects Plaintiffs' substantive rights (to the fullest
remedy available), and does no violence to the decision of the merits of any state age
claim for the purposes of summary judgment.

## B.    DISPARATE IMPACT

### 1.    Analytical Framework for disparate impact

The Supreme Court has devised a three-part burden-shifting test to determine

whether an unlawful disparate impact exists in any particular case. *Isabel v. City of*

*Memphis*, 404 F.3d 404, 411 (6th Cir. 2005), citing *Albemarle Paper Co. v. Moody*, 422

U.S. 405, 425, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975). First, the plaintiff must establish

a prima facie case of discrimination--i.e., the plaintiff must establish that an adverse

impact has occurred. If the plaintiff succeeds, the employer must show that the protocol

in question has "a manifest relationship to the employment"--the so-called "business

justification." *Id,* citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 432 (1971). Akron

attempts to show this by claiming the examinations are "content valid."  If the employer

succeeds, the plaintiff must then show that other tests or selection protocols would serve

the employer's interest without creating the undesirable discriminatory effect. *Id*. citing

---

Plaintiffs are free to proceed under both theories of age discrimination until *Meyer* is definitively decided
Indeed, there may be no required election at all; certainly, there is not one currently.

*Albemarle,* 422 U.S. at 425, 432.  Akron makes no argument at all as to alternative methods.  Therefore, all Plaintiffs disparate impact claims must proceed to trial.

Akron wrongly argues that it merely has a "burden of production" to show business necessity, including that the tests are content-valid, adequate job-analyses were done, the tests <u>substantially predict</u> the required job performance for the particular position, the tests were properly administered, properly scored, properly validated, etc. This is simply not true.  Akron is relying on the outdated case of *Police Officers for Equal Rights v. City of Columbus,* 916 F.2d 1093 (6th Cir. 1990).  But this case predates the 1991 Civil Rights Act, which requires the business necessity (process) to be proved via a burden of *persuasion.*

As noted in *Phillips* 400 F.3d at 397- 398 ("the [1991] amendments also clarified that if plaintiff meets [the prima facie case], the burden of persuasion, not just burden of production shifts to the defendant…" )  Thus, Akron must prove, <u>by a preponderance of the evidence</u>, that the entire testing process meets the various burdens of proof under business necessity, i.e. that the testing procedure has a "manifest relationship" to the employment in question.  *See, also, Nash v. Consolidated City of Jacksonville,* 895 F. Supp. 1536, 1545 (M.D. Fla. 1995) (same) [citations omitted].  And to meet its burden, the employer has several high hurdles to overcome, as discussed more fully below in the Content Validity section.

The business necessity doctrine is very narrow. *Nash v. Consolidated City of Jacksonville*, 895 F. Supp. at 1545, citing *Parson v. Kaiser Aluminum & Chem. Corp*., 575 F.2d 1374, 1389 (5th Cir. 1978). An employer does not meet its burden of establishing the job relatedness of a test by merely showing a rational basis for the test.

*Id*, citing *Fisher v. Procter & Gamble Mfg. Co*., 613 F.2d 527, 544 (5th Cir. 1980), cert.

denied, 449 U.S. 1115, 66 L. Ed. 2d 845, 101 S. Ct. 929 (1981). It must be validated by a

demonstration that the examination is "appropriate for the selection of qualified

applicants for the job in question." *Id* citing *Washington v. Davis*, 426 U.S. 229, 247, 48

L. Ed. 2d 597, 96 S. Ct. 2040 (1976).

**2.      "Reverse" Discrimination – Captain's Test**

Akron asserts that Plaintiffs have pleaded reverse discrimination disparate impact

claims.  This is simply false.  Plaintiffs have never asserted that any of their disparate

impact claims are "reverse discrimination" claims.  This is because there is no such thing.

Akron attempts to improperly fuse a reverse discrimination disparate treatment

analysis on Plaintiffs' disparate impact claims.  To do this, Akron relies upon disparate

treatment reverse discrimination cases.  See, *Sutherland v. Michigan Dept. of Treasury,*

344 F.3d 604 (6th Cir. 2003); *Golden v. Town of Collierville*, 167 Fed. Appx. 474 (6th Cir.

2006).  These disparate treatment cases require a white plaintiff to prove that the

employer is the unusual employer who would discriminate against the majority.  As noted

above, disparate impact claims do not require a showing of intent.

Therefore, a test demonstrating an adverse impact on hiring of members of ***any***

***race*** or ethnic group is considered "discriminatory" unless it is "validated" in accordance

with the guidelines. 29 C.F.R. § 1607.3(A). *Gonzales v. Galvin,* 151 F.3d 526, 529 (6th

Cir. 1998). [emphasis added].  "Any race" means just that.

**3.      Expert Witnesses**

Much of the evidence in this case relating to the promotional process comes from

expert witnesses.  Competing expert opinions present the "'classic battle of the experts'

and it is up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d at 399 citing *Cadmus v. Aetna Cas. & Sur. Co., 1996 U.S. App. LEXIS 29443, 1996 WL 652769 (6th Cir. Nov. 7, 1996)* (unpublished) (citation omitted).

Dr. Robert Johnson, Plaintiff's statistical expert, has testified in fire promotion cases before.  See, *Luke v. City of Cleveland*, US District Court Case No.: 1:02 CV 01225 (ND Ohio, Judge Gwin).  Dr. Kyle Brink is currently employed by the Jefferson County Personnel Board in Birmingham, Alabama, preparing, administering and scoring promotional examinations since 2002.

Dr. Jeanneret was excluded as an expert in *Johnson v. City of Memphis,* 355 F.Supp. 2d 911 (W.D. Tenn. 2005), for making unfounded conclusions.  Dr. Jacobs is defending his own work.  "Where it is the test maker himself who is trying to defend his conclusions, 'studies so closely controlled by an interested party in litigation must be examined with great care.'"[15]  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 433 (1975).

**4.      Prima Facie Case**

A prima facie violation of the Act may be established by statistical evidence showing that an employment practice has the effect of denying members of one race equal access to employment opportunities. *Connecticut  v. Teal,* 457 U.S. 440, 450 (1982), citing *New York Transit Authority v. Beazer*, 440 U.S. 568, 584 (1979).  A prima face case is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. *Isabel v. City of Memphis*, 404 F.3d

---

[15] It is Plaintiffs contention that neither Dr. Jeanneret nor Dr. Jacobs can testify as expert witnesses in this case.  This is presented in Plaintiffs' motion in limine regarding the expert witnesses.

at 411, citing *Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994).

Moreover, expert statistical evidence in disparate impact cases is not to be considered in a vacuum, as the only evidence permitted to meet plaintiffs' prima facie case; it must be considerd "in light of all the evidence in the record".  *Phillips v. Cohen*, 400 F.3d at 401, citing *Bazemore v. Friday's* 478 U.S. 385, 401, 92 L.Ed.2d 315, 106 S.Ct. 3000 (1986).

It is undisputed the specific employment practice in this case is the promotional selection process.  As shown below, Plaintiffs have also established through relevant statistical evidence that there is an adverse impact.

**5.     4/5s Rule**

The 4/5s Rule is expressly found in the EEOC Guidelines.  29 C.F.R. 1607.4(d). As a starting point, the EEOC Guidelines specify that a selection rate for members of a particular race, sex, or ethnic group will not generally be evidence of adverse impact unless that rate is less than four-fifths of the rate for the group with the highest rate. See, *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S. Ct. 2777, 2789, 101 L. Ed. 2d 827 (1988); 29 C.F.R. 1607.4(D).

Contrary to Akron's assertion, the Sixth Circuit does not view the 4/5s Rule with caution.  Rather, it has been expressly embraced as the starting point for determining adverse impact.  *Isabel v. City of Memphis*, 404 F.3d 404, 412 (6th Cir. 2005).  Other statistical analysis can be used, as well, to demonstrate adverse impact in the absence of a 4/5s Rule violation.  See, e.g. *Id.* at 412. ("Thus, the determinative question in this case is whether we may look to alternative statistical analyses--the T- and Z-tests--to find an

adverse impact."); *Johnson v. City of Memphis*, 355 F.Supp. 2d at 915 ("The EEOC
Guidelines note that the four-fifths rule is not the only evidence to consider. "Smaller
differences in selection rate may nevertheless constitute adverse impact where they are
significant in both statistical and practical terms…." ); *Black v. Akron*, 831 F.2d  131, 134
(6th Cir. 1987).

So, while statistics can be used to determine adverse impact in the absence of a
4/5s Rule violation, they cannot be misused to ignore a 4/5s Rule violation altogether and
be substituted in its place – which is precisely what Akron invites this Court to do.

Jacobs concedes there are 4/5s Rule violations at both ranks for race.  (Jacobs Tr.
145).  Akron spends much effort in trying to evade the Uniform Guidelines, asserting that
the 4/5s Rule cannot be used due to a small population size.[16]  Therefore, so Akron's
logic goes, reliance upon its statistical analysis -- which suffers from the same flaws to an
even higher degree than the 4/5s Rule, and more – is proper to determine adverse
impact.[17]  There is ample evidence that indicates that Akron's statistical analysis is
seriously deficient.

The statistic Akron relies upon is Fisher's exact.  Although, it must be noted that
Dr. Jacobs failed to include any statistical adverse impact analysis at all in his final
report; the use of Fisher's exact is solely in Dr. Jeanneret's analysis.  Fisher's exact is a
form of statistical testing that is generally referred to as "null hypothesis testing."  Null
hypothesis testing is a hotly debated topic in behavioral science.  (Brink Decl. ¶¶32).

---

[16] Jacobs even testified that 4/5s Rule was used in the UGES because they did anticipate other statistical
tests at the time they were written.  (JacobsTr. 146).  This is utterly false. See, Johnson Decl.¶7-16).
[17] Akron misleads by stating that Dr. Johnson conceded that his lack of statistical analysis was a
"weakness."  A correct reading of the testimony passage cited readily reveals that Dr. Johnson was
referring to what he perceived to be Akron's line of argument as to his not performing a statistical analysis.
Dr. Johnson clearly stated that use of statistics in this case would be too unreliable due to the small sample
sizes involved.  (Johnson Decl. ¶39-41).

Indeed, Jeanneret cites no resource for his use of this statistic, but in the face of the recent (2008) peer-reviewed study that indicates that Fisher's exact will yield inaccurate results as to adverse impact with populations of this size, it is inappropriate.[18] (Brink Decl. ¶¶50-52). Moreover, the Fisher's exact lacks sufficient power in this case to be accurate as a measure of adverse impact. (Brink Decl. ¶52; Johnson Decl. ¶33, 36).

It must be noted that Akron and its experts totally ignore the fact that use of statistics with small sample sizes are even more unstable and should not be used for top-down decision selection models – like the promotional process used in Akron. (Brink Decl ¶¶6, 35-38, 52; Johnson Decl. ¶22, 26).

Moreover, with sample sizes like those found in this case, the 4/5s Rule actually has advantages over statistical analysis. (Brink Decl ¶23-32). Statistical tests are likely to have far less power than the 4/5s Rule and in this case are far more likely to be incorrect than the 4/5s rule. (Brink Decl. ¶26, 30). For example, the power analysis of the statistical analysis used by the City at the Lieutenant rank is .2 – which means that any decision made based on the statistics has an 80% probability of being wrong.[19] (Brink Decl. ¶¶28, 29; Johnson Decl. ¶¶33, 36).

Even so, using chi-square, a traditional statistical method used to determine adverse impact, a statistically significant difference exists for race at the Captain rank. (Brink Decl. ¶¶80). While not very strong and the absence of statistically significant adverse impact is meaningless, this evidence is still cumulative to the 4/5s Rule violation to show adverse impact.

---

[18] OFCCP does recommend use of Fisher's exact, but only when the total number of candidates is less than 30 with a frequency of 5 or less – a condition that does not exist at either rank. (Brink Decl. ¶44).
[19] Currently, no statistical analysis is really complete without a power analysis, which is a measure of the reliability of the statistic being relied upon. NIH grant requests require a power analysis as part of the submission, for example. (Johnson Decl. ¶18).

6.      **The promotional selection process in issue**

As noted above, the selection rates for each of the Plaintiff groups in this case is less than 80% that of the group with the highest selection rate, otherwise known as the "4/5s Rule".  (Johnson Decl. ¶5).  Therefore, Plaintiffs have established a prima facie case of disparate impact based upon both race and age at both ranks.  See, 29 C.F.R. 1607.04(D).

Akron misleads the Court by contending that in determining 4/5s Rule violations, this Court must focus on pass rates rather than actual selection rates.  Notably, the Sixth Circuit has expressly held that selection rates are the proper method of computing adverse impact, something Akron has to know as the Sixth Circuit did so in  *Black v. Akron,* 831 F.2d 131, 134 (6th Cir. 1987) ("The 4/5 rule, by its own clear words, applies to selection rates, not rejection rates. This is because the selection rate is the statistic which is important to the applicants and which best measures the likely motivations of the employer. If, for a very competitive job, an employer chose 5 % of the white applicants but only 1 % of the black applicants, this significant disparity would flunk the 4/5 test based upon selection rates").

This was recently confirmed yet again by the Sixth Circuit.  *Philips v. Cohen*, 400 F.3d at 399 (in promotion cases, the "relevant inquiry" is comparing actual promotions to those seeking them).  See, also,  *EEOC v. Joint Apprenticeship Comm. Of the Joint Indus. Bd. Of the Elec. Indus.*, 186 F.3d 110, 120 (2nd Cir. 1998)("Finally, we reject JAC's contention that the appropriate statistical inquiry would have focused on a "pass ratio"); *Cotter v. City of Boston*,  323 F.3d 160, 170 (3rd Cir. 2003); *Stout v. Potter*, 276 F.3d 1118, 1122 (9th Cir. 2002) ("A prima facie case of disparate impact is "usually

accomplished by statistical evidence showing 'that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants.'").[20]

Use of the selection rates is also required by the Uniform Guidelines.  (Brink Decl.¶¶ 4, 5).

**7.     Burden Shifts to Akron to prove that the selection process has a manifest relationship to the employment, i.e., the promotions**

**a.     Content Validity**

In this case, once the Plaintiffs have established a prima facie case, Akron has to show by a preponderance of the evidence that these examinations are "content valid." Content validity is one of the methods that can be used to demonstrate the validity of any given examination and is the method chosen by Jacobs.  See, 29 C.F.R. 1607.  (Uniform Guidelines on Employee Selection, referred to herein as "Uniform Guidelines" or "UGES").  Moreover, even if Akron could carry this burden of persuasion, it has the independent burden of persuasion of proving that rank-ordering promotions is "necessary under the circumstances."

Akron has not even addressed these burdens, instead incorrectly asserting that it has a mere burden of production rather than a burden of persuasion.

Initially, it must be noted that content validity "is not an all or nothing thing, it comes in degrees.  A test may have enough validity for making gross distinctions

---

[20] The reason for this is fairly easy to demonstrate.  Assume that a promotional test has 120 candidates; 100 white and 20 black, all of whom pass the examination.  The black candidates, however, are exclusively ranked in the bottom half of the eligibility list.  If the employer only promotes up through number 60 on the eligibility list, no blacks would be promoted at all despite their passing the examination.  Under the City's fallacious logic, this examination would pass muster regardless of the fact that virtually no blacks were actually selected for promotion at all -- simply because the pass rates for both groups are the same. Obviously, this is an absurd perversion of the selection rate computation.

between those qualified for a job, yet may be totally inadequate to yield passing grades that show positive correlations with job performance." *Guardians Ass'n of the New York City Police Dept. v. Civil Service Comission* 630 F.2d 79, 100 (2nd Cir. 1980).[21]

[It is well-settled that the five criteria for content validity are:] 1) the test-makers must have conducted a suitable job analysis; 2) they must have used reasonable competence in constructing the test itself; 3) the content of the test must be related to the content of the job; 4) the content of the test must be representative of the content of the job; and 5) the test must be used with a scoring system that usefully selects from among the applicants those who can better perform the job. *Fickling v. New York State Dep't. of Civil Service*, 909 F.Supp. 185, 190 (SDNY 1995), citing *Guardians*.

There is sufficient evidence in the record from which a jury could determine that Akron can meet none of these elements.  As shown above, by Jacobs own admission, he performed a perfunctory job analysis from canned information that there is abundant evidence had gaping holes in determining what AFD line officers do and inaccurately defined much of what they do perform.

There is also ample evidence that a jury could determine that Jacobs failed to use reasonable competence in constructing the test itself, from its canned preconceived notions in its job analysis and test structure to the improper Lieutenant incident command scenario and last-minute insertion of the written work sample.  Also, it is undisputed that Jacobs failed to even minimally pilot test any of the questions to ensure that the questions were comprehensible and unambiguous, which is another defect in test construction.  See, *Guardians*, 630 F.2d at 96.

---

[21] *Guardians* is cited with approval by the Sixth Circuit.  See, e.g. *Gonzalez v. Galvin*, 151v F.3d 526, 533 (6th Cir. 1998)

To be valid, successful performance on a selection test must "bear a *demonstrable* relationship to job performance. *Gonzalez v. Galvin*, 151 F.3d 526, 533 (6th Cir. 1998) [emphasis in original].  In this case, the knowledge assessed by the examinations was not representative of the knowledge domain.  (Brink Decl.¶95).  Even by Jacobs own data, he failed to test for substantial portions of the content of the positions.  (Brink Decl. ¶94).  This is further aggravated by the numerous questions that failed to address any of the skills for an officer or omitted critical functions.  There is abundant evidence that the promotional examinations actually tested a nominal amount of the content of the rank being tested, which is consistent with the number of questions involving specialized units, tools not used by AFD, questions from SOGs that are often incorrect and outdated, assessment exercises that presented situations not encountered by officers using tactics that contradicted AFD practices and SOGs, using a written work sample that no officer ever has to do, and so on.   Finally, Jacobs failed to link any of the items on the written test to work behaviors, as required by the Uniform Guidelines. (Brink Decl. ¶93).

And, there is no way Akron can rely upon Jacobs scoring of these examinations with the rampant number of changes, errors, inconsistencies and flat-out fabrications – all of which lack any form of documentation..

Moreover, a stronger case for content validity exists when the selection method approaches the actual working conditions.  (Jacobs Tr. 99-100).  Obviously, the paper-and-pencil technical knowledge examination does not come close to actual working conditions of being a firefighter.  The assessment centers fare little better, especially

when the actual content does not reflect the functions that an officer even does, like the Lieutenant's written work sample and incident command scenario.

**8.      ADEA**

**a.      Plaintiffs have set forth a prima facie case of age discrimination under ADEA and Ohio law, and Akron has not even addressed its burden of persuasion in proving the examination results fit into a Reasonable Factor Other than Age.**

Akron's first attack fails, as it relies on the same misapplication of the requirements for any prima facie case in a disparate impact case.  As Plaintiffs have amply demonstrated previously, Plaintiffs have established a prima facie case of adverse impact in age, as well as race.  As argued previously, this is shown in fact that the examinations also show a 4/5[th]s Rule violation in age.

Moreover, with is misguided Title VII and Ohio disparate impact arguments, Akron continually conflates the theories of disparate treatment and impact.  Plaintiffs will say it again: *disparate impact does not require proof of intent.*  During the depositions of Plaintiffs, Akron counsel continually asked for legal conclusions that were objected to.  In Akron's motion it erroneously attempts to rely on unnamed Plaintiffs' claims of "evidence" of <u>intent</u>.  This is absurd when the very nature of disparate impact is that it is a facially neutral policy.

Akron next argues that Plaintiffs have not "isolated" the specific employment practices forming the basis of their disparate impact age claims.  (Motion at 23).  This is false.  Clearly, Plaintiffs are taking exception to, and have identified, the examinations, as well as the particular components that caused the disparate impact.   Moreover, Akron's contention is belied by *Smith v. City of Jackson,* 544 U.S. 228 (2005), in which the Court specifically stated that mere generalized policies such as a RIF [or a promotion system] is

38

insufficient.  However, the Court noted that isolating a specific test is sufficient.  *Id.,* at 241.  Here, Plaintiffs have clearly set forth the specific practices at issue.

Second, Akron has not even bothered to set forth its affirmative defense of "Reasonable Factor Other than AGE" [RFOA], which is required to prevail.  *Meacham v. Knolls Atomic Powers Lab*, 2008 LEXIS 5029; 76 U.S.L.W 4488.  While it is reasonable to have a promotional system, as well as use examinations, it is not reasonable for any examination or neutral practice to lean more heavily on older, rather than younger firefighters.  Because of the errors, oversights, and underlying invalidity of this particular testing process and components, Akron could never meet its burden of persuasion of an RFOA.  The tests and their impact simply are not reasonable.

An analogous case that cites *Meacham,* is *Henry v. Milwaukee County*, 539 F.3d 573 (7th Cir. Wis. 2008).  Although the case was under Title VII, it involved a BFOQ defense for isolation of corrections workers.  The court found disparate impact and failure to meet the BFOQ affirmative defense, relying on *Meacham*. The court also argued that, "Employers also bear the burden of proving that they could not rearrange job responsibilities or otherwise eliminate the clash between the business necessities and the employment opportunities of female officers."

Because Akron has failed to even argue its burden of persuasion under ADEA disparate impact, the claim should go to trial, as Plaintiffs have clearly made out a prima facie case.

**C.     PLAINTIFFS' DISPARATE TREATMENT CLAIMS**

**1.     Defendant Akron has failed to carry any of its burdens for summary judgment on plaintiffs' claims of disparate treatment under Title VII, ADEA and Ohio claims.**

As set forth earlier, Plaintiffs not only have disparate impact claims, but also disparate treatment claims based on age and race under both federal and state applicable laws.  It is well settled that, in any analysis, federal law regarding summary judgment applies.  The U.S. Supreme Court and Sixth Circuit have both consistently held that summary judgment <u>cannot</u> be granted in which the defendant [Akron] has failed to carry its initial burden for a substantive dispositive motion.

The seminal case is *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), in which the Court held that a defendant cannot merely broadly make a sweeping and conclusory claim that a plaintiff cannot make his case.  Rather, "the moving party must establish that there is no genuine issue of material fact as to <u>each</u> <u>element</u> of [each Plaintiff's] claim, and this initial burden must be satisfied "whether or not the nonmoving party responds." *Essex Ins. Co. v. Merrill*, 1995 U.S. App. LEXIS 35494, 5-6 (6th Cir. 1995), citing *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992).

The extent and nature of the movant's burden was well-explained in *Williamson v. Ga. Dept. of Human Resources & Georgia Regional Hospital*, 150 F. Supp.2d 1375, 1377-1378 (D. Ga. 2001) (citations omitted and emphasis added):

> The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.   How to carry this burden depends on who bears the burden of proof at trial.  If the movant bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." On the other hand, if the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. **Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  A**

> **mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient.**
>
> If – and only if – the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrating that there is indeed a material issue of fact that precludes summary judgment.". . . . If the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden.[22]

Akron's Motion for Summary Judgment on Plaintiffs' disparate treatment claims is virtually non-existent.  There are 29 Plaintiffs in this complex case, all of whom have disparate treatment claims under either race or age theories, and under both federal and state law.  Akron has not challenged a single named Plaintiff under Title VII, ADEA or any state claim, other than to argue, collaterally, about admissibility of ageist remarks in the case (dealt with in the next Section of this Brief)  Indeed, Akron spends all of two paragraphs arguing in favor of summary judgment on the disparate treatment claims of at least 20 Plaintiffs.

Nor can Akron attempt to sneak around its burden as movant by fallaciously relying on the "promotional examination" and candidates' rankings on it as an excuse for disparate treatment, or imply the candidates were not qualified.  (See, Defendant's Brief at 27).  In other words, Akron attempts to rely on the very tests that are at fault in this case and unreliable.  This begs the question and is logically fatal. [23]

---

[22] In the instant case, it is undisputed that the movant – the City – while paying lip-service to "individualized proof," never challenged a single Plaintiff.  As a matter of law, then, Plaintiffs therefore were not required to present individualized rebuttal to the City's brief.

[23] Moreover, even if the tests were valid, manipulation of -- or reckless disregard in -- constructing, administering and/or scoring examinations or promotional systems can be used as evidence of discriminatory intent as well as impact.  See *Dunlap v. TVA*, __ F.3d __, 102 FEP

Further, Akron has failed in its burden to challenge each Plaintiff's case. Thus, Akron fails utterly in carrying its burden of informing this Court of the basis for judgment and as to whom should be dismissed, which claims, and why. (Notably, Akron's counsel labored over depositions of each of the Plaintiffs in this case.  Though all were filed, the duty to inform this Court in the motion itself of deficiencies in the record is fatal)   Plaintiffs need not tailor any response to a non-existent and non-particularized challenge.  *Willliamson, supra.*[24]

Thus, summary judgment on these disparate treatment claims, and as to the individual Plaintiffs who raised the claims in their Amended Complaint, must be denied.

## 2. The ageist comments in this case are admissible, and not "hearsay," regardless of whether they are direct evidence or circumstantial.

While not challenging the underlying claim of any individual Plaintiff, Akron goes to great length (and impermissible single-spacing) to argue that: 1) any ageist comments by fire officials and testers in this case are "inadmissible hearsay" and 2) they are not direct evidence of discrimination, citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007).[25]

_____

Cases 1538 (6th Cir. 2008), (No. 07-5381).  *See, also, Nash v. Consolidated City of Jacksonville,* 895 F.Supp 1536, 1541 (M.D. Fla. 1995) ("Evidence of a disproportionate impact is relevant to the question of intent since an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"); *Duncan v. Fleetwood Motor Homes of Indiana, Inc.,* 518 F.3d 486, 492-93 (7th Cir. 2008) (defendant in ADEA action cannot blame outsourced agency or attempt to deflect liability under a guise of being unaware of the agency's actions).

[24] Indeed, it is reversible error to grant summary judgment without first determining that the movant had met his burden under Rule 56.  See *Walker v. Russell*, 1997 U.S. App. LEXIS 2326, 4-5 (6th Cir. 1997), citing *Carver v. Branch*, 946 F.2d at 454-55; *Essex Insurance Co. v. Merrill*, 1995 U.S.App. LEXIS 35494, 5-6 (6th Cir. 1995), citing *Wilson v. City of Zanesville*, 954 F.2d at 351 (6th Cir. 1992).  *See, also, Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (also noting the alarming number of courts misinterpreting *Celotex* and misapplying rule 56(c)).

[25] Notably, Blair found virtually all of the comments admissible and  equivocated as to whether some of the admissible comments were direct evidence, noting tension in the Circuit and older cases (never

Ironically, *Blair* is quite helpful to Plaintiffs and fatal to Akron's arguments of "inadmissibility." As *Blair* makes clear, there is no preference under the law between direct and circumstantial evidence; they are qualitatively equal routes to the same destination. *Id.,* 505 F.3d at 526. [26]

*Blair* also reversed the trial court's wrongful exclusion of nearly all of the ageist remarks in that case, finding all of them admissible on behalf of the plaintiff under various theories. [27] This is in keeping with the Sixth Circuit tradition of broad admissibility of relevant evidence by superiors and of the work climate in general. *See, e.g., Robinson v. Runyon,* 149 F.3d 507, 512 (6th Cir. 1998); (citing to liberality in admissibility of discriminatory animus and atmosphere).

Akron also fails to apprise this Court of the recent Supreme Court case of *Sprint v. Mendelsohn,* __ U.S. __, 128 S.Ct. 1140 (2008), which recently held:

> The question of whether evidence of discrimination by other supervisors is relevant to the individual ADA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.

*Id. Mendelsohn* makes clear that the closeness of the comments – as in this case, such as leaving a "legacy" of younger firefighters – is clearly relevant and important for credibility determinations by a jury. *See, also, Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1289-1290 (11th Cir. 2008) (utterance of slurs by officials of company admissible for relevance, *even by non-decisionmakers*).

---

overturned y an *en banc* panel) probably dictated the analysis. However, the Court concluded in *Blair* that it did not have to resolve that "conundrum" since the plaintiff was already by the prima facie case under either direct or circumstantial evidence theories. *Id.,* 505 F.3d at 525-526.

[26] As noted previously Akron fails in its initial burden to show that Plaintiffs cannot make out a *prima facie* case under either theory. Nor has it bothered to articulate any legitimate nondiscriminatory reason(s). Rather than pointing to evidence, Akron spends an inordinate amount of time quoting law, but not applying it.

[27] Akron further misstates the testimony of Jeff Layne, who was told directly by an assessor that one of the factors considered was the age of the candidates.

43

It also should be noted that none of the Plaintiffs' testimony about ageist comments is intended to prove the truth of the matter.  <u>None</u> of the Plaintiffs believes he or she is too old to do the jobs for which they are qualified and denied promotion.  Thus, such comments are not hearsay because they are not offered for the truth of the matter asserted. As *Blair* held:

> By definition, only out-of-court statements offered to prove the truth of the matter asserted are hearsay. FED. R. EVID. 801(c). Blair offers Tsolis's April 2001 statement <u>for that fact that it was said</u>, not to prove that Blair was actually too old to work the Ford account. Accordingly, this statement is not hearsay because it is not being offered for the truth of the matter asserted.

*Blair*, 505 F.3d at 524 (emphasis added).  In other words, Akron's reliance on "inadmissibility" of such statements is misguided and incorrect.  Moreover, the comments that were made by superiors to subordinate officers and firefighters are likewise admissible under Fed. R. Evid 801(D)(2)(d), where they were made by superior officers.  *Id.*  Such comments –even by non-decisionmakers – are admissible under 801(d)(2)(D).  The "decisionmaker" issue only (and marginally, given the split in the 6th Circuit) goes to the question of whether the evidence is direct or circumstantial.

In the instant case, Akron cannot get around the fact that former Chief Gladman made numerous age-related comments and wanting to leave his "legacy" of having younger "guys" in the Department.  (Harvey Dep. At 14, 15).  Moreover, the comments by exam assessors during the examination also are probative and admissible as evidence of age-related decisions.  These persons were key and controlling agents in high-stakes promotional testing.  As persons who participated with the authority and blessing of Akron in the decision-making process, then their attitudes and comments about age and

44

white hair are relevant.  These comments were aimed directly at, or referenced, the Plaintiffs asserting age claims.

Ironically, Akron makes note of one assessor's comment on the "white hair" of a candidate/officer, saying it is meaningless.  (Motion at 26).  Yet, a reasonable juror could conclude that that affected the assessor's views and grading.  See *Ash v. Tyson Foods, Inc.,* 126 S.Ct. 1195 (2006) (use of word "boy" is jury issue to be viewed in context of the facts of the entire case).

Akron also ironically notes another assessor's comment to an examinee that "age was important to him because he wanted more senior officers."  (See Def. Motion at 26, citing Harvey Depo. at 14, 15).  Yet, Akron just doesn't seem to get it.  Regardless if one exam assessor is preferring age or any other protected status, this only further proves that there was bias in the examination process, and that the exams were tainted.  Combined with the other comments raised by Akron, age is a factor in the process – at least a reasonable juror could conclude as such.  Thus a factfinder at trial is needed to sort out these issues with credibility assessments and weighing the evidence in this complex case.[28]

As stated previously, Akron has not even challenged the Plaintiffs even at the *prima facie* level on age or race under Title VII, ADEA, or Ohio.   This Court need not determine whether the comments are evidence of direct or circumstantial evidence; the comments proffered in the record are admissible.    They are not being offered for the

---

[28] Akron also seems fond of referring to the race of several of the players and persons involved (Chief Gladman,  Virginia Robinson, etc.), noting when they are African-American.  As the Supreme Court held in *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998), there is no presumption that one member of a group cannot discriminate against another member of the same protected group.  Indeed, Akron's focus on these non-issues shows it is basing at least some of its own arguments on both race and age.  Such stereotyping lies at the very heart of disparate impact and treatment cases.  See *County of Washington v. Gunther,* 452 U.S. 161 (1981) (discrimination "includes the entire spectrum of disparate treatment of men and women resulting from [] stereotypes").

truth of the matter (i.e., that Plaintiffs are too old to do their jobs anyway, per *Blair),* nor

moreover, several also are admissible pursuant to Rule 801(d)(2)(D).

In short, because Akron has made no viable challenge on the disparate treatment

claims, summary judgment, again, must be denied, and all non-hearsay and/or hearsay-

excepted comments are clearly relevant and must be admitted.

**3.      Section 1983, Equal Protection, and "Class of One"**

**a.      Akron's own affidavits establish a custom, practice or policy underlying the
         City's consistent use of promotional examinations that affected the classes of
         employees including the Plaintiffs.**

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-695 (1978), the Supreme

Court held that public entities are not immune from suit under 1983 ("it is when

execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent  official policy, inflicts the

injury").  *Monell* involved female public employees who were subjected to a policy or

practice of forced leave during pregnancy.  In reversing dismissal of their claims, the

Court declared that Section 1983 covers "every person" deprived of civil rights under the

law.

As with the situation in *Monell,* here there are classes of persons denied

promotions and added seniority because of a clear custom and/or practice of use of a

battery of tests from outside consultants for the purposes of high-stakes promotional

testing.  This instance is no different.

The issue here is Equal Protection, and any individual who is deprived of civil

rights under the color of state law can sue under Section 1983, so long as s/he can meet

strict scrutiny analysis for race, or rational basis analysis for age.  It is axiomatic that

anyone deprived of civil rights can sue a governmental entity under Section 1983, not merely racially protected classes.[29]

Akron also is wrong that Equal Protection actions based on race receive only rational scrutiny.  In *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 132 L. Ed. 2d 158, 115 S. Ct. 2097 (1995), the Supreme Court held that "any person, of  whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." 515 U.S. at 224.

Only age claims under the Equal Protection  clause are subject to rational scrutiny, since age, while a statutorily protected class, is not considered protected under the Fourteenth Amendment, and so a lower level of scrutiny is applied.  See *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) ("age is not a suspect classification under the Equal Protection Clause").[30]

Further, under an Equal Protection theory, the examinations at issue are so faulty and void, that they bear no rational relation to the promotional jobs in question.  This is particularly so in that neither Akron nor Jacobs seems to be aware of essential issues in the testing processes at issue; further, documents are missing and development and scoring errors were prevalent, as set forth in the disparate impact section of this Brief.

---

[29] Akron's lone citation for the proposition that persons cannot sue under Equal Protection for age is the unreported case of *Ross v. City of Gerard,* 194 F.3d 1313 (Table).  This cursory and non-controlling opinion merely affirms dicta and cites to no law whatsoever.  Thus, it lacks authority for such a proposition, which is contrary to 1983.

[30] Akron's explanation of the "Class of One" is confusing, but irrelevant.  The five Plaintiffs under 40 – who are not protected by ADEA – are free to sue under 1983 regardless (they do not fit into any race category).  The under-40 Plaintiffs are Santee, Plavrakis, Yoxthimer, Jaggers, Briggs, Alestock and Hagan.  They are suing on behalf of being deprived of seniority and the fact that persons similarly situated who took the examination, who had lower seniority and were lesser-qualified, were promoted over them.  Thus, even under a "Class of One" theory, others similarly situated, but with lesser seniority, were promoted over them.

As noted previously, Akron again does not single out a single individual and only mentions Snyder and Geiser, Plaintiffs who were promoted (but who lost seniority to lesser-qualified persons promoted above them).  Thus, under the Summary Judgment standard set for the *Celotex,* Akron again has failed to carry its initial burden.

Moreover, Akron can hardly rely on an invalid test to argue that all Plaintiffs have failed to state a claim because they were not promoted.  Again, this begs the question. Under either theory under Section 1983, Akron's arguments fail.


       Respectfully submitted,

       */s/ Dennis R. Thompson*
       Dennis R. Thompson #0030098

       */s/ Christy B. Bishop*
       Christy B. Bishop #0076100
       Thompson & Bishop
       2719 Manchester Road
       Akron, Ohio 44319
       330-753-6874
       330-753-7082 (facsimile)
       tmpsnlaw@sbcglobal.net

       ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

A copy of the foregoing was sent to Patricia Rubright and Michael Defibaugh, Attorneys for the City of Akron, via ecf electronic notification this 29 day of September, 2008.


       */s/ Dennis R. Thompson*
       One of the Attorneys for Plaintiffs

**STATEMENT CERTIFYING PAGE LIMITATIONS AND TRACK ASSIGNMENT**

I, Christy B. Bishop, one of the attorneys for Plaintiffs, hereby notify this Court and certify that this case is set on a Complex Track.  I further certify that the undersigned petitioned this Court, and received permission, for extra pages, due to both the complexity of this case and the fact that the Defendant in several instances used single spacing. This case also has numerous complex and intricate claims and issues.

I further certify that this Brief in Response to Defendant's Motion for Summary Judgment adheres to the page limitations permitted by this Court.

Respectfully submitted,

/s/ Christy B. Bishop
Dennis R. Thompson, Ohio Reg. No. 0030098
Christy B. Bishop, Ohio Reg. No. 0076100
Thompson & Bishop
2719 Manchester Rd.
Akron, Ohio 44319
330-753-6874
Fax: 330-753-7082
e-mail: tmpsnlaw@sbcglobal.net
           bishopchristy@gmail.com

**CERTIFICATE OF SERVICE**

A copy of the foregoing was filed and served, via the Court's ECF system, this 29 day of September, 2008.

/s/ Christy B. Bishop
One of the Attorneys for Plaintiffs