IN THE UNITED STATES DISTRICT COURT
FOR THE NORTERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WILLIAM HOWE, et al, ) | CASE NO.: 5:06 CV 2779 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | JUDGE ADAMS |
| ) | |
| CITY OF AKRON, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF GREGORY L. SNYDER

1. I am a firefighter on the City of Akron Division of Fire.
2. I was promoted to the rank of Lieutenant in August, 1995.
3. I have personal knowledge of the information and events contained in this declaration, which I make under penalty of perjury.
4. I participated in the promotional examination for the rank of Captain administered by the City of Akron in December 2004.
5. The results of that examination were posted on April 4, 2005.
6. I was ranked number 13 on the Captain's eligibility list.
7. The eligibility list was effective for two years and expired on April 4, 2007.
8. Candidates for the rank of Captain were promoted up to number 12 on the eligibility list; I was not promoted to the rank of Captain.
9. As part of this litigation, I reviewed thousands of documents relating to the Captain and Lieutenant's examinations, including the assessor notetaking forms, consolidation/rating forms, promotional rating forms (optical scan scoring sheets), written work samples, oral board feedback forms, the final report issued by EB Jacobs, LLC, and other documents relating to the promotional examinations; all of this information was provided by the City of Akron or EB Jacobs through either public records requests or discovery in this case.
10. An e-mail dated October 29, 2004 from Ruth Miller in Akron's Personnel Department to Chief Charles Gladman was a confirmation that the Consultant needed the Chief to meet with the assessors on December 4, two days before the start of the oral board tests. The stated purpose of the meeting was for the Chief to advise the assessors as to "what types of people you are looking to promote to lieutenant and captain." (Exhibit U)
11. If by the date of December 4, 2004, the oral exercises, assessor instructions, and dimensions to be evaluated had already been completed, I am concerned as to how EB Jacobs could influence the test and its results in order to select the "types of people" that the Chief was "looking to promote." (Exhibit U)

12. An e-mail dated December 14, 2004 from Joe Hinish of EB Jacobs to Ruth Miller, requested a database of candidate demographics, to include "race, gender, etc." December 14 was four days after completion of the assessment exercises, and *prior* to the scoring and combining of the test components. (Exhibit A)
13. Rick Jacobs stated in his deposition that in the December 14, 2004 email, the "etc." in "race, gender, etc." might have referred to age or years of service.
14. In an e-mail dated February 18, 2005 from Joe Hinish to Ruth Miller and Stacey Doty, Mr. Hinish wrote; "Incidentally, the adverse impact looks very good." This email was sent six weeks before the lists were posted, and without knowledge as to the number of promotions that would be made off of the lists. (Exhibit B)
15. In section F in the Final Report titled "Examination Component Weighting Determination." (pages 14-15), EB Jacobs writes; "The job analysis data were the primary factor considered when determining component weights for each examination." The split for Captain obtained from the job analysis was 43.5% for abilities (oral boards) and 56.5% for technical knowledge. EB Jacobs disregarded the results of the job analysis and, instead, recommended a split of 66% for oral boards and just 34% for technical knowledge. (Exhibit C).
16. In fact, before the job analysis had even begun, EB Jacobs already planned to place heavy weighting on the assessment center phase of the test. EB Jacobs' proposal to the City, dated June 10, 2004, stated "Our plan is to include a variety of critical abilities in the assessment center exercises thereby allowing us to place heavy weighting on the assessment center phase of the examination process." (Exhibit D).
17. I reviewed an email dated September 20, 2004 from Joe Hinish to Ruth Miller that discussed what EB Jacobs believed to be the best design for the oral assessments. A written work sample for Lieutenant candidates was not part of the recommendation. The written work sample was later chosen as a "Plan B." As a Lieutenant, I have never been required to write a document like the written work sample and there is no justification for choosing this type of exercise, especially since the job analysis for Lieutenant placed "written expression" next to last among all the possible dimensions. (Exhibit E, F)
18. I compiled a summary of the information provided by EB Jacobs and prepared graphs and summaries using this information.
19. As to the ranking of the Captain's examination participants, I prepared a graph showing how candidates were ranked on the oral assessment exercises, indicating race and years of service. (Exhibit G – Dep. Ex. 123).
20. The graph shows all black candidates in green; white candidates who were hired before 1989 in grey, and white candidates hired in 1989 and after in yellow. (Exhibit G).
21. Out of the nine black candidates who took the Captain's examination, six scored within the top eight positions of the oral assessment exercises. (Exhibit G).
22. Out of the nine white candidates who were hired in 1989 and later, five scored within the top eleven positions of the oral assessment exercises. (Exhibit G).
23. None of the white candidates who were hired before 1989 received a score that placed them in the top eleven positions of the oral assessment exercises. (Exhibit G).
24. I prepared a summary of the average raw scores by assessor, as well. (Exhibit H - Dep. Ex. 125).

25. This summary corroborates the fact that senior white candidates were scored lower as a group than lower seniority whites and all black candidates. (Exhibit H).
26. The results of the oral assessment exercise contrast with the results of the technical knowledge examination, which show a far more random distribution of scores for the Captain's candidates. (Exhibit I – Dep. Ex. 124).
27. I have reviewed my own Consolidation/Rating Forms, and have noticed several issues relating to the scoring. For example, my scores relating to some dimensions on the subordinate conference appear to have been changed (Planning & Organizing, Resource Management; Assessors 38 & 39); there is no documentation as to why, how or even who made these changes. (Exhibit J).
28. The changed scores on the consolidation/rating forms sometime appear to be in a different handwriting style. For example, the Planning & Organizing dimension for the subordinate conference has a rating of "4" that is clearly different in form from the number "4" used directly above it in Judgment & Decision Making. (Exhibit J).
29. I reviewed the Consolidation/Rating forms for each of the candidates and there are hundreds of examples where the assessor ratings were changed on those forms. Some examples are attached (Exhibit K – Dep. Exs. 137, 138, 139).
30. There was virtually no documentation provided by either the City of Akron or EB Jacobs that supported or verified why, when or who made these changes.
31. There are also many examples where the assessor ratings on the Consolidation/Rating Forms were incorrectly transferred to the Promotional Rating Forms (optical scan sheets) (Exhibit L – Dep. Exs. 140, 142, 143, 144).
32. There are also instances of erasures and changes made to the promotional rating sheets. (optical scan sheets) One of my scores for Resource Management shows evidence of having been changed from a "5" to a "4" to a "3."
33. I also reviewed the assessor comments on the Consolidation/Rating Forms. Some assessors gave different scores to different candidates despite the fact that their relevant behaviors were the same for that dimension; a brief summary of some of these discrepancies is noted in the attached (Exhibit M - Dep. Ex. 119).
34. EB Jacobs standardized oral scores due to the observation of panel differences, when, in fact, the assessors did not score as a panel, but instead, were instructed to score independent of the other members of the panel.
35. I cannot understand how it is possible to rank order off of a testing process when the process was different for each candidate. Because the assessors did not follow their scripts, the oral scenarios varied widely. Some assessors gave different scores to different candidates even though the candidate's relevant behaviors were the same. It is unclear if any two candidates were subjected to the same testing process.
36. Many of the Standard Operating Guidelines (SOGs) contained in the Operations Manual are outmoded, outdated or simply irrelevant. For example, number 1. in the section titled "During the Fire" (Section 700.00 - p. 11-12) refers to a method of connecting to the intake of a standpipe that has not been used by AFD for 18 years. Number 4. instructs firefighters to take "two sections of 2 ½-inch play pipe with shutoff and proper size tip" into buildings equipped with a standpipe system. This has *never* been the policy of AFD. The section concludes by stating "the elevator should stop at the floor below the fire…" It has been AFD's procedure for more than 15 years to stop *two* floors below the fire. (Exhibit N – Dep. Ex. 127).

37. The AFD Operations Manual includes other outdated policies, such as an outdated FMLA policy. (Exhibit O – Dep. Ex. 128).
38. The AFD Uniform Manual was distributed to the candidates in two different versions, resulting in question 75 being omitted from the technical knowledge test. (Exhibit P - Dep. Ex. 130, 131)
39. The Akron Fire Department Rules and Regulations were omitted from the technical knowledge exam because the City failed to provide a copy to the testing company.
40. I reviewed the scripts that the assessors were supposed to follow in conducting the oral assessment exercises. (Exhibit Q - Dep. Ex. 134), (Exhibit R - Dep. Ex. 135).
41. In my Group Meeting exercise (Day 1), one role player followed the script, another role player followed only portions of the script, while the third role player followed almost none of the script, making up most of his portion of the exercise. (Exhibit Q)
42. In my Subordinate Conference exercise (Day 2), the role player did not follow a single part of the script. He made up the entire exercise. (Exhibit R)
43. During the candidate orientation, Joe Hinish from EB Jacobs stated that the assessors would follow a script and that "They're not going to make things up."
44. When I entered the room for my subordinate conference exercise, two of the assessors would not shake my hand or look up from the table.
45. During this subordinate conference exercise, the role player was argumentative and combative, even rising out of his chair and leaning towards me; I frequently was not permitted to respond to the role player as he kept interrupting me and asking me the same question repeatedly, regardless of my answer to him.
46. I thanked the assessor panel as I was exiting the subordinate conference room. The two assessors who were seated continued to look down at the table and did not respond. The assessor who had been the role player laughed.
47. At the City's request, each assessor was provided an AFD annual report prior to the administration of the examinations. Five of the Captain's candidates were pictured in the report. Four of the five were subsequently promoted to the rank of Captain.
48. EB Jacobs assessor recruiting plan states; "We need to recruit from similar sized departments in the range of 200-700 uniformed personnel." All nine assessors used for the Captain's exam were from departments larger than Akron's. The departments were, on average, twice the size of the Akron Fire Department. (Exhibit S)
49. Four of the nine assessors were from departments that exceeded the recruiting range of 200-700; Fort Worth, Texas (881), Cincinnati, Ohio (828), Dallas, Texas (1,670), and San Diego, California (1,153)
50. I computed the monetary value of a promotion for myself to the rank of Captain. (Exhibit T - Dep. Ex. 147).
51. The promotion to the rank of Captain has an economic value of $254,472.00 over my expected lifetime. (Exhibit T).
52. The rate of increase between ranks is 16%, or about $11,000 per year for Captain and $9,500 per year for Lieutenant.

_Greg Snyder_
Greg Snyder

_September 29, 2008_
Date