IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT, OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM HOWE, et al, | ) | CASE NO: 5:06 CV 2779 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN ADAMS |
| | ) | Magistrate Judge James Gallas |
| CITY OF AKRON | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE
EXPERT TESTIMONY OF DRS. JACOBS AND JEANNERET**

Plaintiffs object to Drs. Jacobs and Jeanneret being offered as expert witnesses in this case and move this court for an order in limine precluding their testimony. Neither Dr. Jacobs' nor Dr. Jeanneret's testimony regarding the promotional examinations in issue are very reliable, due to lack of underlying knowledge, lack of review of pertinent information, misuse of methodology and lack of support for the methodology used.

Because the question of reliability is an admissibility requirement governed by Rule 104(a), a proponent must do more than simply make a prima facie case on reliability. While the proponent does not have to prove to the judge that the proffered expert testimony is correct, she must prove to the judge by a preponderance of the evidence that the testimony is reliable. *In In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995).

After *Daubert,* any distinction between methodology and its application is no longer viable. An expert who has sound methodology but who has misapplied it in the case should not be permitted to testify. *Daubert* provides that "any step that renders the

1

analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id.*

**A.  Dr. Jacobs lacks knowledge, credibility and reliability of his own examination process, and his methodology is unreliable.**

**1.  Dr. Jacobs fails as an expert for his lack of knowledge about the development, administration, and grading of his own examinations, as well as procedures in the Akron Fire Department.**

As an initial matter, Dr. Jacobs is attempting to testify as an expert defending his own firm's work.  While this alone may not be sufficient to disqualify Dr. Jacobs as an expert, it does raise a pall of suspicion as to the credibility and reliability of his testimony for lack of independence and objectivity.

This is further exacerbated by Dr. Jacobs' admitted lack of knowledge about the development, administration, and scoring of his own examinations.  This is borne out by his testimony regarding his lack of knowledge of the testing in this case,  as well as lack of knowledge of the Akron Fire Department [AFD] in general.

For example, in deposition,ptes Dr. Jacobs testified:

Q: What was your understanding as to performance evaluation ratings or any candidate before they could take the exam?
A: I would guess like many other departments that Akron has some formal regulation that's very rarely used.
Q: So I guess you don't know?
A: I don't know for certain.  I don't know that anybody – it was not brought to my attention that anybody was refused admission to the testing process.  (Jacobs Tr. 32, Doc. 106).

In another part of his deposition, Dr. Jacobs testified:

Q: That's correct.  Because no captain or lieutenant in the City of Akron Division of Fire has to be a fire inspector; is that not correct?
A: I don't know.  Based on – I would say no, because if that were the case, they would have taken the entire duty off the list and they did not.

2

Q: Do you know what kind of inspections is expected to be done at the company level?
A: I do not. (Jacobs Tr. 47, Doc. 106).
Q: How about for fire prevention inspector, are you aware that they have to be certificated by the state?
A: I am not aware of that, but that doesn't surprise me. (Jacobs Tr. 48).

In fact, no Captain or Lieutenant is required to have a fire inspection certificate to hold rank, yet Dr. Jacobs included several fire prevention inspection questions on his promotional examinations.

Indeed, due to the lack of verifiable documentation, Dr. Jacobs was reduced to "speculating" about how the few subject matter experts his firm did manage to interview determined to include fire prevention inspections as an item that should be tested. (Jacobs Tr. 51, Doc. 106).

\*\*\*

Q: Well, you're familiar that, for example, HAZMAT requires state certification at the technician level to be able to be a HAZMAT technician?
A: That's probably the case.
Q: Well, do you know that or do you not?
A: I do not know that, but I would imagine it's true. (Jacobs Tr. 48, Doc. 106).

In fact, no Captain or Lieutenant is required to have a HAZMAT technician certificate to hold rank, yet Jacobs included several HAZMAT technician level type questions on his examinations.

Dr. Jacobs also testified:

Q: Well, are you aware whether in Akron you have to be a paramedic to be either a lieutenant or a captain?
A: I am not aware of the requirement. (Jacobs Tr. 49, Doc. 106).

In fact, no Captain or Lieutenant is required to be a paramedic to hold rank, either, yet Jacobs included several treatment-related paramedic questions on his examinations.

\*\*\*

3

Q: ….So you're saying based on the SME's, they told you that it was so important that you put four questions regarding dive team on the written examination?
A: I would say that the body of knowledge that is included in the dive team information was something that the SME's pointed to as being somewhat important. (Jacobs Tr. 50, Doc. 106).
Q: Where do you see the dive team on the importance ratings for the job analysis here?
A: I do not see dive team here. (Jacobs Tr. 54, Doc. 106, when discussing his Appendix D to his final report, which sets forth the "importance ratings" for the critical tasks based upon his job analysis).

In fact, no Captain or Lieutenant is required to be certified as a scuba diver or be a member of the Dive team, yet Dr. Jacobs included several Dive Team questions on his promotional examinations.

While Dr. Jacobs included questions about disassembly of a pump as part of apparatus maintenance, he was totally unaware of the fact that no firefighters are allowed to perform apparatus maintenance (Jacobs Tr. 66, Doc. 106).

\*\*\*
Q: Are you aware whether Akron even has a form for communicating up and down the chain of command?
A: I don't know that for a fact. (Jacobs Tr. 62, Doc. 106).
Moreover, Dr. Jacobs did not know that the AFD's old Standard Operating Guidelines [SOGs] are almost universally recognized within AFD as being outdated and including material that AFD no longer uses or relies on. Yet, these outdated SOGs formed one of E.B. Jacobs' primary sources for test questions (Jacobs Tr. 68, Doc. 106).

When challenged that there were <u>no</u> questions on the examinations about all-important AFD Rules & Regulations, which are necessary for any fire officer to know when in command, Jacobs denied that he had overlooked including such questions. (Jacobs Tr. 72, Doc. 106). He was wrong and contradicted by the testimony of virtually every Plaintiff in this case, as well as the examination questions themselves. In short, Dr.

4

Jacobs' answer makes clear that that he was entirely unaware of even what Akron's Rules & Regulations are and that he only "assumed" that his item writers had the information – and used it. (Jacobs Tr. 72, Doc. 106). The item writers did not. The question then becomes, how can Dr. Jacobs opine with any authority as to the development of the actual test and its underlying validity?

Jacobs relies heavily upon the supposed work performed by the SME's , yet was likewise was unaware that some of the handful of SME's, such as like Chief Hiltbrand, were not even paying attention while performing as SME's; their minds were on other things. (Jacobs Tr. 53, Doc. 106; Hiltbrand Tr. 27-28 Doc. 113).

In addition to the above examples, the record is replete with examples of Dr. Jacobs' lack of knowledge. (Jacobs Tr. 104-105, 126-128, 133, 140, 192-193, Doc. 106). Without having even this basic underlying knowledge, it is impossible to imagine how Dr. Jacobs can reliably express an opinion on much of the issues essential to proving content validity of the examinations in this case.[1]

Though his firm conducted the examination, it admittedly used a canned task analysis "off the shelf," and used an outdated 1994 job description to a handful of firefighter subject matter experts [SMEs] from Akron, asking them to cross out or scribble in any changes. Dr. Jacobs had little – if anything -- to do even with that inadequate aspect of the testing process – yet an aspect so vital to proving content validity of his own examinations.

It is undisputed that the reading/reference list was prepared prior to the actual "job analysis" being done, that is, before Dr. Jacobs supposedly knew what the tasks or

---

[1] Given the requirements of personal knowledge for lay witness testimony, Dr. Jacobs cannot even serve as a fact witness, as he lacks such abundant personal knowledge as to not meet the requirements of Rule 56© and (e).

5

duties being tested for would be. In short, the job analysis in this case is little more than window dressing, more akin to an afterthought, intended to put an unreliable stamp of credibility on an already irrevocably flawed testing process.

Indeed, after listening to his testimony and recurrent refrain of "don't knows", Dr. Jacobs was finally challenged as to how he could even express an opinion in an expert report when "there is so much information about this exam you don't know?", Dr. Jacobs' response was that his "expert" opinions are largely based on knowing about the "characteristics by which [each test] was constructed," and knowing "who participated in the construction of the exam," and his having "confidence in their abilities." (Jacobs Tr. 126, Doc. 106). In other words, he substituted his subjective beliefs about his staff and their abilities for an actual review of the work performed.

Dr. Jacobs clearly was not adequately familiar with the underlying data, the nature of AFD's operations and the test items generated by his firm, the administration and scoring. As such, his testimony as to the validity of these examinations is completely unreliable.

**2.     The lack of documentation on key issues renders any report by Dr. Jacobs unreliable, prejudicial, and also supports an adverse inference in favor of Plaintiffs.**

It is axiomatic that an expert must opine on sufficient and complete underlying data – particularly where he is attempting to defend his own work as an "expert." It is nearly impossible to be able to falsify or confirm (thus rendering the data unreliable) the error rate, due to the admitted lack of documents that have turned up missing in this case and are unaccounted for by E.B.Jacobs.

6

Plaintiffs are entitled not only to an adverse inference that the missing documents would have benefited them, they also assert that Jacobs cannot attempt to provide a complete data set when so many items and documents are missing.

### 2. Dr. Jacobs used faulty methodology.

Jacobs employs inappropriate or improper methodology in his analysis. For example, Jacobs completely misapplies the Uniform Guidelines' Rule of One (N+1 or the flip-flop rule). (Brink Decl. ¶4-16, 41-43, 57, 68-69, 86-89, Doc. 100; Johnson Decl. ¶6, Doc. 101). This rule, which is explained in the Questions and Answers to the Uniform Guidelines, indicates that a sample size is too small for 4/5s Rule analysis when the selection of one more person from the lower selection group "flips" the result. (Brink Decl. ¶57-60, Doc. 100). For example, in a sample where the selection rate for the group with the highest selection rate is 50% and for the lower group it is 33% (1 selection with 3 potential candidates), the promotion of one more person from the lower group would yield a selection rate for that group of 67% -- flip-flopping the adverse impact ratio.

Such is not the situation in this case – by Dr. Jacobs and Dr. Jeanneret's own admissions. (Brink Decl. ¶4-16, 41-43, 57, 68-69, 86-89, Doc. 100). Dr. Jacobs and Dr. Jeanneret both opine – without any support or reference whatsoever between them -- that use of an N+2 or N+3 is appropriate.

There are other examples where Jacobs' methodology and opinions lack any support, except for his bare *ipse dixit* assertion for its justification. (Brink Decl. ¶68, 69, 78, 80, 86-89, Doc. 100). For example, it was entirely inappropriate for Dr. Jacobs to "norm" one assessor group's ratings – when the assessors were supposedly independent and therefore not consensus scoring. Jacobs did this without any supporting reference

7

material at all, and it calls into question the entire validity of the assessments and scoring. (Johnson Tr. 164-165, Doc. 105). Had the assessments been properly done, this would not have been deemed necessary to stamp an unreliable air of credibility on the grading process of the examinations.

However, as the Sixth Circuit has held, "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion that is connected to the existing data only by the *ipse dixit* of the expert." *Mohney v. U.S.A. Hockey, Inc*. 138 Fed. Appx. 804, 809 (6th Cir. 2006), citing *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 139 L.Ed.2d 508, 118 S.Ct. 512 (1997).

Moreover, with the numerous missing documents relating to these examinations, Jacobs' data cannot be completely verified. Sixth, with multitude of scoring changes, inconsistencies and errors, combined with the complete lack of documentation as to any rationale or reasons therefor – all of which was unknown to Jacobs – it cannot be stated that he reviewed either the data or the documentation, such as it is, as to these tests.

Finally, some of the assertions by Dr. Jacobs are just so without merit as to be ludicrous. For example, Dr. Jacobs testified that the Uniform Guidelines, drafted in 1978, relied upon the 4/5s Rule because statistical models were not anticipated. (Jacobs Tr. 146, Doc. 106). Yet, at least some the available statistical models had been around since the early 20th century and anyway, for years before the Uniform Guidelines were promulgated. (Johnson Decl. ¶7-12, 16, 17; Doc. 101). Indeed, the Uniform Guidelines even refer to other statistical analysis. 29 CFR 1607.04(D). (Johnson Decl. ¶16, Doc. 101).

Another example is Dr. Jacobs' statement in his final report that there was no adverse impact at any rank – without any statistical tests for adverse impact anywhere in this report and before a single promotion had been made – while he acknowledges that adverse impact cannot be determined "until all the promotions have been made." (Jacobs Tr. 150-151, Doc. 106). Dr. Jacobs could not explain this one. (Jacobs Tr. 150-151, Doc. 106).

Therefore, Jacobs' testimony as an expert witness lacks the requisite reliability to be admissible as it can only mislead and confuse the jury. As such, to the extent that Dr. Jacobs' testimony is offered as an expert witness, it should be disregarded by this Court.

**B.** **Dr. Jeanneret also should be disqualified for entire reliance on Dr. Jacobs' faulty report, missing data, and for use if incorrect, outdated methodology.**

Plaintiffs also object to Defendant's attempt to interject Dr. Jeanneret as an expert witness. First, Dr. Jeanneret relies almost exclusively upon Dr. Jacobs' final report and expert report in reaching his conclusions. (Jeanneret Tr. 30, Doc. ). As such, Dr. Jeanneret starts from the same hole dug by Dr. Jacobs. Second, through his own misuse of the same methodology used by Dr. Jacobs and the addition of his own errors, including his use of a statistic that results in false negative results, Dr. Jeanneret compounds the error and digs the hole even deeper. (Johnson Decl. ¶28-30, Doc. 101). Third, because Jeanneret merely bases his conclusions on Dr. Jacobs' sketchy data, the proferred testimony is merely repetitious and would merely constitute a waste of the Court's and jury's time.

First, methodologically, as noted above, Dr. Jeanneret relies upon the Fisher's

9

exact statistic to conclude there is no adverse impact.  The defects of using this low-power statistic are significant; it has an 80% chance, in this case, of being wrong.  (Johnson Decl. ¶¶ 28-38, Doc. 101).

Whether the expert's scientific technique has been tested, whether it has been subjected to peer review and its error rate are three of the factors to consider when this Court makes its reliability determination.  *Early v. Toyota Motor Co.*, 277 Fed. Appx. 581, 585 (6th Cir. 2008) [citations omitted].  In this case, Jeanneret's methodology has been tested, subjected to peer review, and has been found to have far too high a probability for error.

Therefore, the reliability of Dr. Jeannerett's testimony is so slight that it will not serve to assist any jury in evaluating the evidence in this case.

The law grants a district court broad latitude when it decides how to determine reliability of any putative expert witness.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-142 (U.S. 1999).  The test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  *Id.*

Objecting in summary judgment papers to such improper evidence is appropriate at the summary judgment stage of proceedings. See, *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480-481 (6th Cir. 2008), citing *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Taylor v. Principi*, 141 F. App'x 705, 708 (10th Cir. 2005).

**C.**     **Conclusion**

For the foregoing reasons, Dr. Jacobs and Dr. Jeanneret should be disqualified as expert witnesses in this case and be precluded from testifying as such.  All testimony offered as expert witnesses should be disregarded by this Court.

        Respectfully submitted,

        */s/ Dennis R. Thompson*
        Dennis R. Thompson #0030098
        tmpsnlaw@sbcglobal.net
        Christy B. Bishop #0076100
        bishopchristy@gmail.com
        Thompson & Bishop
        2719 Manchester Road
        Akron, Ohio 44319
        330-753-6874
        330-753-7082 (facsimile)

        ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

  A copy of the foregoing was sent to Partricia Rubright and Michael Defibaugh via ecf electronic notification this 3 day of October, 2008.

        */s/ Dennis R. Thompson*
        One of the Attorneys for Plaintiffs