1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3  WILLIAM HOWE, ET AL.,

4          Plaintiffs,        Case No. 5:06CV2779
                            Akron, Ohio
5        vs.                 Wednesday, December 10, 2008

6  CITY OF AKRON,

7          Defendant.

8                 TRANSCRIPT OF TRIAL
9         VOLUME 6, PAGES 1136 THROUGH 1325
      BEFORE THE HONORABLE JOHN R. ADAMS
10         UNITED STATES DISTRICT JUDGE

11 APPEARANCES:
   For the Plaintiffs:  Dennis R. Thompson
12                     Christy B. Bishop
                    Thompson & Bishop
13                     2719 Manchester Road
                    Akron, Ohio 44319
14                     (330) 753-6874

15                     Bruce B. Elfvin
                    Elfvin & Besser
16                     4070 Mayfield Road
                    Cleveland, Ohio 44121
17                     (216) 382-2500

18 For the Defendant:   Patricia C. Ambrose-Rubright
                    Michael J. Defibaugh
19                     City of Akron - Civil Division
                    161 South High Street, Suite 202
20                     Akron, Ohio 44308
                    (330) 375-2030
21
   Court Reporter:      Caroline Mahnke, RMR, CRR
22                     Lori A. Callahan, RMR, CRR
                    Federal Building & U.S. Courthouse
23                     2 South Main Street, Suite 568
                    Akron, Ohio 44308
24                     (330) 252-6021

25 Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.

1        WEDNESDAY MORNING SESSION, DECEMBER 10, 2008

2        (Jury in, 10:45.)

3        THE COURT:  Counsel for the plaintiff, you may

4   call your next witness.

10:46:59  5        MR. THOMPSON:  Dr. Kyle Brink, Your Honor.

6        THE COURT:  Doctor, could you approach witness

7   stand here to my right, sir.  Please remain standing while I

8   administer the oath or affirmation.

9                    KYLE BRINK,

10:47:11  10   of lawful age, a witness called by the Plaintiffs,

11        being first duly placed under oath, was examined

12                and testified as follows:

13        THE COURT:  Be seated in the witness stand, sir.

14   I have some instructions I would like to give you before we

10:47:34  15   proceed further.

16        Adjust the microphone so your testimony can be heard

17   by call the participants.  If there is an objection to any

18   question, do not respond to the question until I rule on the

19   objection.  If I sustain the objection, you will not answer

10:47:48  20   the question.  Please wait until the attorneys complete

21   their questions before you begin to respond.

22        It's difficult for the court reporters, the listeners,

23   when two individuals are speaking at the same time.

24        Listen carefully to the questions.  If the question

10:48:03  25   calls for a yes or no, respond if that fashion.  Do not

 1    volunteer any information not called for by the question.

 2    Thank you for your cooperation.

 3         Counsel, you may inquire.

 4              MR. THOMPSON:  Thank you, Your Honor.

10:48:17  5              DIRECT EXAMINATION OF KYLE BRINK

 6    BY MR. THOMPSON:

 7    Q.    Dr. Brink, would you please introduce yourself to the

 8    ladies and gentlemen of the jury?

 9    A.    My name is Dr. Kyle Brink.

10:48:25 10    Q.    And, Dr. Brink, are you employed?

11    A.    Yes, I am.

12    Q.    And currently, where are you employed, sir?

13    A.    At the personnel board of Jefferson County.

14    Q.    And let's talk a little bit about your education.

10:48:40 15    Would you please describe for the jury your education after

16    high school?

17    A.    Sure.  I went to Grand Valley State University in

18    Michigan, and I received a Bachelor's degree in psychology.

19    My major was in psychology.  My minor was a business.  After

10:48:57 20    that I went to graduate school at University of Georgia

21    before I received a master's, as well as a doctor's degree

22    in industrial/organizational psychologist.

23    Q.    For the court reporters, can you slow down a little

24    bit?  You used some big words.  Did you receive a Ph.D.?

10:49:13 25    A.    Yes, I did.

1    Q.    From where?

2    A.    University of Georgia.

3    Q.    What year was that awarded?

4    A.    2003.

10:49:18  5    Q.    And that Ph.D., what is what field, sir?

6    A.    Psychology.

7    Q.    Explain to the jury, if you would, please, what

8    is -- I guess is industrial hyphen or slash?

9    A.    Slash, either way.

10:49:38 10    Q.    What is psychology?

11    A.    It's a field of psychology that focuses primarily on

12    organizations.  It's a lot like human resource field or

13    management type of field, but we focus a little more on

14    science and on the person than on finances and benefits.

10:49:56 15        So some of the areas of study for

16    industrial/organizational psychologist would include

17    training, selection, job analysis, compensation, studying

18    humans and organizations.

19    Q.    And as part of your professional work in psychology,

10:50:17 20    have you conducted any research?

21    A.    Yes, I have.

22    Q.    And do you have your vitae in front of you?

23        MR. THOMPSON:  I think you have it, Judge, as

24    Exhibit 143.

10:50:26 25        THE COURT:  I do.  Thank you.

1   Q.    Using 143, Doctor, can you describe for the jury, if

2   you would, please, some of the research that you've been

3   involved with?

4   A.    I've done some research at the personnel board in the

10:50:40  5   area of selection, and this is research that I presented at

6   conferences.

7   Q.    Stop right there for a minute.  Conferences?  What

8   kind of conferences?

9   A.    The Society for Industrial/Organizational Psychology.

10:50:56  10   Q.    That's abbreviated SIOP?

11   A.    SIOP, S-I-O-P.

12   Q.    What other kind of conferences?

13   A.    And SIOP is our professional organization -- we call

14   ourselves SIOP psychologists because industrial organization

10:51:10  15   gets a little long, but that's the industrial organization

16   for SIOP psychologists.

17   Q.    And what papers have you presented?

18   A.    I've had several.  I chaired a symposium which is a

19   group of papers committed to a common theme related to

10:51:28  20   trying to balance maximizing diversity and validity,

21   sometimes they appear to be conflicting goals.  We offer the

22   strategies where you can try to maximize both.  That's one

23   example of a presentation.

24   Q.    Any others?

10:51:45  25   A.    Recently I chaired another symposium which again is a

1    collection of papers looking at the effects of time and test

2    validation.

3         There is a myth, an urban legend that's commonly held

4    that if you increase the amount of time that you give

10:52:00  5    applicants to take a test, that it can reduce --

6              MS. AMBROSE-RUBRIGHT:  Objection.

7              THE COURT:  Sustained.

8    Q.    This symposium that you were talking about, just

9    addressing it, what was the subject matter of that

10:52:12 10   symposium?

11   A.    The impact of time, length or test time on validity.

12   Q.    Now, explain that to the jury, if you would, please.

13   Doctor, I think you were.  This is just a prep question,

14   just, if you would, please, explain what that means?

10:52:33 15   A.    Time or validity?

16   Q.    What the subject of the symposium was?

17   A.    Okay.  We looked at whether or not time length,

18   whether it was short or long, would influence how valid a

19   test is and the extent to which group differences might

10:52:50 20   vary.

21   Q.    And why was that interesting -- or why was that a

22   subject of interest to industrial organizational

23   psychologists?

24   A.    This is a common held belief that if you increase the

10:53:03 25   amount of time you give to applicants to take a test, it may

1  level the playing field, so to speak, it may reduce group

2  differences.

3       However, we have shown, or at least our research has

4  shown this is not the case.  The differences tend to remain

10:53:15  5  steady regardless of amount of time.

6  Q.    So what you were doing is taking, I guess, a

7  hypotheses and testing a hypothesis?

8               MS. AMBROSE-RUBRIGHT:    Objection.

9               THE COURT:  Sustained.  Disregard the question,

10:53:26 10  ladies and gentlemen.

11  Q.    Was what you were doing hypothesis test?

12  A.    Yes, it was.

13  Q.    And the hypothesis was, sir?

14  A.    The hypothesis we were testing is does time have an

10:53:44 15  impact on group differences.

16  Q.    And for the jury's benefit, describe what a hypothesis

17  is?

18  A.    A hypothesis is a theory or idea that a researcher

19  would propose based on prior research, prior theory, they

10:54:03 20  would come up with a hypothesis which is simply a research

21  question.  A hypothesis might be does smoking cause cancer.

22       But once you have a hypothesis, you would collect

23  data, and would you analyze that data to try and determine

24  whether or not that hypothesis was correct.

10:54:17 25  Q.    Is that what is known as hypothesis testing?

1    A.    That's correct.

2    Q.    Dr. Brink, you said you were employed by the Jefferson

3    County Personnel Board.  Jefferson County is where?

4    A.    Birmingham, Alabama is within Jefferson County.

10:54:38 5    Q.    And how long have you been there, sir?

6    A.    Five and a half years.

7    Q.    And what do you do there?

8    A.    My job title is IO psychologist.  And I supervise a

9    team of currently four employees, and my responsibilities or

10:54:55 10    my team's responsibilities are to study jobs, conduct job

11    analyses is the term that we use, develop minimum

12    qualifications for jobs, we announce jobs, screen

13    applicants, and we also develop and validate selection tools

14    that are used to hire the applicants or candidates.

10:55:17 15    Q.    Why did you take the job at Jefferson County Personnel

16    Board?

17              MS. AMBROSE-RUBRIGHT:  Objection.

18              THE COURT:  It's overruled.

19    Q.    Go ahead.  You can answer.

10:55:28 20    A.    The reason I wanted to go to Jefferson County was

21    because it was a unique opportunities.  They were currently

22    under a consent decree at that time, and this was an

23    opportunity to have a real impact on the organization.  It

24    was a very broken organization and it was a chance for me to

10:55:45 25    use my skills to help make some real impacts there.

1144

1    Q.    When you say they were under a consent decree, explain

2    to the jury what that is?

3              MS. AMBROSE-RUBRIGHT:  Objection.

4              THE COURT:  I'll allow it.  Go ahead.  Ladies and

10:55:56 5    gentlemen, there is no issue -- there is no consent decree

6    at issue in this case.  What this witness is describing to

7    you is his background, experience, what took him to come to

8    work, as I understand it, at his current position or

9    employment.  You are to draw no inference from the fact that

10:56:14 10   in this case -- or in his circumstance, there is some form

11   of consent decree.  No consent decree at issue in this

12   matter.  With that instruction, counsel, go ahead.

13   A.    A consent decree, as I understand it, is --

14             THE COURT:  Wait a minute.  Back up.  Why don't

10:56:33 15   you ask him if he knows and understand what a consent decree

16   is first as a predicate?

17   Q.    Do you know what the consent decree was to Jefferson

18   County Personnel Board?

19   A.    Yes.

10:56:47 20   Q.    Describe to the jury?

21   A.    Due to the use of invalid selection procedures, and

22   the inability to change that and actually develop valid

23   selection procedures, the Court established oversight over

24   the personnel board to ensure that they would begin to

10:57:04 25   develop procedures that are appropriate.

1   Q.    The testing -- or the selection procedures that were

2   in use in Jefferson County prior to your being hired, did

3   they have what is known as an adverse impact?

4   A.    Yes, they did.

5   Q.    Explain that concept in the context of Jefferson

6   County to the jury, please.

7   A.    You want me to explain what adverse impact is?

8   Q.    Yes.

9   A.    Adverse impact is when this is a difference in

10  selection rates between protected classes, protected classes

11  include sex, race, religion -- the ones that are of primary

12  interest most of the time include sex and race.  So is there

13  a difference in selection rates, for example, between males

14  and females such that it adversely affects or impacts one of

15  those particular protected classes.

16  Q.    Tell the jury, if you would, please, who it was that

17  actually hired you at County Personnel Board?

18            MS. AMBROSE-RUBRIGHT:  Objection.

19            THE COURT:  It's overruled.

20  Q.    Go ahead.

21  A.    I was hired by -- at the time the personnel board was

22  under receivership so I was hired by a receiver at the time.

23  Q.    The receiver was appointed by whom?

24  A.    The federal Judge presiding over the case.

25            THE COURT:  Again, ladies and gentlemen, counsel

1   is referencing you by way of background information

2   pertaining to the Jefferson County position this individual,

3   this witness occupies.  There is no consent decree.  You

4   should draw no adverse inference from the facts and

10:58:47   5   circumstance giving rise to this witness's employment in

6   that jurisdiction.  Counsel, next question.

7   Q.     This is background information.

8              THE COURT:  You can address it in summary

9   fashion.  There is no consent decree in this case.  I think

10:59:01   10   perhaps in addition, you should explain for the benefit of

11   the jurors, what a consent decree is, or if this witness

12   knows, let him explain or I'll give some instructions to

13   this jury as to what a consent decree is.

14   Q.     Let me just ask a couple more questions.

10:59:21   15             THE COURT:  Why don't we approach the side-bar,

16   counsel.

17             (Discussion at side-bar as follows:)

18             THE COURT:  A consent decree is just that, an

19   agreement by the parties to allow the Court to appoint an

10:59:39   20   individual to supervise and put in place a plan to address

21   issues that are before this Court.  Now, I'm not going to

22   you allow you to try to present to this jury information

23   that's prejudicial to the defendant, to mislead them into

24   believing that in some way, shape or form the circumstances

11:00:00   25   here are the same or identical to the circumstances in

1   Jefferson County.  They are not.  There is no consent

2   decree.

3        And so, there is no similar circumstances here, so

4   don't go there.  You can lay your foundation as to his

11:00:17 5   qualifications, but don't try to compare Jefferson County to

6   Akron Fire and imply anything beyond that.  And if that's

7   what you're attempting to do, I'm not going to allow it.  I

8   don't want to do this in front.

9             MR. THOMPSON:  I understand.

11:00:33 10             THE COURT:  Establish his background and

11   experience and go from there.  Thank you.

12             MR. THOMPSON:  Thank you, Your Honor.

13        (The following proceedings were had in the hearing of

14   the Jury:)

11:00:46 15   Q.   Dr. Brink, tell the jury how many job analyses you

16   have ever done since you have been in the industrial

17   organizational psychology field?

18   A.   I don't know the exact number, but I've overseen over

19   200 job analysis.

11:01:00 20   Q.   And in the County Personnel Board, the work that you

21   do there, does it involve safety force testing?

22   A.   Yes, it does.

23   Q.   And safety forces for the jury, please, are?

24   A.   Police and fire.

11:01:12 25   Q.   And over the course of your career, sir, how many

1   promotional examinations have you been involved with?

2   A.   I don't know the exact number, but it would be dozens.

3   Q.   When you say you were developing, have you been

4   involved in the development of these promotional

5   examinations, sir?

6   A.   Yes, I have.

7   Q.   What is involved, explain to the jury, if you would,

8   please, when you talk about developing an exam, what all is

9   involved in that, just in a brief spot and then we will

10   follow up?

11   A.   Okay.  Just a few steps to that process.  The first

12   step could be conducting the job analysis, job analysis to

13   identify what is done on the job.  Once you finish with the

14   job analysis, you identify what types of selection devices

15   you might want to use to measure the important aspects of

16   the job.  Once you determine that plan, you would move

17   forward and actually develop the tools, whether it might be

18   an interview, a work sample, which is a simulation of the

19   actual type of work that people might perform, whatever that

20   device might be that you determine to be the most

21   appropriate.

22       Once you develop the test you, you would administer

23   the test to applicants or candidates.  You would assess the

24   test appropriately, analyze the data, and that would pretty

25   much conclude the process once you compute scores and

1    analyze the data.

2    Q.    There is a lot of work in all that process?

3    A.    Yes.

4    Q.    As part of the testing process that you use in

11:02:46  5    Jefferson County, do you use written job knowledge tests?

6    A.    No, we he don't.

7    Q.    Explain to the jury why not?

8    A.    Written job knowledge tests tend to have higher

9    adverse impact.  We try to avoid those types of tests

11:03:03 10    because of that.  We feel like there is other methods that

11    can be used to test job knowledge and in more appropriate

12    ways, so we try to avoid job knowledge tests or we do avoid

13    job knowledge tests.

14    Q.    So tell the jury, if you would, please, the

11:03:18 15    promotional examinations that you are involved with

16    developing and administering in Jefferson County, what is

17    the structure of those promotional examinations?

18    A.    Our promotional exams are usually what are descried as

19    assessment centers.  Assessment center is a selection

11:03:35 20    process that's usually comprised of multiple exercises.  One

21    of the exercises might be, for example, writing a memo or

22    some other type of exercise.  Another exercise might be

23    what's referred to as an in-basket exercise.  And this is

24    sifting through memos -- these are mock memos, voice mails,

11:03:55 25    over things that you might have to address if you were in

1150

1    fact on the job.

2           Sometimes we use role plays.  Role play is just where

3    a training person would interact with a candidate to try and

4    solicit information.  For example, a fictitious management

11:04:11  5    subordinate counseling session where the candidate would

6    have to try to demonstrate that management skills through

7    the fictitious counseling session.  Those are just some

8    examples what you might use in an assessment center.

9    Q.    Dr. Brink, in the assessment center exercises that you

11:04:27 10    are involved with in Jefferson County, are they recorded?

11    A.    Yes, they are.

12    Q.    Explain to the jury how that process is done, and I

13    know the court reporters are trying to take this all down so

14    try to keep it as basic as you can.

11:04:40 15    A.    Sure.  We record all of our assessments using video

16    cameras.

17    Q.    When you record, do you have an actual site that you

18    do this with?

19    A.    Yes.

11:04:53 20    Q.    And the technology that you use, is this off the shelf

21    technology?

22    A.    The technology?

23    Q.    Yeah, the recording device, those things?

24    A.    Yeah, just video cameras.

11:05:09 25    Q.    That's it.

1        Are you familiar with the phrase publish or perish?

2   A.   Yes.

3   Q.   Do you have that pressure to publish what you do for

4   your profession?

5   A.   No, I don't.

6   Q.   Why is that?

7   A.   Publishing is -- publish or perish comes from the

8   academic environment.  There's requirements to publish often

9   to tenure.  In my environment, there is not a requirement

10  for my job to publish.  We are encouraged to do research.

11  That's why we try to do research and go to the conferences

12  to present the research.  But I don't necessarily have to

13  publish.  It doesn't -- I'm not rewarded in my job for

14  publishing.

15       MR. THOMPSON:  Your Honor, we request that Dr.

16  Brink be qualified as an expert in psychology.

17       THE COURT:  Any objection?

18       MS. AMBROSE-RUBRIGHT:  Your Honor, we do have one

19  objection and that is to any testimony --

20       THE COURT:  I'll allow the qualification of the

21  witness as an expert for certain portions of his testimony.

22  If you wish to object, you can object and I'll deal with it

23  at side-bar.  Otherwise we can proceed the with the

24  examination of the witness.

25       MS. AMBROSE-RUBRIGHT:  Thank you, Your Honor.

1          THE COURT:  Go ahead counsel.

2          MR. THOMPSON:  Thank you, Your Honor.

3   Q.    Dr. Brink, tell the jury why you were retained by the

4   plaintiffs in this case?

11:06:28 5   A.    I was asked to examine the selection procedures that

6   were used -- that were developed by E.B. Jacobs for the City

7   of Akron for fire lieutenant and fire captain.  I was asked

8   to determine if there was adverse impact in those procedures

9   to determine if I thought those procedures were valid, and

11:06:49 10   also to determine if there was a search for alternative

11   measures that could have been used that would have resulted

12   in less adverse impact that would have been equally valid.

13   Q.    And in performing those duties, what information did

14   you review or use in coming to your conclusions?

11:07:11 15   A.    The validation report, including the appendices.

16   Q.    Who prepared the validation report?

17   A.    E.B. Jay.

18   Q.    When you say E.B. Jay, who's that?

19   A.    I'm not sure what E.B. Jay actually stands for, but

11:07:23 20   it's a consulting firm that's owned and operated by Dr.

21   Rick Jacobs.

22   Q.    Are you familiar with the -- we talked about the final

23   report.  Did you review anything else?

24   A.    The final report, appendices, and as I was reviewing

11:07:44 25   that, I also looked at the uniform guidelines, which is a

1    form document that served as a guide to develop and validate

2    tests.  I also looked at the SIOP principals which was

3    developed by my professional association, which again

4    specializes in the area of selection.  The SIOP principles

11:08:04 5    are principles of test development and validation.

6         And I also looked at what's referred to as the APA

7    standards.  The APA standards are developed by the broader

8    field of psychology, the American Psychological Association,

9    to guide testing in any environment.

11:08:21 10         So I reviewed those documents as well to refresh

11    myself with standards and guidelines that should be used

12    throughout validating a selection procedure.

13    Q.    Did you have an opportunity to examine any of the data

14    sets for E.B. Jacobs relevant to these exams?

11:08:37 15    A.    Yes, I did.

16    Q.    Explain to the jury what a data set is?

17    A.    A data set is simply a file that contains data

18    reflecting candidate responses.  A candidate will go through

19    a selection procedure, assessors are assigned ratings,

11:08:54 20    scores, based on their responses in the selection procedure.

21    They'll enter that into a database, and that's what is used

22    to summarize all of the scores that were assigned to

23    applicants.

24    Q.    Are you familiar with the term high stakes testing?

11:09:10 25    A.    Yes, I am.

1154

1        Q.    How are you familiar with that term, Doctor?

2        A.    It's a commonly used term in psychology.

3        Q.    Explain to the jury what high stakes testing is?

4                    MS. AMBROSE-RUBRIGHT:  Objection.

11:09:25  5              THE COURT:  It's overruled.

6        A.    High stakes testing is a term that's usually used for

7        tests that really affect the well-being of the person that

8        is taking the test.  Examples of high stakes testing would

9        be tests that are used for selecting or promoting

11:09:41 10      individuals for jobs, as well as, for example, ACT or SAT,

11       tests that would be used for college admission, as well as

12       certification exams that are given or licensure exams, those

13       are all examples of high stakes tests.

14       Q.    These promotional examinations for the City of Akron

11:09:59 15      Division of Fire, would those fall within the category of

16       high stakes testing as you've just defined?

17       A.    Yes.

18       Q.    Describe for the jury, if you would, please,

19       Doctor -- and there is water up there, too, if you need it.

11:10:13 20              Describe for the jury, if you would, please, the

21       methodology that you took in analyzing the examinations in

22       issue in this case.  What were the steps you went there?

23       A.    I first went to adverse impact to see if it existed.

24       And once I found out that adverse impact existed, I started

11:10:36 25      just going through the validation report from start to

1    finish.  Just to look at the entire process from start to

2    finish to evaluate whether or not I felt that it met the

3    guidelines, the three guidelines that I mentioned

4    previously.

11:10:49  5    Q.    We talked about those.  The uniform guidelines on

6    employee selection?

7    A.    Correct.

8    Q.    What are those?

9    A.    The uniform guidelines are -- it's a set of guidelines

11:11:02 10    that was created in 1978, I believe.  It was a joint effort

11    by the EEOC, the Department of Labor, the Department of

12    Justice, and one other federal agency.  And these are

13    federal guidelines that are used to help employees or test

14    developers really know what they should be doing when they

11:11:23 15    develop and validate tests.

16        The guidelines outline also how you identify whether

17    or not adverse impact exists.  Prior to this there was

18    really no guidelines that helped employers know whether or

19    not adverse impact existed.  And this developed the

11:11:39 20    methodology for doing that.

21    Q.    How does the field of industrial organizational

22    psychology use the uniform guidelines?

23    A.    We use them as a guide for developing and validating

24    selection procedures.  And by looking at the guidelines, you

11:12:00 25    can use them to determine whether or not your procedure is

1    valid.  If you followed all the guidelines, you're more

2    likely able to conclude that your procedure is valid.  If

3    you didn't follow any of them, you would conclude that your

4    test is invalid.

11:12:15   5    Q.    And you mentioned the term adverse impact.  We talked

6    about that a little before.  And you just mentioned that

7    when you found adverse impact existed, then you started

8    looking at the exam, start to finish.

9          Tell the jury how you determined that an adverse

11:12:29  10    impact existed in this case?

11    A.    There are several tests that are commonly use for

12    identifying whether or not adverse impact exists.  One is

13    the impact ratio, and this is comparing selection rates of,

14    in this case, black candidates versus white candidates,

11:12:47  15    candidates over 40 versus candidates under 40.  So the

16    adverse impact is a way to make that comparison -- excuse

17    me, four-fifths rule is a way to make that comparison.

18          Other tests that are used to look at adverse impact

19    include statistical tests, such as Fisher's Exact test,

11:13:08  20    Chi-square test, and a Z test of the impact ratio.  And

21    there is also a practical rule of thumb that's outlined

22    again in the uniform guidelines that's referred to as the

23    flip-flop rule or the N-of-1 rule.

24          So I used all these methods to determine whether or

11:13:27  25    not adverse impact exists.

1  Q.    We're going to start going through those one at a
2  time.
3       You already mentioned what four-fifths rule is.  Did
4  you have the opportunity to review the data that the City of
11:13:39  5  Akron filed in briefs in this case?
6  A.    At the time --
7             MS. AMBROSE-RUBRIGHT:  Objection.
8             THE COURT:  Why don't you restate the question,
9  is your.  Rephrase the question.
11:13:50  10             MR. THOMPSON:  Sure.
11  Q.    Did you have an opportunity to review the charts
12  regarding selection and those that passed the exam or
13  completed the process, that the City of Akron presented to
14  the Court in this case?
11:14:04  15  A.    Yes, I have.
16  Q.    Did you have a chance to compute the impact ratio
17  based on the data that the City of Akron presented?
18  A.    Yes, I did.
19  Q.    Based on that observation, your own observation of the
11:14:18  20  City of Akron's data, did you have a conclusion that there
21  was an adverse impact on the basis of race for the rank of
22  lieutenant?
23  A.    Yes.
24  Q.    And that adverse impact was with reference to black
11:14:30  25  candidates or white candidates?

1  A.    There was adverse impact against black candidates for

2  lieutenant.

3  Q.    Again, using the same foundation, based on your review

4  of the data that the City of Akron presented to this Court,

11:14:44 5  did you compute the impact ratio relating to race at the

6  captain rank?

7  A.    Yes.

8  Q.    Were you able to compute that adverse impact?

9  A.    Yes.

11:14:52 10  Q.    Tell the jury what you found?

11  A.    There was adverse impact against white candidates.

12  Q.    And this is using four-fifths rule?

13  A.    That's correct.

14  Q.    Same set of questions relating to age at the rank of

11:15:05 15  lieutenant.

16        Using the City of Akron's data they presented to this

17  Court, were you able to compute the impact ratio as to age

18  at the rank of lieutenant?

19  A.    Well, when I looked at the City of Akron's report, I

11:15:20 20  actually think there was an additional error or an addition

21  error in one of the tables.  But once I corrected that, yes,

22  there was adverse impact.

23  Q.    Again, using four-fifths rule?

24  A.    That's correct.

11:15:31 25  Q.    And when you say adverse impact, describe what you

1    mean adverse impact, as to which group?

2    A.    There is adverse impact against candidates over the

3    age of 40.

4    Q.    And at the rank of captain, were you able to compute,

11:15:44  5    using the data that the City of Akron presented to this

6    Court, were you able to compute the impact ratio as to

7    persons over 40 at the rank of captain?

8    A.    Yes.

9    Q.    And that was, sir?

11:15:55  10    A.    There was adverse impact against candidates over the

11    age of 40.

12            MS. AMBROSE-RUBRIGHT:  Objection.

13            THE COURT:  It's overruled.

14            MS. AMBROSE-RUBRIGHT:  Your Honor, may we

11:16:17  15    approach?

16            THE COURT:  Yes.

17        (Discussion at side-bar as follows:)

18            THE COURT:  Yes, counsel.

19            MS. AMBROSE-RUBRIGHT:  Yes, Your Honor, in the

11:16:42  20    Centrus report, Dr. Brink has a conclusion that there is not

21    adverse impact on the captain's examination.

22            MR. THOMPSON:  Using different data.  The data is

23    based on what you represented in the summary judgment

24    briefs, and that's what I asked him about.  The data you

11:16:57  25    presented to this Court as being what the promotion rates is

1    what he relied on for that opinion.  If you look at the data

2    he has in there, he uses 33 as the total candidate base, not

3    41.  That's based on the data he picked up from Jacobs

4    picking up the wrong number.  So what he did is, if you look

11:17:14  5    at the data --

6                THE COURT:  Slow down.

7                MR. THOMPSON:  If you look at the data you

8    presented to the Court in the summary judgment brief which

9    is what he is testifying off of, there are also math errors

11:17:26 10    in the data you presented.

11         So what he did, he selected from those based on the

12    data you represented in the summary judgment brief and

13    that's what he is basing the opinion on.

14                MS. AMBROSE-RUBRIGHT:  But it's not the data in

11:17:36 15    this examination.

16                MR. THOMPSON:  It's the data we already

17    stipulated to today, and the testimony has been what applies

18    in this case.  If you want to ask him on cross-examination,

19    feel free.

11:17:44 20                MS. AMBROSE-RUBRIGHT:  No, Denny, I'm looking

21    here and he says -- this is his expert's report -- and it

22    says:  Statistical tests were not run for age because

23    adverse impact was not observed based on the four-fifths

24    rule.  And that is based on the data set.

11:17:59 25         If there is a chart in a brief that has some

1       typographical error, that does not mean --

2                    MR. THOMPSON:  The data you presented as to

3       promotion rates at captain are the data that we have already

4       agreed exist in this case.  That's what that opinion is

11:18:13  5   based on.  If you want to ask him about that during cross,

6       go right ahead.

7                    MS. AMBROSE-RUBRIGHT:  I still am not following

8       you.  Is he basing it -- basing it on the data for captain

9       that exists in the case for over 40 and under 40?

11:18:27 10                  MR. THOMPSON:  Yes, based on what was represented

11      in the summary judgment brief and what we agreed in this

12      case.

13                   MS. AMBROSE-RUBRIGHT:  I'm not talking about the

14      brief.

11:18:33 15                  MR. THOMPSON:  It's what we agreed in this case

16      are the data.  If you look at what he's got here, he's using

17      33 as the total overall population.  The overall population

18      was 41.  And the reason for that was the data he picked up

19      were the white selections -- white captains candidates for

11:18:47 20   captain.  That was an error.  What he is doing in his

21      opinion --

22                   MS. AMBROSE-RUBRIGHT:  This is the first time

23      that this has ever been presented.  This has never -- he has

24      never talked about that.

11:18:57 25                  MR. THOMPSON:  The data is right there.

1    THE COURT:  One at a time please.

2        He submitted a report -- I hate to go back to the

3    same.  But I adopt and follow the same rule in every case,

4    and I will in this case.

11:19:08  5        Now, he submitted a written report outlining his

6    opinion.  Counsel for the defendant is holding in her hand

7    the report.  I can read it.

8            MS. AMBROSE-RUBRIGHT:  It's the pink underline,

9    Your Honor.

11:19:22 10            THE COURT:  Let me sort this out.  It says:

11   Statistical tests were not run for age because adverse

12   impact was not observed based on four-fifths rule.  This is

13   the report dated September 7, 2007.  He is now rendering an

14   opinion that is different than that which is the forth in

11:19:39 15   his report.  And why is that?

16            MR. THOMPSON:  Because the date that he used -- I

17   can ask him that.  But the data he used to compute that

18   there is the data that existed in this case based on what

19   was provided to him by Jacobs.  He picked up the wrong

11:19:57 20   number as far as overall population of the captain rank.

21            THE COURT:  So at some later time, did he --

22            MR. THOMPSON:  He looked at their summary

23   judgment brief which we adopted as the data.

24            THE COURT:  When you say adopted, is there some

11:20:08 25   stipulation in the record, some written agreement between

1    the parties that the data submitted in motion practice was

2    now the data upon which the experts are to base their

3    opinion?

4              MR. THOMPSON:  In our summary judgment response

5    to that, we adopted their data and computed based on that

6    data.

7              MS. AMBROSE-RUBRIGHT:  This is a circular --

8              THE COURT:  One second.

9         So again, so I understand what's transpiring here, if

10   I can figure it out, your expert now has a different opinion

11   other than the opinion he previously set forth in his

12   written report under Rule 26 that was filed December 7?  He

13   is now rendering a different opinion?

14             MR. THOMPSON:  On that specific issue, yes.

15             THE COURT:  And let me ask the question.  Once

16   again, we will revisit the same issues we visited in the

17   past.  Did you disclose to the opposing side that your

18   expert, whether it's based on information in the motion for

19   summary judgment or any other information, did you disclose

20   formally through a supplemental report that, in fact, your

21   expert now had a new opinion that he was going to be

22   rendering at trial?  Yes or no?

23             MR. THOMPSON:  The expert --

24             THE COURT:  I --

25             MR. THOMPSON:  I think his declaration did talk

1     about that.

2              MS. AMBROSE-RUBRIGHT:  Denny, show me in the

3     declaration where it says that.

4              MR. THOMPSON:  I said I think.

11:21:28  5        MS. AMBROSE-RUBRIGHT:    This is the first time I

6     ever heard this, ever.  This is not about --

7              THE COURT:  Counsel, stop it right now.  Stop it

8     right now.  I'm telling you, both of you, I told you this

9     before and I'm telling you again, if he is rendering

11:21:40  10    opinions -- I'm about ready to impose a sanction, maybe

11    exclude this testimony, if you're allowing this witness to

12    come up here again and render opinions that have not been

13    fully disclosed or are different from what he has put in his

14    report without providing opposing counsel with a

11:21:59  15    supplemental report, then under the rule, I'm not sure what

16    sanction is appropriate.

17         Now, I'm not going to tolerate it.  Maybe I need to

18    adjourn this jury and let you examine this witness outside

19    their presence in my presence to make sure I understand

11:22:15  20    exactly what it is he's going to testify to.  It is not

21    compliance with the rule to say, oh, by the way we reviewed

22    some new information in the papers and he is rendering a new

23    opinion and not formally advising the other side of the

24    change.  And that's what you seem to believe is the case,

11:22:34  25    and it's not appropriate.  I'm not going to tolerate it.

1    If he is got any new opinions that are not rendered in

2    his report and they haven't been formally disclosed to the

3    other side as the rule requires, I'm not going to allow it,

4    and I'm going to strike it from the record.

11:22:51  5    MR. THOMPSON:  I'll ask him if the opinion that

6    he has in his report is accurate.

7    THE COURT:  No.  This opinion will not be heard

8    by the jury because you haven't timely disclosed it and you

9    basically admitted to me you haven't.

11:23:02 10    MS. AMBROSE-RUBRIGHT:  And, Denny, my experts

11    have an opportunity to review it if that is his opinion.

12    THE COURT:  That's all.

13    (The following proceedings were had in the hearing of

14    the Jury:)

11:23:14 15    THE COURT:  Ladies and gentlemen of the jury,

16    we're going to do the following.  We are going to take a

17    break until I can address this issue outside your presence.

18    So that we can clarify certain issues in this matter.

19    My apologize, ladies and gentlemen, I'm sorry that I

11:23:35 20    have delay the proceedings this morning.  My apologies that

21    I'm going to have to address this issue here this

22    afternoon -- excuse me, still this morning.  Please adjourn

23    to the jury room.  We will help you.  We will make you

24    comfortable, and my apologies.

11:23:50 25    Please remember all the admonitions I've given you

1   about not discussing or expressing an opinion on the matter.

2   Thank, very much, ladies and gentlemen.

3            THE DEPUTY CLERK:  All rise.

4        (Your out 11:25.)

11:24:23  5        THE COURT:  I'm going to take five minutes to

6   decide exactly how I'm going to address this issue.  Counsel

7   if you've got something to point me to in the record, when I

8   say in the record, if you're going to point me to some

9   supplemental report that sets forth in detail any new

11:24:38 10  opinion beyond the scope of what was set forth in this

11  expert's opinion, in his report of September 7, then you can

12  share with me for the record.

13       I'm going review his report again.  I'm going to look

14  in the record to see if there is any supplementation as

11:24:51 15  required by the rule.  If there is not, I'm going to be

16  guided by, again, with my earlier ruling and what the civil

17  rules require as to the scope of this witness's opinions.

18       Furthermore, I am contemplating allowing counsel for

19  the defendant to further voir dire this witness outside the

11:25:12 20  presence of the jury or further at least require him to

21  testify outside the presence of the jury so that I can be

22  certain that any opinions that he renders or any testimony

23  he gives are not outside the scope of what he has previously

24  provided by way of his report.

11:25:29 25       His last answer strikes me as clearly inconsistent

1   with his report, and unless I see a supplemental report

2   setting forth that opinion, it will be excluded and I will

3   so instruct the jury.  I'm not going say this again.  And I

4   put both sides on notice.  Defenses will be stricken -- this

5   case is at the point where I am nearly ready to contemplate

6   either excluding this witness's testimony, or dismissing

7   this case.

8       There is no good reason for not complying with the

9   civil rules and providing notice to the other side of expert

10  opinions in this case.

11      I haven't seen any, I haven't heard any good reason.

12  And this jury, I feel so -- I am so sympathetic to their

13  plight.  We didn't start until 10:30 this morning, and first

14  thing this morning I deal with motions in limine about

15  testimony, undisclosed testimony.  If it's not in the

16  report, and there hasn't been a supplementation, counsel,

17  there will be no opinions rendered regarding the matter.

18      That's all.  I'm taking ten minutes and I'm going

19  decide whether we're going to require this witness to

20  testify outside the presence of the jury so I can be sure

21  there is no new matters raised.

22      If you want to confer with one another, as I've been

23  harping about in this whole case, you may do so.

24      Thank you.

25      (Recess taken, 11:25 until 11:40.)

```
 1              THE COURT:  What we will do is as follows.  Dr.
 2    Brink will retake the witness stand.  Counsel for the
 3    plaintiff, you will review with Dr. Brink in somewhat of a
 4    summary fashion each specific opinion that he intends to
 5    give in this case.  You will also point, for the benefit of
 6    the Court and opposing counsel, present the doctor with a
 7    copy of his report.  He will verify and call to the Court's
 8    attention, as well as to opposing counsel's attention, the
 9    specific portions of his report upon which his opinion is
10    based, or where he references that opinion.
11         If there is a supplemental report that was prepared
12    and submitted setting forth any new opinions, he may refer
13    to that.
14              Doctor, so it's clear, any opinions that you give in
15    this case must have been opinions that were fully disclosed
16    in your report, that you submitted, as it relates to this
17    matter?  Is that understood?
18                   THE WITNESS:   Which report are you referring to?
19                   THE COURT:  The report dated September 7, 2007,
20    which you rendered in this case that were provided to
21    opposing counsel.  If there was a supplemental report that
22    you have that was prepared and timely submitted to opposing
23    counsel, you may refer to that report, and you may render
24    opinions that you submitted in that supplemental report.
25         Is there a supplemental report?
```

1    MR. THOMPSON:  There is.

2    THE COURT:  When was it?

3    MR. ELFVIN:  December 8, 2007, Your Honor.

4    THE COURT:  It was filed when?

11:40:40  5    MR. ELFVIN:   December 8, 2007, or it was

6    tendered to the other side.  I don't know if it was filed

7    that date.  But it was tendered to the defense December 8.

8    I don't think we have an issue of whether they got both

9    reports.

11:40:52  10    THE COURT:  Did you receive the December 7

11    report?

12    MS. AMBROSE-RUBRIGHT:  We did, Your Honor.

13    THE COURT:  Excuse me.  December 8 report.

14    I will take that report as well, a copy of same.  Let

11:41:01  15    me just double check here.  I have a copy of the December 7

16    report in front of me.  I also have a copy of the curriculum

17    vitae, and I'll take the supplemental report, December 8.

18    MR. ELFVIN:  Thank you, Your Honor.

19    THE COURT:  Provide the witness with his expert

11:41:17  20    reports, and you will now examine the witness for the record

21    outside the hearing of the jury.  He will set forth the

22    specific opinions that he intends on giving in this case,

23    and he will refer the Court to the page and paragraph of his

24    report that references that opinion or those opinions.  So

11:41:35  25    that I can be certain that the testimony he is giving has

1    been fully disclosed as required by the rule.

2         Doctor, so it's clear, before this jury, there will be

3    no testimony, there will be no opinions rendered outside of

4    those that have already been made part of your written

11:41:55 5    reports in this case.  Is that understood?

6              THE WITNESS:  To make sure it's clear, that would

7    exclude my declaration?

8              THE COURT:  That excludes your declaration unless

9    that declaration was part of a supplemental report as

11:42:07 10    required by the civil rules which I've already set forth for

11    the record what is required.  Whether the reports or

12    opinions are given in your deposition testimony, what have

13    you, supplementary reports are required by the rule to avoid

14    any unfair surprise and to make certain that there is no

11:42:27 15    confusion among the parties as to what opinions are going to

16    be rendered in this case.

17         If you have any questions, you are not to answer the

18    question.  Is that understood?

19              THE WITNESS:  Yes.

11:42:39 20              THE COURT:  And I want to make it very clear,

21    I've already said, if there is any opinions, new opinions,

22    undisclosed to the other side, that become part of this

23    case, I am reluctant to do it, don't want to do it, it's a

24    harsh sanction, but given the time we have spent addressing

11:42:56 25    these issues, given the undue burden to the jury in this

1   case, this case is subject to either dismissal, I won't

2   allow this witness to testify or other sanctions will be

3   imposed.

4       Is that clear?  Anyone have any questions about what

11:43:13 5   I've just now set forth on the record in this case?

6             MS. AMBROSE-RUBRIGHT:  No, Your Honor.

7             MR. THOMPSON:  No, Your Honor.

8       Your Honor, we would reiterate the issue here is

9   unfair surprise, as per the Sixth Circuit case law that's

11:43:34 10   controlling on this issue, the issue is not as a constrained

11   report, other side surprised by this.  There is extensive

12   testimony in his deposition, for example, about some of

13   these issues.  The only issue we are talking about here is,

14   if you listen to his testimony, it's not going to change

11:43:49 15   this.  This is just one of the little blocks as far as

16   four-fifths rule.

17       It does not change his opinion, this has no impact on

18   his opinion.  The opinion was the same regardless.

19             THE COURT:  So as I understand it, he gave no

11:43:59 20   opinion regarding the specific issue that you're now

21   attempting to raise.  He gave no opinion in his report.  He

22   indicated he had no opinion.

23       As to unfair surprise, the problem, sir, with unfair

24   surprise, is that you may think it's not unfair surprise,

11:44:16 25   but in the middle of the trial, counsel has experts

1    traveling from out of state.  If new opinions are now being

2    raised, in my view based upon the history of this case, the

3    extensive issues in discovery, the extensive disputes

4    between the parties, any new opinions are unfair, not any,

11:44:33   5    but in these specific instances they are unfair, the rule

6    requires, Rule 30, I have to keep reading it, because no one

7    seems to want to follow it or seems to feel it doesn't apply

8    or seem to believe they can ignore it, says clearly, "For an

9    expert whose report must be disclosed under Rule 26, the

11:44:51  10    parties' duty to supplement extends both to information

11    included in the report and to information given during the

12    expert's deposition.  Any additions or changes to this

13    information must be disclosed by the time of the party's

14    pretrial disclosures as required under Rule 26(a)(3).

11:45:10  15         30 days before trial.

16         Not the day of, not the -- during trial.  30 days

17    before trial.

18              MR. THOMPSON:  If we could approach, Your Honor,

19    I'll show you exactly where we are coming from why this is

11:45:23  20    not really --

21              THE COURT:  Is there a supplemental report?

22              MR. THOMPSON:  It's off of Dr. Jeanneret's

23    report.  This is the data Dr. Jeanneret provided.

24              THE COURT:  So what?  Did he then look at Dr.

11:45:33  25    Jeanneret's report and then say by the way, I now have a new

1  opinion.  I've looked at something in the record.  I'm going

2  to testify as to a new matter, a new opinion?  My opinion

3  has changed.  I want to supplement.

4          MR. THOMPSON:  No, there is nothing like that.

11:45:45  5          THE COURT:  Thank you.

6          MR. THOMPSON:  We're using data --

7          MS. AMBROSE-RUBRIGHT:  Your Honor, I would like

8  to put something on the record before we start.

9          THE COURT:  Quickly.

11:45:56  10          MS. AMBROSE-RUBRIGHT:  I took Dr. Brink's

11  deposition on July 2.  He said that he was offering an

12  opinion --

13          THE COURT:  You need to say what year given the

14  history of this case.

11:46:06  15          MS. AMBROSE-RUBRIGHT:  July 2, 2008.  He does not

16  have any opinion that there is age discrimination on the

17  captain's exam.  In his declaration, captain's age, there is

18  no four-fifths rule violation for age, no further analyses

19  were performed, no further statistical analyses are

11:46:25  20  discussed regarding adverse impact for age.  That is as of

21  October 3.

22          THE COURT:  If you're going to make a record,

23  refer to the page and paragraph of the deposition and line

24  and then also refer to the declaration so you make that a

11:46:38  25  part of the record.

1          MS. AMBROSE-RUBRIGHT:  The deposition of Dr.

2    Brink is on page 80, lines 6 through 13.  In his

3    declaration, which is document 100 in this case, which was

4    filed on October 3 of 2008, in paragraph 70, Dr. Brink

11:46:57 5    indicates that he is not giving an opinion on age on the

6    captain's exam.  There has been no subsequent report or

7    opinion rendered.

8          THE COURT:  Anything else you wish to add?

9          MS. AMBROSE-RUBRIGHT:  Not at this time, Your

11:47:13 10   Honor.

11          MR. THOMPSON:  Yes, sir, if you look at the

12    context of that very testimony, again, none of this changes

13    his opinion.  His opinion is remaining the same.  His

14    opinion is not changing.  All this is, is a computation.

11:47:25 15   And when you look at the deposition testimony, he is saying

16    I'm not certain what data I used.  It looks to be the same.

17    I don't have an opinion.  I believe that is the case.  I

18    would have to go back and look at our analysis to verify

19    that.  He was basically saying I didn't have all the data,

11:47:40 20   expressing an opinion not based on it.

21          When he would take Dr. Jeanneret's data that he

22    produces in his report -- they produced it to us, it's their

23    data -- all we're doing is taking their data.  I can put it

24    up in front of him and say using this data is there a

11:47:55 25   four-fifths rule violation.  But this does not change his

1    opinion.

2              THE COURT:  He didn't have an opinion.  He said

3    he did not have an opinion.  I just listened to the

4    deposition testimony.  He said he didn't have an opinion.

11:48:06 5    The fact of the matter that you then later gave him new data

6    and he formed an opinion, all that does is confirm your

7    obligation to share it with the other side.

8         I'm not going to debate it further while the jury is

9    waiting.  This witness will be examined.  He will set forth

11:48:19 10   the opinions that he intends on giving before this jury,

11   quite frankly, in detail.  Because again, I'm not going to

12   deal with, well, he now has a new opinion that he didn't

13   disclose.  But that's okay because we now just looked at

14   some new data that we think he now should be able to give a

11:48:37 15   new opinion on even though he didn't disclose it.  So that's

16   not permitted.

17              MR. THOMPSON:  Okay.

18              THE COURT:  I'm going to hear from him regarding

19   every opinion that he intends on giving, and he can point to

11:48:47 20   his reports, establishing the basis for those opinions.

21              MR. THOMPSON:  Okay.

22              THE COURT:  And, once that is done, then we're

23   going to take a break, counsel is going to be allowed to

24   gather themselves, and then he'll be called back to the

11:49:01 25   witness stand to testify.

1     And you'll testify consistent with that that he has

2     earlier disclosed in the case.  Nothing beyond that.

3          MR. THOMPSON:  Okay.

4          THE COURT:  Is that clear?

11:49:12  5          MR. THOMPSON:  That's fine.

6          THE COURT:  And if I have any more problems of

7     this nature or issues in this case, counsel you're

8     admonished from my earlier comments to you, I made it very

9     clear about opinions and nondisclosure, there will either be

11:49:25 10     a sanction -- and I'm not sure what it will be.  But there

11     will be a sanction, up to and including dismissal of this

12     case.

13          This is wholly inappropriate in the middle of this

14     lengthy trial for these juries to be kept waiting and

11:49:37 15     waiting and waiting while we sort out issues of this nature.

16          Begin your examination.

17          VOIR DIRE EXAMINATION OF KYLE E. BRINK

18     BY MR. THOMPSON:

19     Q.   Dr. Brink, when you issued your report, did you find

11:49:53 20     that there was a four-fifths rule violation at the rank of

21     age -- or rank of captain for age?

22     A.   I did not find a four-fifths rule violation.

23     Q.   What data did you use to base that conclusion?

24     A.   I'm not sure where the age data came from.  I believe

11:50:11 25     it came from Dr. Johnson.

1  Q.    Okay.  Are you going to be expressing an opinion or

2  are you going to be discussing Type I, Type II error?

3        THE COURT:  Will you be expressing opinions.  Not

4  discussing, sir.  He's here to express expert opinions, not

11:50:28 5  discussing matters.

6        MR. THOMPSON:  Fair enough.

7  Q.    Are you going to be expressing opinions on Type I,

8  Type II error?

9  A.    Yes.

11:50:39 10  Q.    And that is in your report where, sir?

11  A.    Page 6.  Page 5 as well.

12  Q.    Are you going to be expressing opinions on the

13  appropriateness of using statistics as a method of

14  determining adverse impact in this case?

11:51:21 15  A.    Yes.

16  Q.    And in your report, or your supplemental report, where

17  are those?

18  A.    Pages 4, 5.

19        THE COURT:  And what are the opinions going to

11:51:43 20  be?  You can tell us specifically what opinions you're going

21  raise, where you have referenced them in the report.

22  A.    Start with the types of test that I used, and the

23  results of those tests.  That's it.

24  Q.    Okay.  If we go to page 18 of your report, are you

11:52:52 25  going to be expressing an opinion that validity evidence is

1    required?

2    A.    Yes.

3    Q.    Are you going to be expressing opinions that job

4    analyses for both lieutenant and captain were inadequate?

11:53:08 5    A.    Yes.

6    Q.    Are you going to be expressing opinions that an

7    inadequate number of subject matter experts was used to

8    conduct the job analysis?

9    A.    Yes.

11:53:21 10    Q.    Are you going to express an opinion that regardless of

11    the type or quality of the examination that was used, the

12    examinations cannot be demonstrated to be job related or

13    valid since without an adequate job analysis, no one -- one

14    cannot fully know what the job entails?

11:53:39 15    A.    Yes.

16    Q.    Are you going to be expressing the opinion, sir, that

17    E.B. Jacobs failed to gather appropriate ratings from SME's

18    on work behaviors, for example, whether work behaviors must

19    be performed upon entry into the position.  This is also

11:53:55 20    known as day one?  Sir is that --

21    A.    Yes.

22    Q.    Day one, I'm sorry, go ahead.  And KSA's, that's

23    knowledge, skills and abilities?

24    A.    Yes.

11:54:06 25    Q.    Whether proficiency in the given KSA's are needed upon

1   entry into the position, how the knowledge assessed is used

2   on the job, and whether the measured KSA's can differentiate

3   among levels of job performance that are necessary to

4   determine the appropriateness of the tests.  Are you going

11:54:23 5   to be expressing opinions like that, sir?

6   A.    Yes.

7   Q.    Are you going to be expressing an opinion that the

8   examinations did not assess a representative sample of job

9   domain?

11:54:32 10   A.    Yes.

11   Q.    Are you going to be expressing the opinion, sir, that

12   either alternative types of assessments nor alternative

13   scoring/waiting methods were considered as required by the

14   uniform guidelines?

11:54:44 15   A.    Yes.

16   Q.    Are you going to be expressing the opinion that the

17   assessment process was flawed due to vague behavioral

18   anchors and no panel rotation?

19   A.    Yes.

11:54:54 20   Q.    And are you going to be expressing the opinions, sir,

21   that there was no basis from the validation study for

22   ranking of candidates?

23   A.    Yes.

24   Q.    Your testimony is going to be addressing those

11:55:09 25   opinions and the reasons for those opinions drawn from your

1    report as testified here today?

2    A.    Yes.

3    Q.    As to the supplemental report, sir, are you going to

4    be expressing the conclusions identified in the supplemental

5    report relating to alternative measures?

6    A.    Yes.

7    Q.    And those opinions are going to be as to the weighting

8    scheme that was used by E.B. Jacobs, Doctor?

9    A.    Yes.

10   Q.    Any others relating to alternative measures, sir?

11   A.    A separate weighting scheme, a supplemental expert

12   weighting scheme.  Excuse me, I'm sorry, the dimension

13   weighting scheme.

14   Q.    Okay.

15   A.    Subject matter expert weighting, and perhaps

16   alternative testing methods.

17            MR. THOMPSON:  I think that's the extent of what

18   we're going him, Your Honor.

19            THE COURT:  Counsel, do you wish to ask any

20   questions of this witness before we adjourn for the lunch

21   hour?

22            MS. AMBROSE-RUBRIGHT:  Your Honor, just a few.

23            THE COURT:  You may.

24            VOIR DIRE EXAMINATION OF KYLE E. BRINK

25   BY MR. AMBROSE-RUBRIGHT:

1   Q.    Dr. Brink, did you supplement either one of the

2   reports that you've just identified?

3   A.    Since these reports, I've had my deposition and I

4   submitted a declaration.

11:56:50  5   Q.    You have submitted no other reports to the City of

6   Akron regarding this testing process; is that correct?

7   A.    That's correct.

8   Q.    Dr. Brink, you've never conducted a written job

9   knowledge examination in your entire career, am I correct,

11:57:05  10   developed and administered?

11   A.    Not job knowledge test.

12   Q.    Thank you.  And you're rendering no opinions regarding

13   the job -- written job knowledge test in this case?

14   A.    Yes, I am, rendering opinions regarding job knowledge

11:57:24  15   test.

16   Q.    And can you tell me where in your report those

17   opinions are with regard to a written job knowledge test?

18   A.    Page 14.

19          THE COURT:  Of your original or your supplemental

11:57:50  20   report?

21          THE WITNESS:  The original.

22   A.    I address knowledge and job knowledge analysis prior

23   to that.  But if you're referring specifically to job

24   knowledge test, page 14, 15.  I believe that's it.

11:58:19  25   Q.    Have you ever developed behavioral anchors for any

1    assessment center?

2    A.    Yes.

3        MS. AMBROSE-RUBRIGHT:  I have no other questions

4    at this time.

11:58:28 5        THE COURT:  We will adjourn until --

6        All right, ladies and gentlemen.  We will adjourn

7    until 1:00.  I have a criminal matter at the lunch hour.  We

8    will reconvene at 1:00.

9        Doctor, you'll be in the witness stand at 1:00.  And I

11:59:15 10   will expect, again, consistent with my order, any opinions

11   that are rendered by this witness, will have been fully

12   disclosed in both of his reports, and I told you, Doctor,

13   directly, and I will tell you again.  Any opinions outside

14   of that set forth in your two written reports submitted in

11:59:35 15   this matter will not be presented to the jury.

16       And just so it's clear, have you submitted, rendered,

17   offered to counsel for the plaintiff any new opinions in

18   this matter outside those that you have set forth in your

19   previous written reports in this case?

11:59:54 20       THE WITNESS:  Have I rendered opinions outside of

21   those reports?

22       THE COURT:  Yes, any new opinions not previously

23   expressed in those two reports that I have before me?

24       THE WITNESS:  Not in reports, no.

12:00:05 25       THE COURT:  No, I'm saying opinions.  Have you

1    provided counsel for the plaintiff any new opinions

2    regarding the issues in this case, other than those set

3    forth in your report.  Or reports?  Do you understand my

4    question?

12:00:21  5        THE WITNESS:  I'm not sure I understand because

6    my declaration obviously has an opinion, but if that's not

7    an opinion, then no.

8         THE COURT:  Well, you set forth in the

9    declaration you're rendering opinions.  Outside of that,

12:00:34 10  have you expressed any new opinions?

11        THE WITNESS:   The only opinions I expressed are

12   in these two reports, my deposition and my declaration.

13        THE COURT:  No new opinions beyond the scope of

14   those?

12:00:44 15        THE WITNESS:  That's correct.

16        THE COURT:  That's all.  We will see you at 1:00.

17        MR. THOMPSON:  And Your Honor, just for the

18   record, we'd put on there our objection that we do not have

19   to supplemental a rebuttal, number one, and number two, as

12:00:54 20  it relates to data that flows from, under Rule 26, from

21   their expert reports or data interpreting.

22        We are just putting our objection on the record.

23        THE COURT:  I'll note your objection.  If I

24   followed that rule, there would never be any finality to

12:01:08 25  this, never be any reasonable order to the proceedings in

1     cases of this nature, number one.

2          If you have a rule that you would cite me to that

3     indicates that there is no requirement for you to submit any

4     rebuttal testimony based upon new information you discover,

12:01:24 5     I would like you to put that on the record as well.

6          MS. AMBROSE-RUBRIGHT:  Your Honor, I also have

7     one question with regard to what we're going do -- what with

8     what the jury has already heard.  I have grave concerns that

9     it has unfairly prejudiced us, and --

12:01:39 10          THE COURT:  When you say -- which question are

11     you referring to the last question regarding the age

12     question?

13          MS. AMBROSE-RUBRIGHT:  Yes.

14          THE COURT:  Which I have, just a moment here.  I

12:01:48 15     have highlighted, I believe, on my real time.  And the

16     question was, was there adverse impact against candidates

17     over the age of 40.  There was an objection.  I overruled

18     it, and then you call a side-bar and called my attention to

19     this issue that I've now tried to address.  What is your

12:02:10 20     suggestion, counsel, since you raised that issue?

21          MS. AMBROSE-RUBRIGHT:  Your Honor, I had thought

22     that the witness answered the question that he gave an

23     opinion that there was adverse impact based on age on the

24     captain's examination?  I'm sorry.  It does not sound like

12:02:27 25     that.  I was relying on memory.  I think that my emotions

1    probably took over my brain at that point, Your Honor.

2              THE COURT:  Do you wish to be heard, quickly,

3    counsel?

4              MR. ELFVIN:  Very briefly, Your Honor.  I believe

12:02:38  5    that he testified that he found a violation of the

6    four-fifths rule, at least that's my recollection of his

7    answer.

8              THE COURT:  Here's what I have.  I'll read it

9    back so we can --

12:02:48 10              MR. ELFVIN:  Thank you.

11              THE COURT:  I'll read it back even further.  I'm

12    reading from my real time.

13         "Q.   Was there an adverse impact against black

14    candidates for lieutenant --

12:03:05 15         "Q.   Again, using the same foundation, based on your

16    review of the data that the City of Akron presented to this

17    Court, did you compute the impact ratio relating to race at

18    the captain rank?

19         "A.   Yes.

12:03:16 20         "Q.   Were you able to compute that adverse impact?

21         "A.   Yes.

22         "Q.   Tell the jury what you found?

23         "A.   There was adverse impact against white

24    candidates.

12:03:27 25         "Q.   And this is using four-fifths rule?

1     "A.   That is correct.

2     "Q.   Same set of questions relating to age at the

3     rank of lieutenant using the City of Akron's data they

4     presented to this Court, were you able to compute the impact

12:03:43 5     ratio as to age at the rank of lieutenant?

6     "A.  Well, when I looked at the City of Akron's

7     report, I actually think there was an additional error -- or

8     an addition error in one of the tables.  But once I

9     corrected that, yes, there was adverse impact.

12:03:58 10     "Q.   Again, using four-fifths rule?

11     "A.   That's correct.

12     "Q.   And when you say adverse impact, describe what

13     you mean adverse impact, as to what group, or to which

14     group?

12:04:15 15     "A.  There is adverse impact against candidates over

16     the age of 40.

17     "Q.   And at the rank of captain, were you able to

18     compute, using the data that the City of Akron gave to this

19     Court, were you able to compute the impact ratio as to

12:04:29 20     persons over the age of 40 at the rank of captain?"

21     The answer was yes.

22     And the question was,

23     "Q.  And that was, sir, that was adverse impact

24     against candidates over the age of 40?"

12:04:41 25     And there is an objection, and we called the side-bar.

1  So he did testify outside, as I understand it, the scope of

2  his earlier opinion that this was adverse impact at the rank

3  of 40, persons over the age of 40.

4              MR. ELFVIN:  Your Honor, and the reason I wanted

12:04:58  5  that read back was because I wanted to make sure exactly

6  where his testimony ended.  Because I do believe if he's

7  asked the follow-up question, and did you examine that data

8  and reach a conclusion that changes what's in your report,

9  his answer is going to be no.

12:05:16 10              MR. THOMPSON:  His opinion doesn't change.

11              MR. ELFVIN:  That's my understanding of Dr.

12  Brink's testimony on this subject.

13              THE COURT:  But what he said in his report was,

14  as I recall -- and we can read it into the record, that he

12:05:27 15  had no opinion.

16              MR. ELFVIN:  And that's what I'm saying.  He will

17  say I have no opinion based on reviewing the additional

18  data, but I did calculate a four-fifths violation, but when

19  I looked at it, it did not -- I have no opinion as to

12:05:41 20  discrimination or adverse impact, you know, based on over

21  40.  I'm trying to avoid giving the jury instructions that

22  may not be necessary.  That's all.

23              THE COURT:  Counsel, the defendant wishes to be

24  heard as well?

12:06:01 25              MS. AMBROSE-RUBRIGHT:  Your Honor, I think it's

1    just a back-door way to try to leave the inference that

2    there is age discrimination on the captain's test.  I would

3    ask the Court to instruct the jury that Dr. Brink has

4    offered no opinion regarding age discrimination on the

12:06:19  5    captain's examination, and did not find any violation.  That

6    is what his report says.

7              THE COURT:  Do you have the report?  Let me

8    just -- refer me to the page.  I have the report here.  Just

9    refer me to the page again so I have it.  Do you have a

12:06:38 10    highlighted copy?  And you've also referred me to his

11    deposition testimony.

12              MS. AMBROSE-RUBRIGHT:  On page, 5, Your Honor,

13    under table 4, the very last sentence, it says:

14    "Statistical tests were not run for age because adverse

12:07:05 15    impact was not observed based on four-fifths rule."

16              THE COURT:  We're at page 5 of his -- of the

17    report?

18              MS. AMBROSE-RUBRIGHT:  Of his September 7, 2007

19    report.  There are two tables.  Under table 4, identified as

12:07:20 20    outcomes of statistical tests for adverse impact for fire

21    captain, the very last sentence in the note under the table.

22              THE COURT:  So he says here that there was no

23    adverse impact even based on four-fifths rule, as I

24    understand it?

12:07:54 25              MS. AMBROSE-RUBRIGHT:  That's correct.

1        THE COURT:  Let me just read back the testimony.

2   Is that inconsistent with his testimony.

3        MR. ELFVIN:  Your Honor, it's inconsistent with

4   his testimony because he said he looked at different

5   numbers, and it's -- Your Honor, simply, it is inconsistent

6   with his testimony as -- before we broke.

7        THE COURT:  All right.  I'm going to instruct the

8   jury to disregard the witness's testimony as it relates to

9   the captain's examination.  Any testimony regarding same,

10  I'm going to strike.

11        MR. ELFVIN:  Are we talking about age, Your

12  Honor.

13        THE COURT:  Just on age, consistent with what he

14  has set forth in his report, I'm going to instruct them to

15  disregard his testimony regarding any age related impact as

16  it relates to, I'll phrase it perhaps more artfully, as it

17  relates to the captain's exam.

18        MR. THOMPSON:  I think you said race.  It's just

19  age.

20        THE COURT:  I'm sorry.

21        MR. THOMPSON:  I thought I heard you say race.

22        THE COURT:  I said age, age only.

23        MR. THOMPSON:  Thank you.

24        THE COURT:  You may step down, sir.

25        (Recess taken, 12:10.)

1    WEDNESDAY AFTERNOON, DECEMBER 10, 2008

2         (Jury in, 1:10.)

3         THE COURT:  Thank you, ladies and gentlemen for

4    your patience.  Let me just give you a brief instruction, if

13:11:36 5    we may.  Ladies and gentlemen, please disregard the portions

6    of this witness's testimony related to adverse am packet for

7    fire captain.  When I say fire captain, any age-related

8    testimony from this witness regarding fire captain, you

9    should please disregard that testimony.

13:11:52 10        Of course, you're free to consider any other testimony

11   the Court has not sustained an objection to, etcetera.  You

12   can consider the rest of the testimony, but none related to

13   adverse am packet, age related testimony related to the

14   captain's examination only.

13:12:07 15        Thank you very much, ladies and gentlemen.

16        Counsel, you may resume your inquiry.

17        MR. THOMPSON:  Thank you.  Sorry, ladies and

18   gentlemen.  I would like to proceed with the direct

19   examination, Your Honor.

13:12:18 20        THE COURT:  Yes, you may.

21   Q.   Dr. Brink, do you have an opinion regarding those

22   instances where adverse impact exists, regarding whether

23   validity evidence is required?

24   A.   Yes, when adverse impact exists, validity evidence is

13:12:35 25   required.

1    Q.    And upon what do you base at that opinion, doctor?

2    A.    The uniform guidelines.

3    Q.    And specifically tell the jury what the uniform

4    guidelines require?

13:12:44  5    A.    The guidelines require when there is adverse impact,

6    that there is sufficient evidence to demonstrate the

7    validity of the selection procedure that was used.

8    Q.    And the validity strategy that was used with regards

9    to these Akron lieutenant and captain promotional exams, was

13:13:02 10    contend validity?

11    A.    That's correct.

12    Q.    And is content validity the only strategy that's

13    possible to use?

14    A.    No, there are multiple strategies for validating

13:13:12 15    select procedures.

16    Q.    With regard to content validity, describe for the jury

17    basically what that is?

18    A.    Content validity is when you try to make sure that the

19    selection procedure is an adequate for representative sample

13:13:26 20    of what's perform on the job.

21         And one thing about consent validity is -- well,

22    another consideration is --

23              MS. AMBROSE-RUBRIGHT:  Objection.

24              THE COURT:  Sustained.  I'm sorry, sir.  Please

13:13:34 25    just answer the question.  Counsel will follow up with

1    additional questions.

2    Q.    There will be follow up-questions, Doctor.

3           THE COURT:  Thank you.  One issue at a time.  Go

4    ahead, sir.

13:13:42  5    Q.    With regard to consent validity, you testified that it

6    has to be representative of the -- what was it

7    representative of?

8    A.    We call it the job domain.

9    Q.    So that's a term the jury hasn't heard yet.  When

13:13:56 10    you're talking about job domain, sir, explain to the jury

11    what you're talking about?

12    A.    The job domain is determined through a job analysis.

13    When you're doing a job analysis, you identify work

14    behaviors or duties, tasks, these are the activities that

13:14:10 15    are performed by incumbents, and you lust typically identify

16    the knowledge, skills, and abilities that are required to

17    perform those duties or tasks.

18    Q.    And the knowledge, skills, and abilities are generally

19    abbreviated to KSA's?

13:14:25 20    A.    That's correct, that's an acronym.

21    Q.    Those becomes an alphabet soup-type thing.  So

22    whenever we're talking about KSA's we are talking about

23    knowledge, skills, ability?

24    A.    That's correct.

13:14:36 25    Q.    What are some of the underlying assumptions as far as

1    content validity.  What must -- in other words, in order for

2    content validity to be appropriate strategy, what must the

3    examination or selection method be in relation to the job to

4    make that argument?

13:14:55  5    A.    In order to be content valid, the two most important

6    things are that's it's a representative sample of the

7    particular job in question.  The second really important

8    feature of contend validation would be that the test itself

9    closely resembles the job.  The closer the test appears to

13:15:15 10    the actual job behave jurors, the more valid.  Earlier this

11    morning --

12    Q.    Wait a minute.

13    A.    Okay.

14    Q.    So, for example, when you talk with assessment center

13:15:24 15    exercises, those are what you characterized, I believe as

16    simulations?

17    A.    Yes, that's correct.

18    Q.    So the closer those simulations actually resemble the

19    actual experience you have on the job, the stronger the

13:15:36 20    argument can be made for content validity?

21    A.    That's correct.

22    Q.    And it works the other way, I guess, the farther

23    removed away the selection device is from the actual job,

24    the weaker argument is made for content validity?

13:15:49 25    A.    That's correct.

1    Q.    So, for example, in this case there are paper and

2    pencil tests?

3    A.    Correct.

4    Q.    How close to those types of tests resemble the actual

13:15:58  5    experience on the job?

6              MS. AMBROSE-RUBRIGHT:  Objection.

7              THE COURT:  It's overruled.

8    A.    Most jobs do not require people to answer multiple

9    choice questions.  Therefore, on the continuum, that would

13:16:09 10    not be similar to the job.  The term we use is fidelity.

11    Fidelity -- high fidelity is the close match between the job

12    and the test much so that would be a low fidelity test.

13    Q.    Being that it doesn't resemble the job?

14    A.    That's correct.

13:16:26 15    Q.    And the other attribute was that it has to be a

16    representative sample of the job domain?

17    A.    That's correct.

18    Q.    And to be a representative sample of the job domain,

19    what must an exam be?  What must it do?

13:16:40 20    A.    Well, it should be -- your goal is to measure as many

21    KSA's as feasible.  And as you're determining that, you

22    should try and measure the more important ones prior to the

23    least important ones.  You can't measure everything but your

24    goal is to try and -- given the entire domain, you want to

13:17:00 25    try and have a representative sample.  You don't want to

1  measure one narrow part of that domain.  You want to try and

2  be as comprehensive as you can.

3  Q.    The validation evidence that existed in this case, was

4  it sufficient to support an argument for content validity?

13:17:16 5  A.    I do not think so.

6  Q.    And, sir, what do you base that opinion on?

7  A.    The job analysis.

8  Q.    That's the next phase.  Do you have an opinion on the

9  job analysis on whether they were inadequate at both ranks,

13:17:35 10  captain and lieutenant?

11  A.    I believe the job analysis was inadequate at both

12  ranks, captain and lieutenant.

13  Q.    Let's start with the job analysis what do you base

14  that opinion on, Doctor.

13:17:49 15       Let me be a little more precise.  How was the job

16  analysis down in this case based on the documents that you

17  reviewed from E.B. Jacobs?  How was it done?

18  A.    To try and summarize the job analysis, it began by

19  convening -- just from, to start off, the job analysis

13:18:12 20  procedure was the same for the captain, so when I'm

21  describing this, it would be applicable to both lieutenant

22  and captain.

23  Q.    So the same process was used for both?

24  A.    That's correct.

13:18:20 25  Q.    Okay.  What did Akron do; what did E.B. Jacobs do as

1    far as how he conducted job analysis everyone the job

2    analysis?

3    A.    E.B.J. has a list of existing duties and tasks from

4    their file drawer or off their shelf, whatever you want to

13:18:38  5    call it, from their previous work.  The job analysis began

6    with that list of tasks from other agencies.

7    Q.    So this was a task analysis?

8    A.    This would be -- yeah, an analysis of the tasks that

9    are used in the job.

13:18:52 10    Q.    And let's talk, Dr. Brink, if we could, please, one of

11    the things that an exam is supposed to measure, tasks versus

12    duties, versus abilities versus knowledge.  Define tasks,

13    duties, abilities, and knowledge for this jury, please.

14    A.    Okay.  Duties and tasks are similar.  They're

13:19:17 15    activities that are performed on the job.  Typically duties

16    are also call work behaviors.  These are broader activities.

17    Tasks fall within those work behaviors.  So we have a

18    general category called work behavior or duty.  Being in a

19    might be five, ten, 15 tasks that help clarify or narrow

13:19:35 20    down what's actually performed within that work behavior .

21         Knowledge is typically refers to a body of information

22    that you might use or reference on the job.  And this could

23    be procedure manuals, operations manuals, a number of other

24    knowledge sources.

13:19:51 25         And abilities are -- easiest to describe abilities is

             1    with examples, mathematical exhibit, memory, interpersonal

             2    skills, these are the scope of the abilities we possess.

             3    Q.    Just for the benefit of the court reporter, you have

             4    to slow it down just a little bit?

13:20:13     5          Dr. Brink, when we're talking about Akron's job

             6    analysis, the job analysis that was done in Akron, was this

             7    off the shelf or task list that Dr. Jacobs or Jacobs had,

             8    did you have a chance to see that during your review of

             9    document?

13:20:32    10    A.    Yes, I did.

            11    Q.    Did Dr. Jacobs in his final report or anywhere explain

            12    where these tasks came from?

            13    A.    Not specifically.  I believe it was indicated in the

            14    report that the tasks were from prior -- from work done in

13:20:54    15    prior agencies.

            16    Q.    Prior agencies, prior cities?

            17    A.    Yes, I would presume cities outside the City of Akron.

            18    Q.    So what did Jacobs & Associates do with that task

            19    analysis?  What did they do with it?

13:21:08    20    A.    They convened a group of six people and they asked

            21    those six people to review those task and duties.

            22    Q.    We were starting to talk about job analysis but only I

            23    don't think so went into specifics.  Specifically what is a

            24    job analysis?

13:21:29    25    A.    A job analysis is a study of a job, really to identify

1    what's performed on the job.  And this is the duties and

2    tasks I talked about earlier, as well as what's required to

3    perform the job.  And this would be the knowledge, skills

4    and abilities or KSA's.  So it's a study of what's performed

13:21:49  5    and what it takes to perform that.

6    Q.    And why do you do it?

7    A.    Job analysis is a foundation for validity.  Without a

8    job analysis, there is simply no way to know if your test is

9    valid.  You have to know what's required for the job before

13:22:04 10    you can measure -- before you can develop a test to measure

11    whether or not somebody would perform well in the job.  We

12    call it the foundation for our validation studies.

13    Q.    And how do you do it in Jefferson County?

14    A.    The job analysis process we follow at the personnel

13:22:26 15    board at Jefferson County begins with a review of whatever

16    information we might have on hand.  That may be previous job

17    analyses that we perform at Jefferson County.  It may be

18    class specifications which are shorter descriptions of jobs.

19    It might be research related to the applicable job.  That's

13:22:43 20    the first step.

21    Q.    What's the next?

22    A.    The second step we usually follow is to conduct what

23    we call site visits or site observations.  And this is where

24    a person will go out and actually observe an incumbent

13:22:56 25    performing their job.  We're trying to see what they

1    actually do on the job, observe what they perform on the

2    job.  We can ask them what work is on the job, ask them for

3    examination of documents of materials that people used on

4    the job, to try and get an in-depth understanding of what

13:23:10  5    they actually do.

6    Q.    Then what?

7    A.    Our next step is we convene what we call focus groups

8    with the incumbents, and we have incumbents are people who

9    are currently working in the job that we're studying.

13:23:24 10    Q.    What do you do with this focus group?

11    A.    Actually, between the site visits and focus groups, we

12    developed a preliminary list of work behaviors or duties,

13    tasks, as well as knowledge, skills and abilities.

14    Q.    You do that?

13:23:38 15    A.    That's correct.

16    Q.    Go on.  I didn't mean to interrupt you.

17    A.    So in this focus group, we bring together six, eight,

18    ten subject matter experts, we refer to them as.  These are

19    incumbents who are employees in the job.  And we ask them to

13:23:53 20    review those lists.  We ask them to see if anything is

21    missing.  If so, we would add that in.  Or if it is

22    something that's inappropriate, we would want to remove

23    that.  Or we ask them to revise information that might be

24    there as applicable.

13:24:08 25    Q.    What do you do with that information?

1       A.      Based on that information, we will revise that list.

2    And then we will convene a second group of supervisors to

3    confirm or also review what the incumbents or employees

4    revised.  Then we will have them go through the same process

13:24:27  5    of examining work behaviors, the tasks, as well as the

6    knowledge, skills and abilities that are required, and then

7    add if anything is missing, delete things that are not

8    important or revise things that may not be applicable.

9       Q.      So by the time you get to the supervisors, you have

13:24:44 10    already done more than one visit?

11       A.      That's correct.

12       Q.      You already done focus groups with incumbent in the

13    position?

14       A.      That's correct.

13:24:51 15       Q.      And after you do the supervise, do you do anything

16    after that?

17       A.      We would revise the list again, if there were changes,

18    and then we put work behaviors, tasks, knowledge skills and

19    ability in a questionnaire and then we administer that

13:25:04 20    questionnaire to the subject matter experts.

21       Q.      What do you do with the results from that?

22       A.      We will analyze those results and look at what some of

23    the more important work behaviors tasks and KSA's are.

24       Q.      At any time do you ever go to the general population

13:25:20 25    of incumbents in the position beyond the focus group to get

1    their input?

2    A.    The job analysis questionnaire would be getting their

3    input.  It's a questionnaire where we ask them to rate the

4    importance of, for example, duties, tasks, and KSA's.  So we

13:25:38 5    are getting input from the incumbents the subject matter

6    expert's subsequent to the focus groups.

7    Q.    Okay.  The questionnaire is distributed on the average

8    to what percent average of all the incumbents?

9    A.    I think for the most part we target around 75 percent

13:26:05 10    to the incumbents.  Some jobs have fewer incumbent.  If

11    there were only ten incumbents we to try and target all ten.

12    If there are a hundred or a very large number, we would

13    probably target around 75 percent.

14    Q.    How many subject matter experts were there in the City

13:26:31 15    of Akron for each rank at the job analysis phase of this

16    examination?

17    A.    There were six subject matters used and captain and

18    lieutenant.

19    Q.    Do you know how they were selected?

13:26:46 20    A.    I do not.

21    Q.    Was it disclosed anywhere how they were selected in

22    either the final report or any of the documentation that was

23    given to you as part of this case?

24          MS. AMBROSE-RUBRIGHT:  Objection.

13:26:59 25    A.    I don't believe so, but I would have to check the

1       report.

2                      THE COURT:  Excuse me.  Just a second.  There is

3       an objection.

4                      THE WITNESS:  Sorry.

13:27:09  5            THE COURT:  It's overruled.  You can answer the

6       question, if you know.

7       Q.    The question was, was it disclosed to you how the

8       subject matter experts were selected?

9       A.     It may be in the report, I don't think.  I do not

13:27:23 10     think it was disclosed.

11                     THE COURT:  Do you know or do you not recall?

12      What's the answer?

13                     THE WITNESS:  I'm sorry.  I do not know.

14                     THE COURT:  Thank you.

13:27:31 15     Q.    What are the subject matter expert's responsibilities

16      with respect to defining the job domain?

17      A.     Subject matter expert -- I mean the responsibility

18      would be to give a thorough review of the lists, and provide

19      their evaluation of whether or not they actually perform the

13:28:07 20     duties that are described and provide input into whether or

21      not the lists are appropriate.

22      Q.    What are day one ratings?

23      A.     Day one ratings are ratings that identify whether or

24      not a particular knowledge, skill, ability or duty is

13:28:25 25     required when a person enters the job.  And this is

1  something that's required by the uniform guidelines and SIOP

2  principles.  It's inappropriate to measure something what's

3  not needed before a person would enter the job.

4  Q.    Explain that.  What does that mean?

13:28:41  5  A.    For example, if a person learns about a knowledge

6  while they're on the job, or if they develop skills through

7  coaching or whatever it might be, once they're hired or

8  promoted to that job, it's not something that you would want

9  to measure in the selection procedure because technically

13:28:59  10  it's not actually required before they enter the job.

11  Q.    Does that same rational apply to duties and

12  responsibilities that an incumbent or someone assigned to a

13  job is never required to know?

14  A.    Please repeat the question.

13:29:16  15  Q.    Sure.  Does that also apply to those duties, tasks,

16  that a person promoted to the position is never required to

17  know?

18  A.    Yeah, if a person would never be required to know

19  that, then it would not be needed at entry.

13:29:35  20  Q.    And the data that was provided by E.B. Jacobs to you,

21  and the documentation provided relating to the City of Akron

22  lieutenant and captain examinations in question, was there

23  ever any identification of day one responsibilities or day

24  one duties anywhere in that data?

13:30:01  25  A.    There were day one ratings for the knowledge sources.

1204

1    Q.    For anything else?

2    A.    There were not day one ratings for abilities or duties

3    or tasks.

4    Q.    Is will a difference between independent rating and

13:30:22 5    consensus rating with regards to a job analysis?

6    A.    Yes.

7    Q.    Explain to the jury, first, what independent rating is

8    and the second one, what consensus rating it?

9    A.    An independent rating would be what you have if you

13:30:36 10    give a survey to people.  If I ask you all to take a survey,

11    and you take that survey home and fill it out and give it

12    back to me, that would be an independent rating.

13          A consensus rating would be perhaps I gave you all the

14    same survey, but we sat in the same room, and we talked

13:30:55 15    about our responses to that survey, that would be consensus.

16    So as a group, you as a whole reach consensus rating.

17    That's the difference between the two.

18    Q.    And what significance does that have in working

19    through a job analysis?

13:31:09 20    A.    Independent ratings are prone to measurement error.

21    We'll --

22    Q.    We'll talk about that.  What is measurement error?

23    Explain that.  What is measurement error?

24    A.    Well, let's me use the context of a job analysis.

13:31:32 25    Suppose you all have the same -- perform the same job in

1    general but you might each have -- 50 percent of your job

2    might overlap.  You each might have a unique 50 percent as

3    well.  If you work together as a group, it's much easier to

4    come to consensus what that job broadly defined, might

13:31:52  5    entail.

6         However, when you're focusing on your individual job

7    as an individual with individual ratings, you're not taking

8    into account what other people working in that job might

9    actually do.  So with that, you get measurement error, the

13:32:04 10    results of your independent ratings would be further removed

11    from what's performed in the actual job, than results of

12    consensus rating would be because you can discuss things and

13    share things about what you perform to help or understand

14    what you might be performing in your job.

13:32:20 15    Q.    With regards to the job analysis that was performed

16    here in Akron, was it independent or consensus?

17    A.    The validation report indicates that the ratings on

18    duties were independent.

19    Q.    Is that consistent with other data you've seen

13:32:40 20    provided to you in this case from either Jacobs or Akron

21    about the job analysis?

22    A.    I don't believe I've seen any data from the job

23    analysis.  I have not.

24    Q.    How about any statements -- any information provided

13:32:55 25    to you at all regarding the job analysis from Jacobs or an

1206

1    employee of Jacobs?

2    A.    Including defendant declarations?

3    Q.    Sure.

4    A.    Yes.

13:33:08  5    Q.    Explain the difference.  Go ahead.

6    A.    Okay.  The validation report says that the ratings

7    were independent.  However, a declaration by Mr. Hinnish, I

8    believe is how you say his name, indicated that they were

9    actually consensus.

13:33:22 10    Q.    And what happened -- well, what was the final report

11    prepared, do you remember?

12    A.    The validation report?

13    Q.    Yes.  The validation report.

14    A.    I believe the work was done in 2003 and the report was

13:33:37 15    printed or published or dated in 2004.

16    Q.    Mr. Hinnish's declaration, what was that dated?

17    A.    That would have been the last four months.

18    Q.    After your deposition, sir?

19    A.    That's correct.

13:33:53 20    Q.    Are there any American psychological association

21    standards that relate as to what you must specify as to the

22    method used for job analysis, whether it be independent or

23    consensus ratings?

24    A.    The APA standards specify -- it's not specific to job

13:34:24 25    analysis but any research or validation process, they

1  specify that it's important to identify whether or not it is

2  independent or consensus.

3  Q.    For what reason?

4  A.    There is nothing wrong with either one.  But when

13:34:39  5  you're evaluating the work, it's really important that you

6  know which method was followed.  Consensus is okay in some

7  circumstances, and independent ratings are okay in some

8  circumstances as well.  But it's important that as an

9  evaluator that might be reviewing the research and the

13:34:53 10  validity information that you actually know.

11  Q.    What impact does the job analysis have on component

12  weighting?

13  A.    There is a number of ways to weight your selection

14  components.  One of those ways would be based on the results

13:35:23 15  your job analysis.

16  Q.    When we are talking about component waiting, define

17  for the jury what do you mean by component weighting, and

18  your spelling weighting W-E-I-G-H-T-I-N-G?

19  A.    That's correct.

13:35:36 20  Q.    So using it as that word.  Okay.  Explain what

21  component weighting is.

22  A.    First of all, a component would be one selection

23  exercise or device.  In this case, for example, one

24  components would be the knowledge test.  Another component

13:35:51 25  would be the written work sample.  A third component, the

1    oral boards.  So these are the given components that were

2    used.  Component weighting is when weights are actually

3    established and assigned to scores on each component.  If

4    one component is more important than the other two

13:36:08  5    components, that will receive the highest weight.  And this

6    together, the weights, the components that are weighted, are

7    summed together to perform an overall score.

8    Q.    And what impact does job analysis have on the total

9    weighting?

13:36:29  10    A.    The component that measures more important aspects of

11    the job as defined by the job analysis would receive a

12    higher weight.

13    Q.    When was the component weighting for these tests

14    administered in Akron determined by E.B. Jacobs?

13:36:49  15    A.    According to the validation report, the component

16    ratings were established after the job analysis but before a

17    test plan or before the actual tests were developed.

18    Q.    Why is that significant to you?

19    A.    They established weights for a test that did not yet

13:37:09  20    exist.

21    Q.    So before the test had ever been defined, they were

22    establish being weights of components?

23    A.    Yes, before the test was even developed, they

24    established the importance of the different components of

13:37:22  25    the test.

1    Q.    How were the abilities defined?  First you have the

2    tasks.  Then that defines tasks and duties, if I understand

3    what you're saying.  And then there is abilities.  How were

4    those determined?

13:37:50  5    A.    The abilities were presented to the subject matter

6    experts by E.B. Jacobs.

7    Q.    Do you know where they came from?

8    A.    Based on recent declaration, the ability were based on

9    the taxonomy of ability.

13:38:11 10    Q.    Spell that.

11    A.    T-A-X-O-M -- O-N-O-M-Y.

12    Q.    What is a taxonomy?

13    A.    A taxonomy is -- it's a listing of ability.  This

14    particular taxonomy was called the grade eight taxonomy.

13:38:43 15    Q.    What does that mean?

16    A.    And this apparently is taxonomy of supervisory

17    abilities.  So it's a listing of supervisory ability.

18    Q.    In your typical job analysis, who determines the

19    abilities to be measured by the examination?

13:39:01 20    A.    Both the uniform guidelines and the SIOP principles

21    indicate that subject matter experts, which would be the

22    incumbents or supervisors, actually identify the ability.

23    Q.    In this case who identified the ability?

24    A.    E.B. Jacobs offered the ability apparently from the

13:39:22 25    grade A text on my.

        1    Q.    Is there any indication in the information provided to
        2    you that the subject matter experts had any input in the
        3    determination of abilities that were going to be measured by
        4    these exams?
13:39:39 5    A.    The validation report simply indicates that they link
        6    the ability to the work behaviors.  It does not indicate
        7    they have any input as they did with the tasks.
        8    Q.    Is that consistent with uniform guidelines and SIOP
        9    principles?
13:39:54 10   A.    The SIOP principles and uniform guidelines indicate
       11    that the subject matter expert should be the ones creating
       12    the ability or identifying the abilities.
       13    Q.    What impact, going back to rate weighting just for a
       14    minute.  What impact, sir, Dr. Brink, does weighting an
13:40:15 15   examination that does not yet exist have on the relation or
       16    pertinence of those --
       17                COURT REPORTER:  I'm sorry.  Can you repeat that.
       18                MS. AMBROSE-RUBRIGHT:  Objection.
       19                THE COURT:  I sustained the objection.  I'm going
13:40:42 20   to ask the question either be withdrawn or rephrased.
       21                MR. THOMPSON:  I'll withdraw the question.  That
       22    way we don't have to worry about it.
       23    Q.    Doctor, do you have an opinion as to whether or not
       24    the number of subject matter experts that were used to
13:41:18 25   develop the exams in this case were adequate?

```
 1              MS. AMBROSE-RUBRIGHT:  Objection.

 2              THE COURT:  Overruled.

 3    A.   I do not believe the sum of subject matter experts

 4    that were used for either lieutenant or captain was

13:41:30 5    adequate.

 6    Q.   And explain what that opinion is based on, sir?

 7    A.   Assuming that, again, these are independent ratings,

 8    there is an equation that you can use to calculate the

 9    confidence, the list of confidence you have in independent

13:41:49 10    ratings given certain sample size.

11    Q.   Okay.  Let's talk about this just for a little bit.

12         If these are independent assessor ratings as E.B.

13    Jacobs indicates in the final report, are they subject to

14    some kind of statistical analysis?

13:42:04 15    A.   Yes.

16    Q.   You use some terms, confidence levels and so forth.

17         What sign of statistical analysis are independent

18    ratings amenable to being used?

19              MS. AMBROSE-RUBRIGHT:  Objection.

13:42:16 20              THE COURT:  Sustained, sir.  Why don't you

21    rephrase the question?

22              MR. THOMPSON:  Thank you.

23    Q.   What kind of statistical analysis would be pertinent

24    to analyzing independent job ratings?

13:42:27 25              MS. AMBROSE-RUBRIGHT:  Objection.
```

| | |
|---|---|
| 1 | THE COURT:  It's overruled. |
| 2 | A.    I performed an analysis looking at that.  I'm not sure |
| 3 | there is necessarily a name for that analysis.  It looks at |
| 4 | the confidence level and margin of error of survey ratings. |
| 13:42:39 5 | Q.    And that kind of analysis was derived from where, the |
| 6 | method that you used? |
| 7 | A.    It's an equation that's -- you can derive it from |
| 8 | statistical textbooks that talk about probability and |
| 9 | sampling. |
| 13:42:54 10 | Q.    And base on that analysis, how big should these SME |
| 11 | samples have been? |
| 12 | MS. AMBROSE-RUBRIGHT:  Objection. |
| 13 | THE COURT:  It's overrule.  Based upon are |
| 14 | analysis in your opinion. |
| 13:43:06 15 | Q.    In your opinion. |
| 16 | THE COURT:  Why don't you rephrase the question, |
| 17 | based upon his knowledge, skill and experience in his |
| 18 | opinion, please.  He is testifying as an expert, ladies and |
| 19 | gentlemen.  He is giving his opinions based on the |
| 13:43:16 20 | underlying data in this case. |
| 21 | Q.    Dr. Brink, in your opinion, based on your training, |
| 22 | skills and experience, and based on your education and your |
| 23 | evaluation of the data in this case, what should the number |
| 24 | of SME's have been with relation to each of these numbers? |
| 13:43:37 25 | A.    I did the calculations in my report. |

1   Q.    I'm just looking for the numbers.

2   A.    For an 80 percent confidence level, which is a really

3   a low confidence level -- ideally we look for 90 percent

4   confidence level -- but with the 80, I found that 29 subject

13:44:11 5   matter experts would be needed for fire lieutenant, and 15

6   subject matter experts would be needed for fire captain.

7   Q.    Dr. Brink, do you have an opinion, sir, as to if the

8   examinations in this case can be demonstrated to be job rate

9   related or valid based on the job analysis?

13:44:40 10                 MS. AMBROSE-RUBRIGHT:  Objection.

11                 THE COURT:  It's overruled.

12   A.    My opinion is that this test cannot be validated or

13   you cannot develop a valid test because the job analysis was

14   insufficient.  As I said earlier, the job analysis is the

13:44:55 15   foundation for your test development process.  If it's

16   insufficient, there would need to be foundation, and no

17   matter what kind of test you develop can't be valid.

18   Q.    And the basis of for that opinion, sir, is -- you base

19   that opinion on what, sir?

13:45:13 20   A.    On my review of the job analysis and some of the

21   things that we talked about.

22   Q.    Was there any evidence from the information provided

23   to you that Jacobs & Associates considered any alternative

24   weighting -- call it schemes, I don't like that

13:45:40 25   word -- weighting alternatives?

1    A.    E.B.J. proposed three weighting method in their

2    validation report.  They name the methods and they

3    identified the weights but they didn't actually evaluate how

4    those weighting methods would have turned out with their

5    data.

6    Q.    Did you evaluate those alternative weighting systems

7    or weighting schemes as proposed by E.B. Jacobs?

8    A.    Yes, I did.

9    Q.    And in those alternative weighting schemes that you

10   evaluated, did you prepare an analysis as to what the

11   outcome would have been had those weighting alternatives

12   been actually employed with relation to these tasks?

13   A.    Yes, I performed those calculations.

14         MR. THOMPSON:  Your Honor, these are the tables

15   in the supplemental report.  We would like to introduce them

16   for the purpose of this examination if we could, please?

17         THE COURT:  You may.

18   Q.    Directing counsel to page 5 of the supplemental

19   report.  In front of you is what is identified, sir, as

20   table 5.  Let me know when you're there, please.

21   A.    I'm there.

22   Q.    Tell the jury what table 5 is, sir?

23   A.    Table 5 compares adverse impact using four-fifths rule

24   or the impact ratio when using five different weighting

25   methods.  And this is done for lieutenant on race.

1    If you look at the first column, you will see we're

2    looking at rank.  This would be ranks on the test.  So the

3    range here is ranks 21 through 35.  The actual number of

4    ranks that were actually used in this test, the number of

13:47:41 5    people that were promoted was 28.  So you can see the middle

6    row is bolded.  That's rank 28, and that's where the actual

7    selections ended.

8         And we showed ranks 25 percent above and below where

9    they actually ended up.  That's were we have ranks 21

13:47:58 10   through 35.

11        The next column shows adverse impact, again, using the

12   impact ratio with a method that was actually selected by

13   E.B.J.

14   Q.   And when you say the second column, this column here?

13:48:13 15   A.   It's the B -- it's the E.B.J. selected method.

16   Q.   This one?

17   A.   Yes, that's correct.

18   Q.   And you can that screen when you want to circle

19   certain things, then tap it in the lower left corner to

13:48:29 20   clear.  If you want to direct the jury to things, Doctor,

21   feel free, and then you can clear it.

22             MS. AMBROSE-RUBRIGHT:  Objection, Your Honor.

23             THE COURT:  Yes.  Pose specific questions

24   regarding both the report, please, if you would, please.

13:48:41 25   Q.   You were on column two.  Explain the next column?

1    A.    The next column, the sum of weighed means

2    meted -- actually, the next three columns were methods that

3    were named by E.B.J. in their validation report.  They

4    actually name these methods.  They determined the weights

13:49:10  5    that would apply to the components if they would have used

6    these methods in the validation report.

7        What we did is reanalyzed the data using these three

8    weighting methods that again E.B.J. identified.

9    Q.    And what did you find?

13:49:25 10    A.    We found in all cases that that adverse impact would

11    have been better or equal at all ranks, using all methods,

12    or to say it another way, E.B.J.'s method was equal to or

13    worse than all of the other method at all of the other ranks

14    in terms of the adverse impact.

13:49:49 15    Q.    Is there another table in the report that addresses

16    this issue?

17    A.    Yes.  If you wouldn't mind, if we would back up to the

18    last column in that.

19    Q.    Oh, okay.  I'm sorry.  So you're now at this column

13:50:04 20    here?

21    A.    Just to recap, the first method was the method

22    actually selected by E.B.J.  The next three columns were

23    weights they identified in their report but didn't actually

24    use or try.  The last column is another method that's

13:50:19 25    sometimes used in test validation, and that's the dimension

1   weighted method.  What this does is it assumes that we don't

2   really have components.  Each of the components measures

3   certain abilities.  What this does is it derives weights for

4   abilities instead of components.  It's just another way to

13:50:38 5   calculate weights using test scores.

6        And this method like the other three resulted in less

7   adverse impact that was less than or equal to that of the

8   method chosen by E.B.J.

9   Q.    Anything else that this chart shows to us?

13:50:59 10   A.    Unfortunately, some of the values are bold and some of

11   them are not.  I don't know if you can see that on your

12   screen.

13        THE COURT:  Can you see it, ladies and gentlemen?

14   Q.    Can you circle the ones that are bold?

13:51:26 15   A.    Most of the values that fall below that line are

16   bolded.  And those are where adverse impact was actually

17   more favorable than the E.B.J. method.

18        Another thing to point out --

19        MS. AMBROSE-RUBRIGHT:  Objection, Your Honor.

13:51:42 20        THE COURT:  Yes, sir.  Just wait for another

21   question, please, sir.

22        Next question, please.

23   Q.    Is there anything else that you want to demonstrate

24   with regards to this chart?

13:51:51 25   A.    One final thing is you'll notice that -- especially in

1    the sum of weighted mean method, you will see several values

2    greater than or equal to .80.  .80 is the cutoff for the

3    impact ratio.  If the impact ratio is less than .8, there is

4    adverse impact.  If it's .8 or greater, there is no adverse

13:52:14  5    impact.  So what you can see is using the sum of weighted

6    means method, as well as the dimension weighted means

7    methods, would have resulted in several ranks that did not

8    have adverse impact.

9    Q.    And what does table 6 show, sir?

13:52:40  10   A.    Table 6 shows the exact same thing with respect to the

11   fire captain test.  The same weighting methods.  The captain

12   test promoted through rank 12.  We once again went 25

13   percent above and below rank 12 which is ranks 9 through 15.

14         In almost all cases, adverse impact was better than

13:53:08  15   the E.B.J. method.  There were only two values in this table

16   that are not bold which would mean that there are only two

17   values that are actually equal to adverse impact using the

18   E.B.J. method.  That would be the two right here.

19         In every other case, adverse impact was -- there was

13:53:30  20   less adverse impact in the method chosen by E.B.J.  And you

21   can also notice that at rank 12, the rank where hires

22   actually stopped, both the sum of weighted means method and

23   the dimension weighted means method would have resulted in

24   no adverse impact as evidenced by an impact ratio of .84

13:53:52  25   which again is greater than .8.

1      Q.      What is required of any tester to do with regards to

2      looking for alternative methods?

3      A.      A person who's developing a test should try and

4      identify alternatives before they start test developments.

13:54:22   5      And if there is adverse impact, they should also try to

6      determine or seek to determine if there are other

7      alternatives that could have been used that would have been

8      equally valid but would have resulted in less adverse

9      impact.

13:54:36  10      Q.      Is that required also under the SIOP principles?

11      A.      That's correct.

12      Q.      And with regards to the alternative measures being

13      considered by any testers, in this case testing consultant,

14      is it required that they document what they have done?

13:54:49  15      A.      That is correct.

16      Q.      And is that also under the SIOP principles?

17      A.      Yes.

18      Q.      In the data that you reviewed in the final report or

19      in the validity report that was prepared by E.B. Jacobs, is

13:55:08  20      there any documentation anywhere of alternative measures

21      considered by E.B. Jacobs?

22      A.      No, there is not.

23      Q.      Do, you have an opinion on whether E.B. Jacobs

24      gathered ratings from the subject matter experts on relevant

13:55:37  25      work behaviors -- strike that question.

1           Do you have an opinion on whether E.B. Jacobs gathered

2     appropriate or adequate information from the subject matter

3     experts regarding work behaviors that are required day one?

4     A.    They did not gather day one ratings as required by the

5     uniform guidelines.

6     Q.    And upon what do you base that opinion, sir?

7     A.    On validation report.

8     Q.    What would you expect to see in the validation report

9     that would support a consideration that the testing

10    consultant in this case actually used the SME's to consider

11    day one ratings?

12    A.    Well, they very clearly used it for the knowledge

13    sub-source ratings that actually had a day one rating scale

14    and they asked the subject matter experts to consider the

15    knowledges and whether or not they're needed at day one, so

16    they thought it was important for the knowledges, however,

17    they did not gather those same rating for duties or

18    abilities.

19    Q.    Doctor, you have an opinion, Dr. Brink, do you have an

20    opinion as to whether the promotional examinations in this

21    case assessed a representative sample of the job domain?

22    A.    I have an opinion.

23    Q.    And your opinion is, sir?

24          MS. AMBROSE-RUBRIGHT:  Objection.

25          THE COURT:  It's overruled.

1    A.      I do not think it assessed a representative sample of

2    the job domain.

3    Q.      And why not?

4    A.      For one, the job analysis, I do not think, fully

13:57:16  5    define the job domain.  If you don't know the entire domain

6    is, then it's impossible to know if you have a

7    representative sample of that domain.

8          To give you an example, if I pull a --

9              MS. AMBROSE-RUBRIGHT:  Objection.

13:57:28 10              THE COURT:  Sustained.

11    Q.      If you would, please, describe for the jury what an

12    example would be of a job domain that is adequately

13    represented by an examination?

14    A.      If you permit me to use an example that's not related

13:57:55 15    to job analysis to clarify it.

16    Q.      Please.

17    A.      Suppose I pull a handful of jelly beans outs of my

18    pocket and I asked if that handful of jelly beans was a

19    representative sample of my jar of jelly beans at moment.

13:58:07 20    How would you know that unless you knew what was in my jar

21    of belly jeans.

22          You would have to know what colors I have in my jar,

23    how many of those colors I might have in my jar, but you

24    can't know in my pocket all of the jelly beans as a

13:58:19 25    representative sample because you don't know what the entire

1    domain is.

2         The same thing occurs in a job analysis.  If you don't

3    identify the entire domain, you simply can't know if you've

4    measured the representative sample of that domain.

13:58:34  5    Q.    Doctor, you have an opinion as to whether alternative

6    measures, as far as assessments, were considered by E.B.

7    Jacobs in its testing process for lieutenant and captain?

8    A.    No alternatives were considered.

9    Q.    Ab you base that upon, sir?

13:59:04 10   A.    The validation report identified the types of measures

11   that were used, but it identified no consideration of any

12   other types of measures.

13   Q.    So there is no documentation provided?

14   A.    That is correct.

13:59:17 15   Q.    Do you have an opinion as to whether the assessment

16   process was impacted due to vague behavioral anchors?

17   A.    Yes, I do.

18   Q.    First of all, what's your opinion?

19   A.    My opinion is that it was affected by vague behavioral

13:59:42 20   anchors.

21   Q.    What do you base that opinion on?

22   A.    Behavior anchors are --

23            MS. AMBROSE-RUBRIGHT:  Objection.

24            THE COURT:  Let's start with some foundation.

14:00:03 25   What is a vague behavioral anchor.

1    Q.    Fair enough.  What is a vague behavior anchor?

2    A.    Let me start with the oral board.  The oral board

3    test.

4              THE COURT:  The question is what is a behavior

14:00:19 5    anchor?  Start with that.

6    A.    A behavioral anchor is used to help guide assessors

7    when they are rating candidates on a dimension.

8    Q.    Let's talk about dimension.  What is a dimension?

9    A.    Dimension would be in the case of the oral board test,

14:00:34 10   one of the abilities that was measured in the oral board.

11   Q.    And did you have a chance to review the behavioral

12   anchors that were used with these exams?

13   A.    Yes, I did.

14   Q.    And --

14:00:47 15            MR. THOMPSON:  Your Honor, I'm going to direct

16   the witness to Exhibit 1030 which is a defense exhibits.  It

17   was provided, and this is out of the assessor training

18   manual and we would request permission to publish this to

19   the jury, sir.

14:01:13 20            MS. AMBROSE-RUBRIGHT:  No objection.

21            THE COURT:  All right, sir.  Go ahead and publish

22   it, please.

23   Q.    This is defined as the oral board behaviorally

24   anchored rating scales, and this says oral expression.  What

14:01:35 25   is this?

1    A.    This is a listing of behavioral anchors that were used

2    to rate candidates on oral expression on the oral board

3    portion of the exam.  At the top you can see number 9.

4    Number 9 would be the highest possible score in this

14:01:51  5    dimension and the behavioral anchor describing 9 would be

6    spoke in a clear, fluent and articulate manner.

7         If you go on down the list there is behavioral anchors

8    for ratings that would be assigned from 9 all the way down

9    through 1.

14:02:05 10    Q.    Was it determined or could you determine from the

11    report from E.B. Jacobs how these rankings or behavioral

12    anchors were determined?

13    A.    I did not know how they were determined.

14    Q.    Exhibit 1030-32.  It says interpersonal relation, and

14:02:37 15    these are behavioral anchors for this dimension?  It should

16    be the very next page.  Do you know where these behavior

17    anchors came from?

18    A.    The report does not indicate where the anchors came

19    from.  I'm sorry, when you say where they came from, the

14:03:13 20    documents in the appendicis, is that what you're asking?

21    Q.    Yes.  Or how these were determined.  It there any

22    indication how these were determined?

23    A.    No, there is not.

24    Q.    Is there some of the information that would need to be

14:03:27 25    documented in a validation report?

1     A.    Yes, it should be.

2             MS. AMBROSE-RUBRIGHT:  Objection.

3             THE COURT:  Well, I'll allow the question.

4     Counsel, please, nonleading questions, sir.  Thank you very

14:03:37 5     much.

6     Q.    Dr. Brink, tell us, if you would, please, what impact,

7     lack of documentation has on the ability of any

8     professional, such as yourself, to go back and assess these

9     examinations in terms of validity, content, or any of the

14:03:57 10    attributes that you have to determine whether the exam is

11    content valid?

12    A.    The validation report would document the entire study

13    in enough detail that somebody else within the profession

14    could come replicate what was done.  And this is specified

14:04:14 15    in the uniform guidelines and SIOP principles.

16    Q.    Was that kind of documentation -- strike that.

17          The did that kind of documentation exist in this case?

18    A.    No, it did not.

19    Q.    As far as these behavioral anchors that we were

14:04:40 20    looking at, are the type of oral communication skills

21    example that are appropriate for one scenario applicable to

22    another scenario?

23    A.    Not necessarily.

24    Q.    Give an example of that, please?

14:05:06 25    A.    Well, behavior related to a dimension in one context

1 might be different or appropriate behavior related to a

2 particular dimension or ability in one context may differ

3 from another.  An example would be interpersonal skills in

4 the courtroom, here, appropriate incident personal skills in

14:05:23 5 the courtroom maybe very different than appropriate

6 interpersonal skills at a party, for example.

7 Q.    So it sounded like you just used interpersonal skills

8 as a generic terms that just goes across the board?

9 A.    Right, to the degree that the dimension related

14:05:41 10 behavior may different across exercises, you should reflect

11 that.  Different scenarios would perhaps require different

12 types of dimension-related behavior.

13 Q.    Is there anything in the validation report that

14 indicates that these behavior anchors were somehow rooted in

14:05:59 15 the job analysis?

16 A.    There is no indication of that.

17 Q.    And when you say that these were vague behavioral

18 anchors, what do you mean by that?

19 A.    They were not sufficiently specific to the particular

14:06:20 20 exercises or components.  In fact, they were identical

21 across the different oral board exercises.  And across

22 lieutenant and captain.  Behavioral anchors were the same

23 regardless of the component or the job level.

24 Q.    So the behavioral component, for example, oral

14:06:39 25 expression for the group exercise was identical as it was

1    for the subordinate conference was identical as it was for

2    the incident command?

3    A.    That's correct.

4    Q.    And do you have an opinion, sir, as to whether that

14:06:52  5    was appropriate?

6    A.    Yes, I do.

7    Q.    And that opinion is?

8    A.    It's not appropriate.

9    Q.    And that goes back to the context that you were

14:06:58 10    talking about just a few minutes ago?

11    A.    That's correct.  It should be more specifically

12    related to the particular exercise that the candidates are

13    performing.

14    Q.    In performing the analysis that needs to be done to

14:07:10 15    establish the context for these dimensions, how do you do

16    that?

17    A.    What we usually do is, at the personnel board is when

18    we are developing exercises with the subject matter experts,

19    we would have to develop we would have them develop bench

14:07:32 20    marks that are used synonymously in each of those exercises.

21    So once they develop the exercise, we have them develop

22    behavior anchors that reflect each of the ability as

23    reflected in that particular exercise.

24        So would hardly ever have the same exercise -- excuse

14:07:50 25    me, the same dimensions across exercises, have the same

1    bench marks or behavioral anchors.

2    Q.    So you define the behavioral anchors first based on

3    the context exercise?

4    A.    We first identify what abilities we're trying to

14:08:13 5    assess.  We develop an exercise to reflect those abilities,

6    then we develop behavioral anchors to score a person on

7    those particular abilities in the context of that exercise.

8    Q.    And we saw on the sheets that we just put up, the

9    stuff we just put up, we saw the term dimension.  Explain

14:08:36 10    that to the jury, please.

11    A.    The dimension in an exercise is nothing more than the

12    ability from the job analysis.  So the job analysis

13    identified ability, and the dimensions in the test were

14    actually the same thing as the abilities.  So they're

14:08:51 15    synonymous term.

16    Q.    Dr. Brink, do you have an opinion if there was any

17    basis for rank ordering the candidates in this exam?

18    A.    Yes, I do.

19    Q.    And that opinion is?

14:09:13 20    A.    There was no documentation in the validation report to

21    support rank ordering.

22    Q.    And you base that conclusion on what, sir?

23    A.    Based on E.B.J. validation report.

24    Q.    And specifically what from Jacobs' validation report

14:09:31 25    do you base that conclusion?

1    A.    Well, there was nothing in there to specify that it

2    was appropriate.  The guidelines and principles would

3    suggest that if you are going to rank people based on test

4    scores, you have to specify your rational for being able to

14:09:47 5    do that, and it has to be documented.

6    Q.    And was there any documentation in the final report

7    that indicated to you that rank ordering was appropriate in

8    this case?

9                MS. AMBROSE-RUBRIGHT:  Objection.

14:09:59 10                THE COURT:  It's overruled.

11   A.    There was no documentation to support the use of rank

12   ordering in this case.

13   Q.    Doctor, I'm going to present to you some of the

14   exhibits that have been used or are being used in this case

14:10:18 15   relating to consolidation rating forms.  And specifically,

16   I'm going start with 68-7.  And this is the Akron Fire

17   Department oral board lieutenant incident command rating

18   form.  Do you see that?

19   A.    Yes.

14:10:38 20   Q.    As you look at these rating forms for this particular

21   candidate, and this particular one is Kerry Briggs who's one

22   of the plaintiffs in this case, can you ascertain from the

23   information here what justifies the ratings of the assessors

24   in this case?

14:10:57 25                MS. AMBROSE-RUBRIGHT:  Objection.

1     THE COURT:  Counsel, why don't we approach?

2     (Discussion at side-bar as follows:)

3     MS. AMBROSE-RUBRIGHT:  This is the first time

4   that that has ever come up that he reviewed consolidated

14:11:20  5   rating forms.  This is the first time that there has been

6   any indication that this witness is going to review

7   consolidated -- consolidation rating forms, give some

8   opinion on whether or not a particular candidate is

9   appropriate, not appropriate.  To our knowledge, that's

14:11:42 10   never been anywhere that he examined those documents.

11     MR. THOMPSON:  He did identify them in his

12   deposition testimony.

13     MS. AMBROSE-RUBRIGHT:  For his expert report.

14     MR. THOMPSON:  What he is talking about, exactly

14:11:53 15   the documents he reviewed, that were produced that includes

16   these?

17     MS. AMBROSE-RUBRIGHT:  Did you send all of these

18   to him and he said he reviewed these before he gave his

19   expert opinion?

14:12:02 20     MR. ELFVIN:  These are among some of the

21   documents he reviewed questions.

22     MS. AMBROSE-RUBRIGHT:  And he listed these in his

23   expert report?

24     MR. THOMPSON:  So he said he received the stuff

14:12:10 25   from City of Akron.  These are among the documents he

1    reviewed.  We are trying it right back to the behavioral --

2              MS. AMBROSE-RUBRIGHT:  When did he review those

3    documents?

4              MR. THOMPSON:  When he came up.

14:12:18 5         THE COURT:  Didn't he already testify that he

6    reviewed them.  He found them inadequate.

7              MR. THOMPSON:  Yes, he did.

8              THE COURT:  Well, I think that's sufficient.

9              MR. THOMPSON:  That's fine.

14:12:27 10        MS. AMBROSE-RUBRIGHT:  Thank you.

11        (The following proceedings were had in the hearing of

12   the Jury:)

13             THE COURT:  Just so it's clear for the record in

14   the interest of time, let me address this very briefly.  I

14:12:40 15  apologize to counsel.  I do not mean to take over the

16   examination.

17        Doctor, is this an example of some of the

18   documentation that you reviewed that you found -- or that

19   you found to be inadequate?  Is the document that's placed

14:12:51 20  in -- put it on the screen so he can see it.

21             THE WITNESS:   I haven't examined the document.

22             THE COURT:  You have or have not?

23             THE WITNESS:   I have not.

24             THE COURT:  You have not examined it before

14:13:01 25  today?

1          THE WITNESS:    I may have seen it, but I have not

2     examined it closely.

3          THE COURT:  All right.  Just a second, ladies and

4     gentlemen, we are going to do the following:  I can see that

14:13:09 5     some of you perhaps are a bit tired.  We are going to take a

6     break.  We are going to take about 15 minutes.  Let me clear

7     this matter up.

8          You're free to bring coffee in the courtroom, ladies

9     and gentlemen, coffee, refreshments, anything you would

14:13:20 10     like.  We will take 15 minutes and we will reconvene here

11     shortly.  Thank you very much.

12          THE DEPUTY CLERK:  All rise.

13          (Jury out, 2:10.)

14          THE COURT:  So I completely understand here, the

14:13:54 15     document -- put the document in front of him on the screen.

16     Put it on the screen, the document you just had before him,

17     just for a second so that I can make sure that I understand

18     this.  I want to make sure the doctor understands as well.

19          MR. THOMPSON:  This one.

14:14:10 20          THE COURT:  Have you seen this document before

21     today, sir?

22          THE WITNESS:  I've seen documents like this.

23     Whether I've seen this specific one or if this is something

24     specific about this particular document, I haven't examined

14:14:23 25     this.

1    THE COURT:  You have not examined this document

2 before today?

3    THE WITNESS:  I've seen several documents like

4 this.  I don't know whether I have or have not seen this

14:14:29 5 particular one.  I haven't examined it in depth.

6    THE COURT:  All right.  Then I'll just simply --

7    MR. THOMPSON:  That's all.  I'll take this --

8    THE COURT:  You're not going to present it any

9 further?

14:14:41 10    MR. THOMPSON:  Correct.

11    THE COURT:  All right.  Step down, take a break,

12 ladies and gentlemen.  One of our jurors, I don't want to

13 identify the specific juror, but I can see she's tired and

14 dozing so that's another reason I adjourned for a break and

14:14:54 15 instructed the jurors to perhaps gather coffee if they wish.

16    Thank you very much.  You can step down.

17    (Recess taken, 2:15.)

18    (Jury in, 2:30.)

19    THE COURT:  All right, counsel, you may resume

14:33:39 20 your direct examination of the witness, please.

21    MR. THOMPSON:  Thank you, Your Honor.

22 Q.    Dr. Brink, I asked you the question earlier about

23 whether you had an opinion whether this exam assessed

24 behaviors.

14:33:50 25    I'm going to ask you the same question as to

1234

1    knowledges.  Do you have an opinion, sir, as to whether

2    these promotional examinations assessed appropriately the

3    knowledges required to do either of these positions?

4              MS. AMBROSE-RUBRIGHT:  Objection.

14:34:03  5              THE COURT:  It's overruled.

6    A.

7              THE COURT:  Do you have an opinion.

8              THE WITNESS:  Yes.

9              THE COURT:  All right, sir.

14:34:10 10    Q.    And that opinion is?

11    A.    It was not an adequate sample of knowledge.

12    Q.    And what do you base that opinion on, sir?

13    A.    40 percent of the knowledge that was rated as critical

14    was not measured.  And also, the test measured two -- two

14:34:33 15    thirds of the test measured knowledge that was -- that had

16    to be memorized.

17    Q.    Just stop for a second.  First off, the 40 percent of

18    critical behaviors, how are you defining -- or where are you

19    getting the definition of -- strike that.

14:34:49 20              What is a critical behavior?

21    A.    By critical, I mean, knowledges that were rated as

22    critical by the subject matter experts in the job analysis.

23    Q.    And when you say that 40 percent of those critical

24    behaviors were not assessed, how did you determine that,

14:35:05 25    sir?

1235

1   A.    I counted the number of behaviors that were rated as

2   critical.  I calculated how many were assessed, how many

3   were not.  I did the math and came up with 40 percent.

4   Q.    And then you were talking about -- I think you said

14:35:19  5   something about memorization?

6   A.    Yeah, the subject matter experts rated knowledge on

7   memorization scale.

8   Q.    What does that mean?

9   A.    The scale had three values.  Did the knowledge have to

14:35:35 10   be -- can the knowledge be referenced all the time, can it

11   never be referenced on the job, does it have to be

12   memorized, in other words, or is it 50/50, can it be

13   referenced half the time, and does it have to be memorized

14   half the time?

14:35:51 15        And according to the validation report, the test only

16   measured items that had to be memorized.  It was a closed

17   book test.  However, the items -- when looking at the items

18   that were actually on the test, two thirds of them were

19   rated as having to be memorized all the time.  One-third as

14:36:09 20   rated as having to be memorized half the time and would be

21   referenced half the time.

22   Q.    What does that mean?  Knowing that you have two thirds

23   that had to be memorized all the time and one-third that

24   could be referenced.  What does that mean?  Well -- did I

14:36:23 25   state that right?  One-third is how much, one-third?

```
 1    A.    One-third was the 50/50 reference.

 2    Q.    Okay.

 3    A.    Memorized.

 4    Q.    Okay.  And the other two thirds was?

 5    A.    Had to be memorized 100 percent of the time.

 6    Q.    What does that mean?

 7    A.    Well, since it was a closed book test, it's really

 8    inappropriate to measure knowledge that can be referenced 50

 9    percent of the time.  What they should have done is, once

10    they graded the test, for those items that measured

11    knowledge that can be referenced 50 percent of the time,

12    they should have determined whether or not those specific

13    items measures those knowledges had to be memorized.

14    Q.    Did they do that?

15    A.    No, they did not.

16    Q.    Was there anything in the final report or any of the

17    data sets that were produced to you that indicated that

18    there was any kind of analysis between items that had to be

19    partially memorized or fully memorized were taken into

20    consideration in creating this exam.  Either of these exams?

21    A.    Well, as I indicated previously, the validation report

22    indicated --

23          COURT REPORTER:  I'm sorry.

24    A.    The validation report indicated that the knowledge

25    test measured only items that had to be memorized 100
```

1    percent of the time.  However, that was not the case.

2    Actually, one-third of the items on the test actually

3    measured items that could be referenced 80 percent of the

4    time.

14:37:54  5    Q.    And the impact that has on this examination and the

6    assessment of its validity, sir?

7    A.    What happens is there is -- or what happened here is

8    that there is a systematic bias in the items.  As I said

9    earlier, you want a representative sample of items, not a

14:38:11  10    small portion of item from the entire domain.

11         What happened here is that the test focused on only

12    items that had to be memorized.  It excluded critical items,

13    40 percent of the critical items that didn't have to be

14    memorized.  So there is a systematic unrepresentative sample

14:38:29  15    of items that were used on this knowledge test.

16    Q.    And how would you, if you were assessing those

17    critical behaviors that had some nonmemorized -- in other

18    words, that could be referenced, how would you assess that

19    kind of behavior in a promotional examination?

14:38:45  20    A.    There are a number of ways that you can assess

21    knowledge.  One way they could have done it, through an open

22    book test.  They could have still used a multiple choice

23    test.  It could have been open book.  Another way is through

24    creating scenarios that might require knowledge, just like

14:39:01  25    scenarios that require abilities.  They might also require

1   knowledge or application of knowledge.  That would be

2   another good way of measures knowledge.  There is a number

3   of ways it can be measured?

4   Q.    Are these standardized testing procedures?

14:39:14 5   A.    Yes, they are.

6   Q.    In your review of the documents and review of the data

7   that was provided to you from E.B. Jacobs and in reaching

8   your conclusions that we asked you about in this case, did

9   you review the written work sample?

14:39:42 10   A.    Yes, I did.

11   Q.    Did you have any concerns with regard to that?

12        MS. AMBROSE-RUBRIGHT:  Objection.

13        THE COURT:  Sustained.

14   Q.    Describe for the jury, if you would, please, what your

14:39:53 15   analysis of the written work sample entailed?

16   A.    Okay.  We began by ensuring that the work sample

17   adequately assessed the ability that it was supposed to

18   assess.  And --

19   Q.    Did it?

14:40:13 20   A.    I did not feel it did.

21   Q.    Why?

22   A.    In particular, the written work sample purported to

23   measure interpersonal skills, and I don't think that the

24   writing task sufficiently measured interpersonal

14:40:26 25   interactions with other people.

1    Q.    The consolidation rating forms for the written work

2    sample, did it also include the dimension of oral

3    expression?

4    A.    I do not recall.

14:40:43  5    Q.    Would you have to see that document to get that

6    recollection, Doctor?

7    A.    Yes.

8          MR. THOMPSON:  Request permission to approach

9    Your Honor.

14:41:09  10          THE COURT:  Yes, you may.

11    Q.    Dr. Brink, what I've handed you is one of the

12    lieutenant written work sample consolidation rating forms.

13    Have you had a chance to review that now, as far as to the

14    dimensions?

14:41:28  15    A.    Yes.

16    Q.    Does that refresh your memory as to whether there was

17    an oral expression dimension that was being assessed in the

18    written work sample?

19          MS. AMBROSE-RUBRIGHT:  Objection.

14:41:40  20          THE COURT:  That's overruled.  I'll allow him to

21    use it to refresh his recollection.  Go ahead.

22    A.    The first dimension listed on here is, in fact, oral

23    expression.

24    Q.    I'll take that back.  Thank you.

14:41:51  25          Did E.B. Jacobs provide in his final report or in any

1    of the data that was provided to you, how a written work

2    sample could assess oral expression?

3    A.    I don't believe I've seen -- I have not seen anything

4    in the report indicating how it can assess oral expression.

14:42:22  5    Q.    In all your experience in testing, sir, in your

6    education, do you have an opinion -- I'm sorry -- can a

7    written work sample assess oral expression?

8    A.    I can't think of any conceivable way it can measure

9    oral expression in a written exercise.

14:42:43 10    Q.    What was the reliability of the written work sample in

11    this case?

12    A.    In our analysis of dimensions that were assessed in

13    the written work sample, we found the reliability ranged

14    from .62 to .73.

14:43:24 15    Q.    Interpret those, if you would, please, what does that

16    computation mean to you?

17    A.    Reliability can range from zero to one.  One would be

18    the perfectly reliable test.  Zero would be a perfectly

19    unreliable test.  A .62 is not a very high reliability

14:43:48 20    especially when there was multiple on one component.

21    Q.    What kind of reliability statistic would you expect to

22    see for high stakes testing?

23    A.    There is different ways of looking at reliability so

24    it's difficult for me to answer that question.

14:44:09 25    Q.    Okay.  I'll withdraw the question.

1                In Jefferson County, the oral assessment exercises,

2       when you administer them there, how are they rated?  How is

3       that done?  Describe for the jury that, please?

4       A.      How assessors rate.

14:44:31  5     Q.      Yes.

6       A.      When assessors rate candidates they watch a videotape

7       of the candidate and they block two person panels.  They'll

8       listen to a person or a candidate respond to the question.

9       And as they are rating, so they'll take notes on that

14:44:45 10     response.  When the response is over, they will compare

11      their notes to the behavior anchors that were designed for

12      that specific exercise and they will make a independent

13      rating.

14              Once they make the preliminary rating, this is an

14:45:00 15     independent rating.  Once they make the independent rating,

16      they will discuss the rating amongst each other and come up

17      with a final rate.

18      Q.      Again, we are talking independent like we talked about

19      before, independent ratings are those kind of ratings

14:45:15 20     that -- well, explain.  What's an independent rating?

21      A.      Independent rating in this case would be they watch

22      the candidate, they make their rating.  There is no

23      interaction with their partner whatsoever.

24      Q.      Consensus rating is different than that?

14:45:29 25     A.      That's right.  Once they make their independent

1  rating, they will discuss what they did.  And if they didn't

2  match, they will reach consensus.

3  Q.    So once in Jefferson County, once they reach the

4  independent assessment, what happens then?

14:45:43  5  A.    Once they reach their independent rating, they will

6  discuss the ratings, and they will circle a final rating,

7  and that will be the rate that go we actually give to the

8  candidate.

9  Q.    That's the consensus rating done at the end?

14:45:57 10  A.    That's correct.

11  Q.    So the independent ratings are done first and then you

12  end up with a final rating after the consensus is drawn

13  together?

14  A.    That's correct.

14:46:04 15  Q.    Were you aware in this case that Dr. Jacobs formed or

16  standardized scores as to panel differences for the

17  assessors in this case?

18  A.    Yes, that's what's indicated in the validation report.

19  Q.    Explain that to the jury.  What are we talking about?

14:46:28 20  A.    What happened here is some of the panels scored

21  candidates on average higher than other panels.  Because of

22  that, they tried to correct more it statistically by

23  recalculating the scores in the panel that was significantly

24  higher so that it would be in line with other panelist

14:46:49 25  scores.

1      Q.     Was that appropriate strategy or was that an

2      appropriate technique based on the type of assessment

3      centers that Dr. Jacobs administered here?

4      A.     Assuming the ratings were independent as described in

14:47:03  5      the validation report and training materials, I do not

6      believe that that was an appropriate step to take.

7      Q.     Why?

8      A.     Since the ratings are independent, there is no

9      mechanism that would cause -- perhaps --

14:47:25 10      Q.     Let me ask you a question.  If the ratings are

11      independent, that means each assessor is doing their own

12      rating?

13      A.     That's correct.

14      Q.     So the scores are not measured by panel?

14:47:34 15      A.     That's correct.

16      Q.     Would there be any justification for adjusting by

17      panel if the scores were not arrived at on a consensus

18      basis?

19             MS. AMBROSE-RUBRIGHT:  Objection.

14:47:43 20             THE COURT:  I'll allow the question.  Go ahead.

21      A.     If the ratings are truly independent, the concept of a

22      panel really doesn't exist.  It just happens to be three

23      independent people in the same room seeing the same

24      candidate.  It's not possible to have what's called panel

14:47:58 25      drift.

1    Q.    Panel drift you called that?

2    A.    Panel drift occurs -- going back to --

3              MS. AMBROSE-RUBRIGHT:  Objection.

4              THE COURT:  Counsel, I guess -- I'll allow the

5    question.  Go ahead.  Tell us what panel drift is quickly,

6    please.

7    A.    Panel drift occurs when you're working with other

8    people and you're talking about your ratings, you begin to

9    see things more similar to one another than what you would

10   to other panels that you are not working with.  So if you

11   stay working together all day, you may start drifting from

12   what the rest of the panels may be doing and that's referred

13   to panel draft.

14         That occurs when your ratings are not independent.

15   Theoretically there's no reason for that to occur when your

16   ratings truly are independent.

17   Q.    Is there any way to avoid panel drift in those kinds

18   of scoring system where there is consensus rating?  How can

19   you avoid that?

20   A.    We avoid panel drift by rotating our assessors so they

21   don't develop those habits, for lack of a better word.  They

22   work with somebody for a couple of days.  Then we rotate

23   them to work with somebody else, and they won't begin to

24   drift away.

25   Q.    Is there any indication in any of the reports that

1     were provided to you, or data, that indicated that these

2     assessors were rotated in the manner you just described?

3     A.     The assessors were not rotated.

4     Q.     The reliability as to the other assessor -- assessment

14:49:27  5     exercises other than the written exercise to which you've

6     already testified, what was the reliability you determined

7     for those exercises, sir?

8     A.     For which exercises are you talking about?

9     Q.     The other assessment exercises, both ranks,

14:49:43 10     subordinate conference, group conference and the incident

11     command?

12     A.     I'm not sure I calculated those.

13     Q.     Okay.  Dr. Brink, what is Type I error?

14     A.     In the case of this case or in the case of adverse

14:50:17 15     impact, Type I error would be incorrectly concluding that

16     adverse impact exists.

17     Q.     And what would Type II error be?

18     A.     Type II error would be the opposite error.  That would

19     be incorrectly conclude that go adverse impact does not

14:50:34 20     exist.

21     Q.     In your analysis, would it be appropriate to

22     use -- well, strike that.

23         Describe for the jury if you would, please, what an

24     inferential statistic is?

14:50:44 25     A.     An inferential statistic is a general category of

1   statistics that is used to make inferences about a

2   theoretical population.

3   Q.    And what's a descriptive statistic?

4   A.    A descriptive statistic is used to describe data.

14:51:05 5   Q.    What are some examples of inferential statistics?

6   A.    Inferential statistics would include a Chi-square

7   analysis, regression analysis, statistical called NOVA,

8   there is a number of inferential statistics.

9   Q.    One of the underlying is assumptions for the use of

14:51:30 10   inferential statistics, what are some that must exist in

11   order for inferential statistics to be appropriate to be

12   used at to any set of data?

13   A.    It should be based on a sampling distribution, some

14   type of sampling distribution.  Mechanisms of deriving a

14:51:49 15   sample from the population.

16   Q.    Which means what?

17   A.    Well, a population is a theoretical concept.  When we

18   ask hypothesis, we talked about much earlier today, when we

19   are trying to answer research questions, our questions are

14:52:02 20   usually about some type of population, within the U.S.,

21   within the City of Akron, so the hypothesis that we're

22   testing are regarding the population.  However, we can

23   hardly ever sample the population -- excuse me.  We can

24   hardly gather data from be everyone that might be in

14:52:21 25   population so what we do is we pull a sample from that

```
          1    population.  So inferential statistics analyze the sample

          2    data we have to answer questions about a population.

          3    Q.    Does the sample have to be random?

          4    A.    The more random the sample, the more accurate the

14:52:43  5    statistical result.

          6    Q.    Fair enough.

          7          Was the sample in this case, those selected, was that

          8    a random selection?

          9    A.    No, it was not.

14:52:51 10    Q.    What kind of selection was this?

         11    A.    A selection -- by selection meaning sampling.

         12    Q.    Sampling, what kind of sampling was this?

         13    A.    It wasn't random because in this case the population

         14    was very narrow and those people who expressed an interest

14:53:10 15    in applying for the job that were qualified.

         16    Q.    Are you familiar with the term top down?

         17    A.    Top down selection?

         18    Q.    Yes.

         19    A.    Yes.

14:53:16 20    Q.    What is that for the jury, please.

         21    A.    That's when you hire people -- it's when you

         22    administer a test, rank people on the test based on their

         23    score, and then hire top down beginning with rank one

         24    beginning with the highest score and working your way down

14:53:31 25    the list.
```

1    Q.    And with Type I error, how do you determine that.

2    That's the false negative or false positive of it?

3    A.    I don't like to use the terms negative and positive,

4    but a Type I error incorrectly concluding adverse impact

14:53:46  5    exists when its do not.

6    Q.    How do you compute that?

7    A.    Type I error is computed by the inferential

8    statistical test.  What we do, we determine the level of

9    error that we're comfortable with by choosing what's call an

14:54:03 10    alpha value.  And historically the most commonly used alpha

11    value would be .05.  What that would mean, given this

12    population, if I do my analysis, if I chose an alpha level

13    of .05, 95 percent confidence that the differences I obtain

14    in the sample are not due to chance.

14:54:24 15    Q.    And how do you compute Type II error?  And Type II

16    arrow again is?

17    A.    Type II arrow would be incorrectly conclude that go

18    adverse impact does not exist when it actually does.

19    Q.    And how do you compute that?

14:54:37 20    A.    You can't actually -- well, Type II error is computed

21    by actually calculating what's called power.

22    Q.    And what is that?

23    A.    Type II error -- excuse me, power would be another

24    decision.  Power is correctly concluding that adverse impact

14:54:56 25    exists when it, in fact, does.  So Type II error would be

```
  1   equal to power -- excuse me.  Type II error is equal to one
  2   minus power.  So there is a perfect inverse relationship
  3   between power and Type II error.
  4   Q.    In all of the data that Dr. Jacobs had in his final
  5   report, any of the data sets that were provided to you did
  6   he compute power as to Type II error?
  7   A.    No, he did not.
  8   Q.    In all the data that you saw from Dr. Jeanneret, did
  9   he compute power as to Type II error?
 10   A.    No.
 11   Q.    Did you review any computations relating to power to
 12   either of those -- to either rank of lieutenant and captain?
 13             MS. AMBROSE-RUBRIGHT:  Objection.
 14             THE COURT:  It's overruled.
 15   A.    Yes, I have.
 16   Q.    Without specifying the amount, what did that data
 17   reveal to you?
 18   A.    The power was low.
 19   Q.    How low?
 20             MS. AMBROSE-RUBRIGHT:  Objection.
 21             MR. THOMPSON:  Let me withdraw that question.
 22   I'll withdraw at that question.
 23        Based on what you saw, Dr. Brink, were there problems
 24   with the power relating to the statistics that were used in
 25   this case by Dr. Jeanneret or Type II error, I'm sorry.
```

14:55:14 (5)
14:55:27 (10)
14:55:38 (15)
14:55:56 (20)
14:56:14 (25)

1    A.    Given the low power, that would mean it's a very high

2    probability of making a Type II error.

3    Q.    Which would be making the wrong decision or

4    interpretation of that data?

14:56:32  5    A.    Yes.

6              MS. AMBROSE-RUBRIGHT:  Objection.

7              THE COURT:  Sustained, disregard the question,

8    ladies and gentlemen.

9    Q.    What does that mean, Dr. Brink?

14:56:37  10    A.    Type II error would be incorrectly concluding that

11    adverse impact does not exist when this, in fact, does.

12              MR. THOMPSON:  If I could have a moment, please,

13    Your Honor.

14              THE COURT:  You may.  Anything further of this

14:57:47  15    witness, please?

16              MR. THOMPSON:   Yes.

17    Q.    Dr. Brink, all your opinions in this case are based on

18    application of SIOP principles?

19    A.    They would include SIOP principles.

14:58:01  20    Q.    Uniform guidelines?

21    A.    Correct.

22    Q.    Other principles espoused by the American Psychiatric

23    Association?

24    A.    That's correct.

14:58:08  25    Q.    And you talked about content validity being one

1    strategy.  Other types of validation strategies would be

2    like example?

3    A.      Criterion validity, be looking at the correlation

4    between your test and job performance.  Looking at the

14:58:29  5    internal structure of the test -- I'm just going to throw

6    terms out, using factor analysis, there is five strategies

7    outlined in the SIOP principles, three strategies outlined

8    in the uniform guidelines.

9    Q.      Were any of those, based on the data that you saw,

14:58:45 10    considered or used in this case?

11    A.      No, they were not.

12    Q.      Doctor, if you would, please, go to your report and

13    then your supplemental report.  I'm going to direct your

14    attention to the last two pages of your report, please, sir.

14:59:19 15    Have we addressed during this testimony here all of your

16    opinions that you expressed or laid out there?

17            MS. AMBROSE-RUBRIGHT:  Objection.

18            THE COURT:  Sustained, counsel.  I'm not sure of

19    the purpose of the question.  I don't want to comment

14:59:38 20    further.

21            MR. THOMPSON:  No further questions.

22            THE COURT:  Thank you.

23        Counsel, you may cross-examine.

24                CROSS-EXAMINATION OF KYLE BRINK

14:59:51 25    BY MS. AMBROSE-RUBRIGHT:

1    Q.    Good afternoon, Dr. Brink.

2    A.    Good afternoon.

3    Q.    We have met before; is that correct?

4    A.    Yes, that's correct.

14:59:56  5    Q.    And, Dr. Brink, you were describing high fidelity

6    testing, and as lawyers, we take bar examinations to become

7    lawyers, are you aware of that?

8    A.    Right.

9    Q.    And to become a lawyer, I had to pass a bar

15:00:12  10   examination and I sat in a room and I took a very long

11   multiple choice test call the multi-state examination.  Are

12   you familiar with that at all?

13   A.    I'm familiar with certification tests, not that

14   particular one.

15:00:25  15   Q.    So when I sat down and took this multiple choice

16   multi-state test to determine whether or not I could become

17   a lawyer, I was taking a very low fidelity test; is that

18   correct?

19   A.    That's correct.

15:00:36  20   Q.    So even though it was a low fidelity test, it didn't

21   mean they could not make a decision on whether or not I

22   could be a lower or not; isn't that true?

23   A.    I wouldn't know that without examining the validation

24   evidence for that test.

15:00:49  25   Q.    So the validation evidence is what determines whether

1253

1    or not the test is good, for lack of a better term, or bad;

2    is that right?

3    A.    Right, the validation evidence is very well defined,

4    yes.

15:01:05 5    Q.    So whether or not a test as high fidelity or low

6    fidelity, really doesn't answer the question of whether it's

7    valid or not; isn't that true?

8    A.    It's one of many factors.

9    Q.    It doesn't answer the question of whether it's valid

15:01:17 10    or not, isn't that true, just the mere fact of fidelity?

11    A.    As I indicated earlier, if the test has higher

12    fidelity, it would be considered more valid than if it had

13    lower fidelity, but that's just one factor.

14    Q.    So you condition base validation on just the fact that

15:01:33 15    a test is high fidelity; isn't that correct?

16    A.    That's correct.

17    Q.    In this particular case, you have submitted a report

18    under the name of Centrus; is that correct?

19    A.    That's correct.

15:01:43 20    Q.    And who's Centrus?

21    A.    Centrus is a firm that was form by myself and two of

22    my coworkers.

23    Q.    And when you say two of your coworkers, you're talking

24    about two of the other Ph.d.s, IO psychologists in Jefferson

15:01:56 25    County?

1254

         1    A.    That's right.

         2    Q.    And you decided to form Centrus when Attorney Thompson

         3    call you to get involved in this case; is that correct?

         4    A.    We had been thinking about forming a company for quite

15:02:11 5    some time.  We decided to form a LLC since this was our

         6    first contract or first business, yes.

         7          THE COURT:  Make sure the question is, sir.

         8    Q.    Would you answer my question?  You formed Centrus

         9    after Attorney Thompson called you to get involved in this

15:02:27 10   case; isn't that correct?

        11    A.    Yes.

        12    Q.    And you told me that you decided to form this and

        13    become an expert consulting firm, and you worked out of one

        14    of the other IO psychologist's houses and you call

15:02:42 15   yourselves Centrus; is that right?

        16    A.    Yes.

        17          THE COURT:  Counsel, why don't you slow down a

        18    little bit for the court reporters?  Again, I appreciate the

        19    pause, but just take your time.

15:02:55 20         MS. AMBROSE-RUBRIGHT:  I'm trying to hurry as

        21    much as I can.  I apologize, Your Honor.

        22          THE COURT:  There is no -- take your time.

        23    Whether you're in a hurry or not isn't going to help the

        24    court reporters transcribe it and the jurors can't follow

15:03:07 25   it.

BY MS. AMBROSE-RUBRIGHT:

Q.     If you would go to your vitae, please.  It's Exhibit 1064, or you may have the one that Mr. Thompson identified.

       And when you prepared this vitae, you have research and invited presentations on page -- the first page.  Do you see all those items?

A.     Yes.

Q.     And then you continue on the next page, page 2, and you have another list of items under the heading of research and invited presentations; is that correct?

A.     That's correct.

Q.     And the one that I have a highlighted check next to is your only published research; is that correct?

A.     Yes, that's correct.

Q.     And in this one piece of research that you've conducted, you are the third author; is that correct?

A.     Yes.

Q.     And that has some significance in the world of publication and peer reviewed articles; isn't that correct?

A.     What do you mean by significance?

Q.     That you're listed third instead of first.  Does that have some significance with regard to the article?

A.     Authors are listed in order of contribution to the paper.

Q.     So you are the third contributor to this article; is

1   that right?

2   A.    That's correct.

3   Q.    Is this the first time in your career as an IO

4   psychologist you've ever conducted any kind of evaluation of

15:04:54 5   adverse impact based on age?

6   A.    Yes.

7   Q.    Is it common when you do these presentations to SIOP,

8   the Society of Industrial Organizational Psychology, that

9   when you do these presentations that you later submit your

15:05:21 10   presentations for publication?

11   A.    Some of them, yes.

12   Q.    Have you ever done that?

13   A.    No.

14   Q.    You list also in your vitae -- if we can go back to

15:05:38 15   it.  And I'm going to direct you to pages -- it's page 5 of

16   your vitae.  You have select technical reports, and you have

17   listed a considerable number of technical reports.  And you

18   also continue with that list of technical reports on page 7

19   in your vitae; is that correct?

15:06:05 20   A.    Just so you know, I actually have a different copy

21   than you have, but that appears to be correct, yes.

22   Q.    So you may have added a few more technical reports

23   since you gave this to me?

24   A.    Yes.

15:06:18 25   Q.    Regardless of whether you added more technical reports

1  since you gave this to me or not, all of these technical

2  reports are things that you do in your job for Jefferson

3  County; is that right?

4  A.    That's correct.

15:06:30 5  Q.    And these are not publications that are peer reviewed

6  or examined for publication by your peers, isn't that right?

7  A.    Correct.

8  Q.    And there are also confidential documents by virtue of

9  an actual section in these reports that say that they are

15:06:47 10  also not for publication; is that right?

11  A.    I do not know.

12  Q.    Haven't you written them?

13  A.    I don't recall a confidential section.

14  Q.    We'll go there a little bit later.  We will move on.

15:07:05 15     Have you ever developed a promotional examination for

16  any position in a safety force that is based on a written

17  examination, a written technical job knowledge test?

18  A.    No.

19  Q.    So all of your testimony and criticism of what Dr.

15:07:27 20  Jacobs did is something you have never done; is that

21  correct, Dr. Brink?

22  A.    That's correct.

23  Q.    And this case is the very first promotional

24  examination in a safety force that you've ever analyzed

15:07:45 25  outside of Jefferson County; is that correct?

1    A.    That's correct.

2    Q.    You told me that one of the plaintiffs in this case, a

3    gentleman by the name of Bradley Carr, furnished you some

4    information about the testing process and gave you some

5    summaries of information; is that correct?

6    A.    I received some materials from Bradley Carr, yes.

7    Q.    And you told me when you looked at those materials you

8    examined them with a grain of salt; is that right?

9    A.    Correct.

10   Q.    And you've not used them in any way, shape or form to

11   form any of the opinions that you've just given me; is that

12   correct?

13   A.    To my knowledge, that's correct.

14   Q.    Jefferson County, where you work, actually hired Dr.

15   Jeanneret to develop tests for Jefferson County; is that

16   correct?

17   A.    We hired Jeanneret & Associates which is his

18   consulting firm.

19   Q.    Well, he's the president and CEO, isn't he?

20   A.    Right.

21   Q.    And Dr. Jeanneret actually came down to where you work

22   and developed tests; is that right?

23   A.    Dr. Jeanneret didn't personally involve himself in the

24   work.

25   Q.    But his firm was?

1259

1    A.    That's correct.

2    Q.    Okay.  But Dr. Jeanneret, you told me, that you met

3    him because he spoke to you about the SIOP principles and

4    the revision of those principles; is that correct?

15:09:09  5    A.    That's correct.

6    Q.    And Dr. Jeanneret, as you know, was the chairman of

7    the revision of those principles; is that correct?

8    A.    Yes.

9    Q.    And you would agree with me that Dr. Jeanneret is a

15:09:23  10   well regarded and imminent expert in the field of industrial

11   psychology; is that right?

12   A.    Yes.

13   Q.    And what's it take to become a fellow in the

14   organization of the Society of Industrial and Organizational

15:09:39  15   Psychologists?

16   A.    I believe you have to be nominated by other fellows

17   which is usually something that happens later in your

18   career.

19   Q.    Have you ever been nominated for that?

15:09:49  20   A.    No, I have not.

21   Q.    Have you ever seen the complaint in this case that was

22   filed in Court?

23   A.    I don't believe I have.

24   Q.    Did any of the plaintiffs or Mr. Thompson indicate to

15:10:04  25   you before you even did your report that there was adverse

1    impact on these examinations?

2    A.    I do not recall.

3    Q.    You testified about a lot of defects in the final

4    report of Dr. Jacobs, and this information wasn't there,

15:10:25  5    this avenue wasn't documented, I didn't have enough

6    information about this.  I couldn't tell about that.

7         Can you tell me, Dr. Brink, how you can express any

8    opinion about the validity of this examination if all these

9    things are missing?

15:10:40 10   A.    There was lots of information in the validation

11   report, some of it was missing information that was

12   necessary to form an opinion on the validation.  Some of it

13   was there.  The fact that some of the information was not

14   there, by itself, would allow me to form the opinion that

15:11:01 15   it's not valid.  The missing information in some cases was

16   missing because it wasn't done.

17   Q.    Did you ask for more information?

18   A.    I know we submitted some requests.  I don't recall

19   what those were.

15:11:18 20   Q.    Who submitted some requests?  If you needed all this

21   information, did you ask for it, and how did do that?

22   A.    We asked for additional appendices early on that we

23   haven't received a report.  Right when this all started we

24   asked for additional information.  Since then I don't

15:11:33 25   believe we asked for additional information.

1    Q.    Are you telling me that you did not receive the

2    appendices to the final report that Dr. Jacobs prepared?

3    A.    The confidential appendices.

4    Q.    You have never seen the confidential appendices?

15:11:47 5    A.    Initially, the first thing I received was the

6    validation report and not confidential, I have seen and

7    reviewed the confidential appendices but that was one of the

8    things I asked for during the litigation.

9    Q.    So you received all the documents that are related to

15:12:02 10    the final report, including the appendices and including the

11    confidential appendices listed at the front of the report;

12    is that correct?

13    A.    That's correct.

14    Q.    Did you ask for more information?

15:12:14 15    A.    Not that I recall.

16    Q.    Were there questions that you had that you wanted

17    answered by Dr. Jacobs so that you could explore some of

18    these avenues where there was not sufficient documentation?

19    A.    Some of the inconsistencies were --

15:12:42 20    Q.    Do you want me have the question reread to you, Dr.

21    Brink?

22    A.    Yes, please.

23    Q.    Perhaps that might help you.

24         THE COURT:  Madam court reporter, if you read

15:12:54 25    loudly for the ladies and gentlemen.

```
 1              (Record read.)

 2    A.      I don't recall any specific questions that I had.

 3    Q.      Dr. Brink, you talk about errors, Type I, Type II.  Is

 4    the four-fifths rule subject to considerable sampling error?

 5              MR. THOMPSON:  Objection.

 6              THE COURT:  It's overruled.

 7    A.      Yes.

 8    Q.      So even when you did these analysis of adverse impact

 9    that you based on four-fifths rule, it has the same type of

10    error possible represents, isn't that be correct?

11    A.      The same type of errors but in the opposite direction.

12    Q.      But it has the same type of problems?  It has errors.

13    It just depends on whether it's Type I or Type II, isn't

14    that correct?

15    A.      That's correct, yes.

16    Q.      And in fact four-fifths rule is very susceptible to

17    very small sample size; isn't that correct?

18    A.      Yes.

19    Q.      So when we have small sample sizes, this four-fifths

20    rule as to adverse impact, not adverse impact depends on how

21    many people you promote or select; isn't that correct?

22    A.      It could, it could not.

23    Q.      But it depends on the number you select.  So if this

24    week we promoted ten individuals, we could calculate this

25    four-fifths rule, and it potentially could demonstrate
```

1    adverse impacted based on four-fifths rule; is that correct?

2    A.    Potentially.

3    Q.    And then a month from now, we can decide that we need

4    ten more people promoted and then we would recalculate

15:14:44  5    adverse impact and maybe at that point it might be

6    different; isn't that correct?

7    A.    Potentially.

8    Q.    At the end of the day, you can't finally determine

9    whether or not based on four-fifths rule, until -- it cannot

15:14:59 10    be based -- excuse me.  Let me rephrase the question.

11         Until you're finished promoting, until you're finished

12    hiring, you can't calculate a final determination based on

13    four-fifths rule; is that correct?

14    A.    If you're talking the overall use of the test, that's

15:15:21 15    correct.

16    Q.    What do you mean overall use of the test?  I just gave

17    you an example.  I'm asking you, Dr. Brink, if you're

18    looking at an examination and you're calculating four-fifths

19    rule based on how you calculated it in this test, which is

15:15:39 20    the number promoted, we never know whether there is adverse

21    impact or not until we're completely done promoting; isn't

22    that correct?

23    A.    That's correct.

24    Q.    So when we give a test, there is no way to determine

15:15:57 25    whether or not there is a four-fifths rule violation or not

1   because we don't know how many people are going to get hired

2   or promoted from that list; isn't that correct?

3   A.   Yes.

4   Q.   And in this particular case, do you have any idea how

15:16:11  5   the number of 28 lieutenants came up on the lieutenants exam

6   and 12 captains were promoted?  Do you know where those

7   numbers were determined?

8   A.   That's how many were promoted.

9   Q.   My question is, do you know how those numbers came

15:16:25  10  about, that the City of Akron said we're going to promote 28

11  lieutenants.  We're going promote 12 captains?

12  A.   I would assume it's based on the number of vacancies.

13  Q.   And do you know whether it depends upon funding?

14  A.   Perhaps.

15:16:41  15  Q.   Does it in Jefferson County?

16  A.   Yes.

17  Q.   Wouldn't you say it's a fair statement that you have

18  no idea on the final number of individuals that will be

19  promoted or hired until all of those variables are finally

15:16:57  20  determined, the number of vacancies, the number of

21  retirements, the number of resignations?

22  A.   No.

23  Q.   How else would you determine it?

24  A.   You said no idea.  I think you can have a pretty good

15:17:12  25  idea based on past use of lists, past hires.

1265

1    Q.    So we can determine four or five years later, after a

2    prior list that was established, how many people we're going

3    promote?

4    A.    Your question said no idea.  I'm saying you can make a

15:17:30 5    reasonable estimate based on the past hires over the last

6    few years.

7    Q.    Using your four-fifths rule calculations, you can't

8    tell me the probability of making a wrong conclusion based

9    on four-fifths rule; is that correct?

15:17:50 10   A.    You can estimate that.

11   Q.    Can you tell me the probability that you're wrong

12   based on your four-fifths rule?

13   A.    I can't answer that question as asked.

14   Q.    You were talking about the power of the analysis, of

15:18:16 15   the statistical test being low.  If we wanted to make the

16   statistical analyses done on these examinations, we would

17   have to add more candidates; isn't that correct?

18   A.    Add more candidates for what purpose?

19   Q.    Who took the exam.  If we want better statistics, in

15:18:37 20   your estimation because the power is low, we would have to

21   make it so that more people took the lieutenant's test and

22   more people took the captain's test?

23   A.    That's one way of increasing power.

24   Q.    Do you have any idea how we could possibly do that

15:18:53 25   when only 112 people signed up for the lieutenant's test and

1    44 people signed up for the captain's?  Are we supposed to

2    go out and recruit people to get our numbers up?

3              MR. THOMPSON:  Objection.  Argumentative.

4              THE COURT:  Sustained.  Disregard the question,

15:19:08 5   ladies and gentlemen.

6    BY MS. AMBROSE-RUBRIGHT:

7    Q.    How do you suggest that we increase our numbers to get

8    better power?

9    A.    Your numbers are what they are.

15:19:17 10  Q.    So we can't change it.  It's just an observation of

11   yours based on the number of people who signed up for the

12   test; is that correct?

13   A.    What's an observation?

14   Q.    Your power, that it's low or high or good or bad, or

15:19:32 15  medium or whatever you want to characterize it as, is an

16   observation about the data as it exists?  We can't change

17   that in this data; is that correct?

18   A.    Right.  The power calculation is for this specific

19   sample, this specific data.

15:19:49 20  Q.    And I can't increase it because I can't make more

21   candidates in this candidate pool, can I?

22   A.    Once your data is collected, you can't increase it.

23   Q.    You did not calculate four-fifths rule based on

24   passing rates; is that correct?

15:20:08 25  A.    That's correct.

1    Q.    But you do do that in Jefferson County, don't you, Dr.

2    Brink?

3    A.    Yes.

4    Q.    And in Jefferson County you also look at the mean

15:20:19  5    score differences between black and white candidates, males

6    and females; is that correct?

7    A.    That's correct.

8    Q.    And you analyze whether or not there is adverse impact

9    based on those exact calculations, mean score differences

15:20:34 10    and passing rates; isn't that correct?

11    A.    No, it's not correct.

12    Q.    I'm going to ask you to go to exhibit --

13         MS. AMBROSE-RUBRIGHT:    If I could take a

14    moment, Your Honor.

15:20:50 15         THE COURT:  Yes, you may.

16    Q.    If you could find Exhibit 109, Dr. Brink, 8?

17         THE COURT:  Which exhibit?

18         MS. AMBROSE-RUBRIGHT:  1098.

19         THE COURT:  Defendants?

15:21:15 20         MS. AMBROSE-RUBRIGHT:  That's correct, Your Honor

21    you don't have that?

22    A.    What is it?

23    Q.    Exhibit 1098?

24    A.    What's the title.

15:21:32 25    Q.    He is entitled Content Validation Report, Police,

1    Sheriffs, Sergeant, January 2008 and has a list of

2    individuals on the front including your name?

3    A.    I don't have a copy of that.

4    Q.    Let's me find that for you.

15:22:14  5           MR. THOMPSON:  May I approach the witness, Your

6    Honor?

7             THE COURT:  Yes, you may.

8    A.    Could you repeat the number, please?

9    Q.    Yes, it's Exhibit 1098.  Are you there, Dr. Brink?

15:23:00 10   A.    Yes.

11            MS. AMBROSE-RUBRIGHT:  Your Honor, may I publish

12   this?

13            THE COURT:  Any objection?

14            MR. THOMPSON:  No.

15:23:05 15           THE COURT:  All right.  Go ahead.  You may.

16        Dr. Brink, this is a contend validity report that you

17   are one of the authors of; is that correct?

18   A.    That's correct.

19   Q.    And this is from your job in the personnel board of

15:23:29 20   Jefferson County; is that right?

21   A.    Yes.

22   Q.    And this is not included in your vitae; is that

23   correct?  This isn't one you listed?

24   A.    It may not be in the copy that you have.

15:23:41 25   Q.    Is it in the copy that Mr. Thompson gave you?

1    A.    No, that was older.

2    Q.    I'm sorry, I cannot hear you?

3    A.    No, it was not.

4    Q.    So this isn't listed anywhere in all of the technical

15:23:50 5    reports that you listed in your vitae; is that right?

6    A.    Without looking at it, I would say I don't know.

7         THE COURT:  Well, if you want to take a minute

8    and look.

9         Take a minute and look at it, sir.  Do you have it in

15:24:04 10   front of you?

11        THE WITNESS:  I have an older copy than what you

12   have so I have to look at ours.

13        THE COURT:  For the ease of the witness, I have

14   what I believe is the more recent version which is

15:24:13 15   Plaintiff's Exhibit 143.  I believe this version, ladies and

16   gentlemen of the jury, has been updated, to set forth the

17   doctor's, all of the things -- more current information than

18   at the time of his deposition which was given some months

19   ago.

15:24:28 20        THE WITNESS:   Actually, this is the older

21   version, sorry.

22        THE COURT:  Well, I guess I have the older

23   version, too.  Who has the newer version?

24        MR. THOMPSON:  Exhibit 143, Your Honor.

15:24:38 25        MR. ELFVIN:  It was identified today.  It on page

1    2, Your Honor.

2              MS. AMBROSE-RUBRIGHT:  May I?

3              THE COURT:  The one I have in my hand is marked

4    as Plaintiff's Exhibit 143.

15:24:47  5    A.    That's the older -- the one you put on the screen as

6    older.

7              THE COURT:  It doesn't matter.  Give him the new

8    one if you have it please.  Thank you.

9    A.    No, I do not see it listed.

15:25:13 10    Q.    I'm going to show you what is on page 29 of that

11    report, but it's marked in Exhibit 1098, and it's 1098-28.

12    Do you see that?

13    A.    Yes.

14    Q.    And I'm looking at the adverse impact results for race

15:25:34 15    and for sex.  Do you see that, Dr. Brink?

16    A.    Yes.

17              THE COURT:  Can you read it, ladies and gentlemen

18    of the jury?  You'll need to make it larger for the benefit

19    of the jury, please.  Thank you.  Are you all right?  All

15:25:47 20    right.  Thank you.

21    Q.    And it says screen adverse impact results for race in

22    table four, screen adverse impact results for sex in table

23    5; is that correct?

24    A.    You skipped the MQ, but other than that, that's

15:26:05 25    correct, yes.

1    Q.    And in these tables, you're looking at the number of

2    individuals who passed the test and failed the tests; is

3    that correct?

4    A.    Yes, that's correct.

15:26:14  5    Q.    And there is also a calculation that says impact

6    ratio.  Isn't that what we're talking about here,

7    four-fifths rule?

8    A.    Yes, that's the same thing.

9    Q.    So back in Jefferson County when you did this validity

15:26:28  10    report, you were looking at adverse impact in calculating

11    four-fifths rule based on passing rates; is that correct?

12    A.    For the minimum qualification test, is that correct.

13    Q.    In this same report, you represent also that you

14    conduct assessor training for your assessors; is that

15:26:57  15    correct?

16    A.    Yes.

17    Q.    And how long is your assessor training?

18    A.    Sometimes depends on the exercise, but it's usually

19    about a day.

15:27:05  20    Q.    Do you know how long the assessor training was here in

21    this testing process?

22    A.    I believe it was a day and a half.

23    Q.    And, again, in this -- and I'm going to direct your

24    attention to Exhibit 1098-8.  This is from the same report.

15:27:34  25          In your job analysis data for this particular position

1    that you did this validity report for, you used an old job

2    analysis from 2003; is that correct?

3    A.    Yes.

4    Q.    And it says that whoever this group was, the Yusko

15:28:00  5    group, had done an earlier job analysis, so you were just

6    confirming it; is that correct?

7    A.    That's correct.

8    Q.    And how many SME's did you use to confirm that earlier

9    job analysis?

15:28:12  10    A.    We confirmed it during the test development process.

11    If you give me a minute, I can try and determine the number

12    of SME's that were in the test development.

13    Q.    Well, let me ask you this question.  You know how you

14    gave us this formula about how to calculate how many SME's

15:28:37  15    are necessary, did you do that here?  Did you do this

16    formula that you came up with to calculate the number of

17    necessary SME's to participate in a job analysis?  And did

18    you do that here?

19    A.    Well, the job analysis was done in 2003.

15:28:53  20    Q.    My question is, you were reaffirming the job analysis,

21    am I correct, with SME's?

22    A.    Reaffirming, yes.

23    Q.    And when you were reaffirming this job analysis, did

24    you use that formula that you've just told the jury about?

15:29:13  25    A.    No.

1    Q.    Calculated how many SME's you need?

2    A.    No, I did not.

3    Q.    Do you know how many lieutenants and captains are on

4    the Akron Fire Department?

15:29:31 5    A.    Page 8 of my first report indicates how many were in

6    the Akron Fire Department as of 2005.

7    Q.    So you reported those numbers?

8    A.    Yes.

9    Q.    And they are?

15:30:05 10   A.    There were 80 fire lieutenants and 17 fire captains.

11   Q.    Do you know what our total strength is in those ranks?

12   A.    No.

13   Q.    When you're in Jefferson County -- you operate under a

14   consent decree.  There's already been testimony about that.

15:30:25 15   So you have very high scrutiny of what you do in Jefferson

16   County; is that correct?

17   A.    Yes.

18   Q.    And that has been the case for many, many years in

19   Jefferson County, isn't that correct?

15:30:35 20   A.    Yes.

21   Q.    And you work for the County Personnel Board, and you

22   have about 28 plus or minus industrial psychologists; is

23   that right?

24   A.    Currently it's around 20.

15:30:49 25   Q.    So you've been cut in staff?

1    A.    Yes.

2    Q.    And those -- you do jobs for all of Jefferson County

3    from clerical workers through public safety positions; is

4    that correct?

15:31:01  5    A.    Yes.

6    Q.    So the types of jobs that you study are various

7    different jobs; is that right?

8    A.    Correct.

9    Q.    And do you give high fidelity video testing to all of

15:31:13  10    those jobs?

11    A.    Yes.

12    Q.    And you built a rather state-of-the-art video center

13    to do this, didn't you?

14    A.    Yes.

15:31:23  15    Q.    And it cost millions of dollars to build this center

16    for Jefferson County, didn't it?

17    A.    I do not know what it cost.

18    Q.    Expensive?  Is that a fair statement?

19         MR. THOMPSON:  Objection.

15:31:35  20         THE COURT:  It's overruled.

21    A.    I have no idea what it cost.

22    Q.    When you analyze your tests in Jefferson County, if

23    you calculate this four-fifths rule, do you still go ahead

24    and do statistical tests?

15:31:52  25    A.    Yes.

1    Q.    Do you promote or hire in Jefferson County even if

2    there is a four-fifths rule violation?

3    A.    Yes.

4    Q.    You're aware that there are no statistically

15:32:07  5    significant mean differences in the components of the

6    lieutenant's examination; is that correct?

7    A.    I believe so.

8    Q.    And on this captain's examination, you are aware that

9    there is no significant difference in the final scores of

15:32:26 10    black and white candidates; is that correct?

11    A.    I did not calculate it, but I believe that's what was

12    found.

13    Q.    And in Jefferson County when you're looking at adverse

14    impact, you also examined mean score differences in

15:32:39 15    determining whether or not there is adverse impact; is that

16    correct?

17    A.    No.

18    Q.    Do you want to go back to Exhibit 1098?

19          Are you there?

15:33:19 20    A.    Yes.

21    Q.    I'm going to ask you to go to page 40.  I'm looking at

22    what's table 15 in your report, and here you're calculating

23    mean scores, am I correct?

24    A.    Yes.

15:33:57 25    Q.    On item and dimension descriptive statistics?

1     A.     Yes.

2     Q.     And you are also looking at the mean scores of black

3     and white candidates; is that correct?

4     A.     Yes.

15:34:08  5     Q.     And you also, if I look at T test and P value, you are

6     calculating, whether or not it is statistically significant,

7     if there are statistically significant differences between

8     black and white candidates?  And you're looking at the

9     in-basket and the roll call and the role play and the

15:34:27 10     situational judgment test; is that correct?

11     A.     Yes.

12     Q.     And do you evaluate that to see whether or not there

13     is or is not adverse impact?

14     A.     No.

15:34:39 15     Q.     So you just do those calculations for the heck of it

16     and don't consider it, whether in your scoring --

17     A.     If I could explain my response.  We do mean

18     differences, but mean differences do not indicate whether or

19     not there is adverse impact.  Adverse impact is based on

15:34:54 20     select, not mean differences.  So we do form calculations

21     and it's informative about mean differences, but we don't

22     use that to form conclusions on adverse impact.

23     Q.     Do you use it to determine how you're going to weight

24     a test?

15:35:08 25     A.     No.

1   Q.    Do you use it to take out specific portions of a test?

2   A.    Perhaps.

3   Q.    And in Jefferson County, if your description of what

4   you told me -- and my recollection is correct, before you

5   give any test in Jefferson County, you don't tell the

6   candidates what the weight of any component on that test is,

7   am I correct?

8   A.    Yes.

9   Q.    And then at the end, after all the candidates have

10  taken it, and you look at the adverse impact of all the

11  different components, you decide on a weighting system that

12  reduces adverse impact; is that correct?

13  A.    Yes.

14  Q.    So you get to decide, after the fact, after the

15  candidates have taken the test, how you're going to weight

16  the test to make sure it looks good for adverse impact; is

17  that correct?

18  A.    Yeah, we determine the most appropriate weighting

19  strategy as we analyze the data.

20  Q.    Have you ever tried to do that outside of Jefferson

21  County in safety forces like the City of Akron Fire

22  Department, the Akron Police Department, or any other

23  community that is not under Court oversight?

24  A.    No.

25  Q.    You were questioned regarding the different weighting

1    methods or the fire lieutenant's examination, do you recall

2    that on direct, Dr. Brink?

3    A.    Yes.

4    Q.    And I'm referring to Defendant's Exhibit 1086-4; is

15:36:59  5    that right?  That's where you explored different weighting

6    schemes?

7    A.    I don't have the numbers, I'm sorry, but this is the

8    document that you have up.

9    Q.    The document that I have up is from your expert

15:37:13 10    report?

11    A.    Yes, September 7 -- or excuse me --

12    Q.    It's table 5 in your expert's report?

13    A.    Yes.

14    Q.    And you explored ranks 21 through 35; is that correct?

15:37:29 15    A.    Yes.

16    Q.    And when you look at these numbers, what these numbers

17    tell me is that we go from adverse impact, .68 -- and you

18    can look across all the numbers and go down the columns.  So

19    would go from adverse impact at 21, and then there is, in

15:37:54 20    these ranks, 21 through 28, we have adverse impact; is that

21    correct?

22              THE COURT:  Can you read it, ladies and gentlemen

23    of the jury?  All right.  Thank you.

24    A.    Yes, there is adverse impact at ranks 21 through 28.

15:38:12 25    Q.    And then magically when we go to rank number 29, one

1  person different, we don't have adverse impact.  Isn't that

2  correct?

3  A.    Yes, there is no adverse impact at rank 29.

4  Q.    So we can look at all these scores and they can go up

15:38:28 5  and down, there is adverse impact, there isn't adverse

6  impact, and it just depends on how many people you promote;

7  isn't that correct?

8  A.    That's one of the factors it depends on.

9  Q.    But it changes?  It goes up and down?

15:38:43 10  A.    Yes.

11  Q.    When you have small sample sizes, four-fifths rule is

12  quite volatile, is it not?

13  A.    It's more volatile when there is small samples than

14  when this is large samples.

15:39:15 15  Q.    And these two pools of candidates for lieutenant,

16  captain, are small sample sizes, are they not?

17  A.    Captain might be small -- lieutenant is it?

18  Q.    Captain might be small?

19  A.    Captain is a small sample.  Lieutenant is a pretty

15:39:30 20  decent sample.

21  Q.    You were talking about calculating the number of SME's

22  that has to participate in a job analysis.  Do you recall

23  talking about this formula, and we had to have 29 SME's for

24  the lieutenant's exam and some other large number for the

15:39:59 25  captain's exam job analysis.  Are you familiar with that

1    testimony that you gave earlier?

2    A.    Yes.

3    Q.    Are you familiar with a book by Brannick & Levine

4    called Job Analysis?

15:40:36  5    A.    I haven't read it.

6    Q.    Are you familiar with the book and whether or not it

7    is in any way, shape or form an authority on job analysis

8    and how to conduct them?

9    A.    I haven't read it so I wouldn't be able to answer that

15:41:09 10    question.

11    Q.    Would it surprise you if Brannick & Levine, who have

12    written an entire book about job analysis and SME's said

13    that --

14             THE COURT:  He's not familiar with it, counsel.

15:41:22 15    There is an objection.  I'll sustain it.  Thank you.  Next

16    question.

17         Just for the record, the Court will note even though

18    the objection wasn't stated verbally, counsel stood and I

19    assume he was going to raise an objection.  So it was

15:41:36 20    somewhat anticipatory.  I sustained the objection.

21    Q.    We were talking about reliability and I wanted to ask

22    you about first level supervisory positions such as

23    lieutenant.  Based on your experience in Jefferson County,

24    do you have any idea whether or not -- I'm sorry, it's not

15:41:56 25    about reliable.  It's about adverse impact.  Whether or not

1    you expect adverse impact to occur more frequently at the

2    first level of supervisory promotions?

3    A.    It's hard to say, I think it would depend on the

4    context that you're in.

15:42:14  5    Q.    Did you examine the reliability of the written job

6    knowledge test that was given here?

7    A.    You said the job knowledge, the multiple choice test?

8    Q.    Yes.

9    A.    I did not calculate that for reliability.

15:42:30  10    Q.    Did you read in the final report what the reliability

11    figure was on the written job knowledge test?

12    A.    Yes, I've seen the -- I've seen what it is, the

13    reliability estimate.

14    Q.    And there was a very high reliability for that test,

15:42:44  15    was there not, Dr. Brink?

16    A.    I don't recall what the number was.

17    Q.    If I told you it was in the high 80s, would that

18    surprise you?

19            MR. THOMPSON:  Objection.

15:42:57  20            THE COURT:  Well, counsel, why don't you

21    rephrase --

22            MS. AMBROSE-RUBRIGHT:  I'll withdraw the

23    question.

24            THE COURT:  Either withdraw it or present him

15:43:05  25    with an exhibit that would confirm what you're saying,

1    please.  Thank you.

2    Q.    Did you look at any of the reliabilities of the

3    assessment center oral boards for either lieutenant or

4    captain?

15:43:19  5    A.    I computed reliability for the written work sample,

6    and I've seen reliability estimates that were in the report.

7    Q.    And based on your examination of the reliabilities

8    reported on those oral assessment exercises, those were in

9    your estimation above the .70 that you consider an

15:43:37  10   acceptable reliability; is that correct?

11   A.    Did you say just the oral board?

12   Q.    Yes.

13   A.    I believe it was above the .7.

14   Q.    And you told me that .7 and above is acceptable in

15:43:50  15   your estimation; is that correct?

16   A.    Ideally would be in the area --

17        THE COURT:  Is .7 -- that's not the question.

18   Read back the question.

19        (Record read.)

15:44:14  20   A.    It depends on what you're estimating reliability for.

21   Q.    Do you recall me asking you a question in your

22   deposition, and you telling me --

23        THE COURT:  Before you do that, refer to page and

24   line.  Do you recall at the time I took your deposition you

15:44:31  25   were asked this question and this answer was given.  Please

1       do it in that fashion for the benefit of all of us, please,

2       all the listeners, and the record.

3              You're referring now to page?

4                     MS. AMBROSE-RUBRIGHT:  I'm referring to page 86

15:45:12  5    in your deposition at line 7.

6              "Q.   What's the range for a diverse group of

7       knowledge sources, what in your opinion are acceptable

8       levels of reliability?"

9              "A.   In my opinion, I would be concerned if my

15:45:33 10    reliability was below .7.  Beyond that I cannot recall a

11      specific range.  I have to consider a number of factors."

12             And you were speaking about the job knowledge test; is

13      that right.

14      A.    I don't have it in front of me, but I believe that's

15:45:48 15    what you initially read, if that's what it says.

16      Q.    And is that reliability the same reliability that you

17      would expect in oral board assessment exercises?

18                    MR. THOMPSON:  Objection, Your Honor.

19                    THE COURT:  It's overruled.

15:46:04 20    A.    Again, the only way I can answer that is if I explain

21      the types of reliability that you might be looking at on

22      this test.

23                    THE COURT:  Counsel, if you can't answer the

24      question as posed -- why don't you rephrase the question?

15:46:17 25    Counsel, why don't you restate it or rephrase it?

1284

1          MS. AMBROSE-RUBRIGHT:  I'm going withdraw the

2     question, Your Honor.

3          THE COURT:  All right.  Thank you.

4     BY MS. AMBROSE-RUBRIGHT:

15:46:30  5     Q.    You talk about research you did on time studies and

6     its relationship to whether or not there were difference.

7     Do you recall that in your testimony?

8     A.    Yes.

9     Q.    How many people did you study to make your

15:46:41 10     conclusions?

11     A.    I do not recall.

12     Q.    Was it a small sample?

13     A.    I simply do not remember.

14     Q.    It's true, is it not, Dr. Brink, that if there is not

15:47:12 15     adverse impact on these examinations, there is no

16     requirement in the uniform guidelines to demonstrate

17     validity; is that correct?

18     A.    Yes.

19     Q.    So all these complaints you have about all the

15:47:26 20     different job analyses points that you've made, are not

21     relevant if there is not adverse impact on these two

22     examinations?

23     A.    Yes.

24     Q.    When you do job analyses, do you ever go to the

15:47:50 25     Internet and look at O Net?

1   A.    Yes.

2   Q.    And O Net tells you things about different jobs; is

3   that correct?

4   A.    Yes.

15:47:58 5   Q.    And if you go to the internet and do that, do you

6   think it's reasonable for an industrial psychologist to rely

7   on prior job duty and task analyses in other cities that

8   they actually did?

9   A.    Yes.

15:48:16 10   Q.    And you know that that's what Dr. Jacobs did here?

11   A.    If that's your only job analysis step, I would say --

12            THE COURT:  The question is do you know whether

13   Dr. Jacobs did that here?

14   A.    Dr. Jacobs used information from prior analyses.

15:48:38 15   Q.    And do you know whether or not his prior experience in

16   other cities across the country, when he developed these

17   duty and tasks lists, whether or not those were the result

18   of these job analysis questionnaires that you said you do in

19   Jefferson County?

15:48:54 20   A.    I do not know how I do derive that information.

21   Q.    Do you know in the City of Akron that when we promote

22   people to lieutenant and captain, that the very next day

23   they take over that job?

24   A.    I'm not aware of the procedure here in Akron.

15:49:14 25   Q.    Are you aware that we don't have a training program,

1    that is, we're going to promote you today and you go through

2    a six-month training program to become lieutenant or

3    captain?  Are you aware of that?

4    A.    I've read that in Dr. Jeanneret's report.

15:49:29  5    Q.    So we have no training academy for those people.

6    You're aware of that; is that correct?

7    A.    Assuming Dr. Jeanneret's statement is correct, yes.

8    Q.    So you don't know personally.  You're relying on that?

9    A.    Right.

15:49:40 10    Q.    And that would then indicate to you, would it not,

11    that when that person goes into work the next day from a

12    firefighter to a lieutenant, they're expected to do that

13    job, know that job, and have the ability to do that job?  Or

14    is it something we can learn later?

15:49:57 15    A.    Is this a yes or no question?

16    Q.    Is it something you can learn later, or are you

17    expected to know how to do the job the next day?

18    A.    You assume the role of the job the next day, if

19    that's -- assuming that's correct.

15:50:17 20    Q.    Have you examined the proposals that were submitted by

21    other industrial psychologists in this case to do this

22    testing for fire lieutenant and fire captain?

23    A.    Have I seen them?

24    Q.    Yes.

15:50:53 25    A.    No.

1    Q.    Do you know whether or not before this examination was

2    given that other industrial psychologists submitted

3    proposals with different components for the position of fire

4    lieutenant and fire captain?

15:51:10 5    A.    No.

6    Q.    Do you know what a panel review session is?

7    A.    Could you describe it?  Depends on context.

8    Q.    I'm asking if you know, is that term familiar to you?

9    A.    It may be the same as what we call focus group.

15:51:37 10    Q.    In Dr. Jacobs' final report he describes his SME

11    panels where they went over job tasks, duty tasks and made

12    these ratings as panel session?

13    A.    Okay.

14    Q.    Having said that to you, do you know whether or not

15:51:55 15    the people in these panel sessions discussed the duties,

16    abilities, tasks that needed to be performed by captains and

17    lieutenants?

18    A.    According to the validation report, it says they

19    discussed the tasks and did independent ratings on duties,

15:52:15 20    abilities, and knowledge language and, but they also

21    discussed or had consensus ratings on the three subsections

22    ratings of knowledge, which included day one, memorization

23    or whatever the third scale is.  I don't recall.

24    Q.    Dr. Brink, do you know what an Akron Fire Department

15:52:38 25    lieutenant or captain does?

1    A.    Not outside what I saw in the job analysis.

2    Q.    But you personally didn't conduct a job analysis in

3    any way, shape or form to give your testimony today; is that

4    correct?

15:52:51   5    A.    That's correct.

6    Q.    So how can you say that the test was not job related?

7    A.    I said the job -- did I say the test was not job

8    related?  I said the job analysis was insufficient.

9    Q.    Well, is it your opinion then that it's not job

15:53:11  10    related since the job analysis wasn't the sufficient?

11    A.    The job analysis is not sufficient.

12    Q.    So you have not rendered an opinion on whether the

13    test was job related or not; is that correct?

14    A.    Given the job analysis is not sufficient, it can't be

15:53:23  15    job related, can't be determined to be job related.

16    Q.    In the assessment center that was administered in

17    Akron, we were talking about panel differences.  And you

18    told me in Jefferson County you just rotate panels so you

19    never know whether or not there were panel differences; am I

15:53:45  20    correct?

21    A.    We rotate to prevent panel differences.

22    Q.    So if you keep the same panels, and one panel scores

23    higher than other panels, in the field of industrial

24    psychology, is it not appropriate to standardize those

15:54:09  25    scores?

1    A.    Assuming the rates are -- yeah, it's appropriate in

2    some cases.

3    Q.    You talked about how you do it in Jefferson County and

4    you talked about preliminary ratings, and then you have a

15:54:22 5    consensus rating; is that correct?

6    A.    Yes.

7    Q.    When your assessors do these preliminary ratings, I

8    assume that they give numbers to candidates; is that

9    correct?

15:54:32 10    A.    Yes.

11    Q.    Do you examine the point spreads in those preliminary

12    ratings?

13    A.    Yes.

14    Q.    Before they do consensus ratings?

15:54:41 15    A.    Could you perhaps rephrase the question?

16    Q.    Sure.  You told me that there were two assessors that

17    you had rate candidates.  And they did preliminary ratings

18    before they did a consensus rating; is that correct?

19    A.    Yes.

15:55:01 20    Q.    And when they preliminarily rate a candidate, do you

21    go in and examine the preliminary ratings to determine if

22    there is too large of a point spread before they reached

23    consensus?

24    A.    Perhaps I could reexplain the process.

15:55:24 25            THE COURT:  No, sir.  I'm sorry.  Do you

1290

1    understand the question?

2         THE WITNESS:  I can't answer the question as

3    asked.

4         THE COURT:  Do you understand the question?

15:55:30  5         THE WITNESS:  Yes.  It just doesn't make

6    sense --

7    Q.   I don't know how else to ask this, Dr. Brink.  If you

8    had two assessors that gave preliminary ratings and their

9    preliminary ratings of a candidate were three points, four

15:55:47  10   points a part?

11   A.   Right.

12   Q.   And then they reached a consensus rating, would you

13   ever go in to the underlying preliminary ratings and

14   determine that their consensus rating was incorrect or

15:56:03  15   unreliable?

16   A.   We use the preliminary ratings to calculate

17   reliability.  We do examine the ratings.

18   Q.   So you look at the preliminary ratings, and regardless

19   of what the point spread is, whether it's two points, three

15:56:18  20   points, you do an overall reliability calculation, don't

21   you?

22   A.   Yeah, reliability is based on the preliminary ratings.

23   Q.   Do you do reliability calculations after consensus?

24   A.   No.

15:56:29  25   Q.   If you look at the preliminary ratings and you

1 calculate reliabilities based on those preliminary assessor

2 ratings, what kind of reliabilities are you looking for?

3 A.    On dimension ratings?

4 Q.    On the preliminary ratings that they give, what are

15:56:49 5 the reliabilities that you're looking for in those

6 assessment center exercises?

7 A.    Ideally the dimension ratings would be in the range of

8 .9 to .99.  And then 1.0 would be the highest reliability

9 possible much.

15:57:06 10       That would be the highest level to achieve.  And

11 anything above .8 would be good.  .7, we start to get a

12 little concerned when it was gets close to.7.  And it's okay

13 to have one or two, I think below .6, but you wouldn't want

14 your entire test or component to have ratings -- excuse me,

15:57:25 15 reliability estimates in dimensions on the range of .6.

16 Q.    And in the assessment centers given here for

17 lieutenant and captain, do you know what the reliabilities

18 are?

19 A.    We're speaking about dimension reliabilities,

15:57:41 20 component reliabilities?

21 Q.    Component reliabilities?

22 A.    I believe they were presented in the validation

23 report.

24 Q.    Do you know whether they are high enough to be

15:57:54 25 acceptable in your opinion?

1    A.    Are we talking about dimension ratings.

2    Q.    Exercise?

3    A.    I would have to see what they are.

4    Q.    Oral boards?

15:58:06  5         THE COURT:  I'm sorry.

6              THE WITNESS:  I would have to see what the actual

7    numbers were.

8              MS. AMBROSE-RUBRIGHT:  I'm going to take a

9    moment, Your Honor.

15:58:14  10         THE COURT:  Just so it's clear, ladies and

11   gentlemen, we are adjourning at 4:30 for benefit of this

12   jury.  We're not going carry on after 4:30, given the fact

13   that it will be -- again, there will be no day late.  The

14   jurors are traveling to their vehicles, and parking decks

15:58:36  15   here in the downtown area.  And I already indicated one of

16   our jurors travels more than 100 miles each way to be here.

17         So I would hope that both counsel and the witness are

18   mindful of the fact that this is the schedule we are going

19   to follow.

15:59:32  20   Q.    Dr. Brink, let me show you page 40 from the final

21   report of Dr. Jacobs?

22              MR. ELFVINwhich exhibit is this, please?

23              MS. AMBROSE-RUBRIGHT:  1016.

24   Q.    I'm asking you to look at the statistics that were

16:00:04  25   calculated on interrater agreement for the incident command

1   subordinate conference for group rating.  Do you see that

2   for lieutenant, captain?

3   A.    Yes.

4   Q.    And those numbers .921, .922, .971, .965, are very

16:00:18  5   high reliabilities, are they not, Dr. Brink?

6   A.    As I said earlier .9 will be very good.

7   Q.    Thank you, Dr. Brink.  Dr. Brink, you made a statement

8   that in the written work sample exercise, that you can't

9   understand how oral expression would be assessed is that

16:00:52 10   exercise.  Do you recall that statement?

11   A.    Yes.

12   Q.    I'm going to show you what is in the assessor training

13   manual which is Exhibit 1029.  I believe it might be behind

14   you.

16:01:50 15   A.    Which binder?  Do you know, is it separate?

16   Q.    It's a separate binder?

17          THE COURT:  1029?

18          MS. AMBROSE-RUBRIGHT:  That's correct.  Your

19   Honor, may I approach the witness and help him?

16:02:05 20          THE COURT:  Yes, why don't you approach.  If not,

21   I'll allow him to use my copy.

22          MS. AMBROSE-RUBRIGHT:  That might expedite it.

23          THE COURT:  Sir, it's there before you in the

24   bracket binder, the one before you on the podium, just

16:02:27 25   handed to you sir.  You can use my copy.  Thank you.

1      THE WITNESS:  Thanks.

2  Q.    I'm on page 25 of that exhibit, Doctor.

3       Did you see this confidential appendix which was the

4  training manual for the assessors before today?

16:02:59 5  A.    I've seen the appendices.  I don't know about every

6  page, they're very, very thick.

7  Q.    If you would look at page 25 under the written work

8  sample.  Do you see the list of abilities and the X's?

9  A.    Yes.

16:03:19 10  Q.    On which abilities are measured in certain exercises

11  and which are not?

12  A.    Yes.

13  Q.    What would you take NA to mean?

14      THE COURT:  You're going to need to blow that up

16:03:29 15  for the jurors.  I can tell they're not going to be able to

16  read it.  Can you read it, ladies and gentlemen?  I didn't

17  think so.

18

19      MS. AMBROSE-RUBRIGHT:  That's as far as it will

16:03:39 20  zoom in, Your Honor.

21       No, it's not.

22  Q.    Do you see that, Dr. Brink?

23  A.    Yes.

24  Q.    And what does NA mean to you?

16:03:48 25  A.    Not applicable.

1  Q.    Would you take that to mean that oral expression was

2  not assessed in the written work sample?

3  A.    That -- yeah.

4        MS. AMBROSE-RUBRIGHT:  I just need one moment,

16:04:10 5  Your Honor.

6        No further questions.

7        THE COURT:  All right.  Thank you.  Any redirect

8  of this witness?  All right.  Counsel, you may proceed.

9           REDIRECT EXAMINATION OF KYLE BRINK

16:04:29 10 BY MR. THOMPSON:

11  Q.    Dr. Brink, you were testifying just a few minutes ago

12  about how you calculated reliability based on the

13  preliminary assessment; is that correct?

14  A.    Yes.

16:05:12 15  Q.    Are you aware of -- and you saw this information put

16  up here where counsel said look at this reliability number

17  and how fabulous it is, do you see that there, this 92, and

18  971, do you know how that was computed?

19  A.    No, I do not.

16:05:30 20  Q.    Here is also from the final report, and this is the

21  final eligibility list.  Do you see that number right there,

22  that 42.381.  These are the scores after they had been

23  standardized?

24        MS. AMBROSE-RUBRIGHT:    Could you give us an

16:05:43 25  exhibit number, please, counsel.

1       THE COURT:  One moment being please.

2       MS. AMBROSE-RUBRIGHT:  The exhibit number.

3       THE COURT:  Why don't you pull it down, perhaps

4  in the interest of time, hand it to opposing counsel and let

16:05:52 5  her look at it.

6  Q.     Exhibit 169?

7       THE COURT:  Are you ready, counsel?  Go ahead.

8  You may proceed.

9  Q.     On Exhibit 1016, do you see the oral board says 42381?

16:06:24 10  A.     Yes.

11  Q.     Then you see on the reliability computations used by

12  Dr. Jacobs, do you see it also here we highlighted it for

13  you, 42381?

14  A.     Yes.

16:06:35 15  Q.     So Dr. Jacobs was computing reliability after --

16       MS. AMBROSE-RUBRIGHT:  Objection.  He said he

17  didn't know.

18       THE COURT:  Sustained, ladies and gentlemen of

19  the jury, disregard counsel's question.  Nonleading

16:06:44 20  questions, sir.

21  Q.     What does this tell you -- thank you, Your Honor.

22       What does this tell you about how Dr. Jacobs computed

23  these reliability numbers?

24       MS. AMBROSE-RUBRIGHT:  Objection.  He just said

16:06:53 25  he don't know.

1    THE COURT:  It's overruled.  He can -- ladies and

2    gentlemen of the jury, again, your collective minds and

3    memories of what this witness may have earlier testified to,

4    you can rely upon that in deciding this particular issue.

16:07:08  5    Go ahead.  You can answer the question, sir.

6    Again, what his earlier testimony may have been, you

7    will have to recall.  Thank you.

8    A.    Would you please restate the question?

9    Q.    Sure.  The oral scores that appear on this Exhibit

16:07:31 10    1016, sir?

11    A.    Yes.

12    Q.    Are these the scores after they've been standardized

13    and Z scored?

14    A.    There was two standardization processes so I can't

16:07:53 15    answer that question.

16    Q.    Okay.  And the first standardization process was when?

17    A.    Well, we talked about earlier the standardized, based

18    on the panels themselves, but they also standardized scores

19    when they were calculating overall test scores.

16:08:11 20    Q.    And when there is standardization is that what is

21    known as Z score?

22    A.    One type of standardized score would be a Z score.

23    Q.    In these tables for the final eligibility list from

24    the City of Akron Division of Fire promotional examination,

16:08:29 25    sir, the final eligibility list was determined after all

1    these standardizations were done?

2    A.    That's correct.

3    Q.    So these scores that are reflected here are after all

4    the standardization, the first time for panel differences,

16:08:46  5    and the next time based on total scores, how that was done?

6              MS. AMBROSE-RUBRIGHT:  Objection.

7              THE COURT:  Sustained.  Nonleading questions,

8    sir.  It is redirect.

9              MR. THOMPSON:  Okay.

16:08:58 10    Q.    So the final eligibility list, based on the final

11    report and the data provided to you was after the

12    standardization was done?

13    A.    The final score?

14    Q.    Yeah.

16:09:15 15    A.    The final score was after all the standardization was

16    done.

17    Q.    And is that reflected in this table here from

18    Defendant's Exhibit 1016?  These are the final scores used

19    to rank order?

16:09:26 20    A.    Yeah, the final score would be on the final SCR

21    column.

22    Q.    Okay.  And is that the score that appears here in the

23    final report on page 41, Dr. Jacobs, when he's computing his

24    reliability statistic?

16:09:48 25    A.    The highlighted value?

1   Q.   Yes.

2   A.   That's the final score in the oral component.

3   Q.   Okay.  Good.

4        And the last table that was put up before you, sir,

16:10:01 5   was one where it said there were certain behaviors that were

6   not assessed.  Do you recall that?

7   A.   Repeat the question, please.

8   Q.   Sure.  Do we have that?  1029?

9        On page 25, Exhibit 1029?

16:10:25 10   A.   Okay.

11   Q.   I'm trying to do this as quickly as I can.  This one,

12   do you remember this?

13   A.   Yes.

14   Q.   I'm going to show you --

16:10:37 15        MR. THOMPSON:  Again, Your Honor, this is one the

16   consolidation rating forms that we published earlier.  We

17   would like to use this for expediency purposes?

18        THE COURT:  Put it up.

19   Q.   This is called lieutenant written work sample

16:10:49 20   consolidation rating form.  And what's the very first

21   dimension that's being evaluated there?

22   A.   If you can move a little to the right.

23   Q.   Sorry.  This is Exhibit 78-16?

24   A.   Oral expression.

16:11:00 25   Q.   And this is on the written work sample consolidation

1    rating form, sir?

2    A.    Yes.

3    Q.    And this has a rating number across the top there,

4    sir, or a number, 7?

16:11:17  5    A.    Yes.

6    Q.    Doctor --

7          MR. THOMPSON:  Can I approach, please, Your

8    Honor, to gets the vitae that was provided to you?

9          THE COURT:  You may.

16:11:44  10   Q.    If I could take that from you for a minute, please,

11   Dr. Brink.  Dr. Brink, the curriculum vitae that was put to

12   you earlier, do you remember this?

13   A.    Yes.

14   Q.    And the question was asked to you about whether you

16:12:05  15   put that one analysis in your C.V.?  I'm going to direct

16   your attention right here.

17   A.    Yes.

18   Q.    Is that the study that questions were asked of you on

19   cross-examination?

16:12:24  20   A.    Yes, it is.

21   Q.    So it is on your vitae?

22   A.    Yes.

23   Q.    I want to make sure that we have this right.  The

24   assessment centers in Jefferson County are videotaped?

16:12:40  25   A.    Yes.

```
 1              MS. AMBROSE-RUBRIGHT:  Objection.

 2              THE COURT:  It's overruled.  I think he already

 3      testified to it, but it's overruled.  I'll let counsel ask

 4      the question.  Go ahead.

 5      Q.    And, Dr. Brink, at any time in any of Dr. Jacobs'

 6      data, did you ever advise you or did he provide any

 7      information on to who assessor 99 was for the written work

 8      sample?

 9      A.    I don't recall whether I was provided, but assessor 99

10      was an E.B. Jacobs employee.

11      Q.    Employee of E.B. Jacobs?

12      A.    Yes.

13      Q.    Was not a fire officer?

14              MS. AMBROSE-RUBRIGHT:  Objection.

15              THE COURT:  Overruled.

16      A.    All I know it was an employee of E.B.J., I'm not sure

17      what that person's background was.

18      Q.    And according to the final report of Dr. Jacobs, do

19      you know when the final weighting scheme was established for

20      these examinations?

21      A.    The final weighting scheme was established by E.B.J.

22      based on the three --

23              THE COURT:  The question was when?  I'm trying to

24      assist the proceeding.  The question was when.

25      A.    Oh, when?
```

1    Q.    When, yes?

2    A.    When.

3    Q.    Yeah, when the weighting scheme that was used by E.B.

4    Jacobs was decided?

16:13:53  5    A.    The weighting scheme was decided after the job

6    analysis and before the test was developed.

7    Q.    And on cross-examination you were asked questions

8    about the job analysis.  Do you remember the just Yusko

9    group?

16:14:09 10    A.    Yes.

11    Q.    And the job analysis that the Yusko group did in 2003,

12    briefly, how thorough was that job analysis?

13    A.    It would have followed the procedures that I described

14    much earlier today with site observations, focus groups and

16:14:25 15    job analysis questionnaires.

16    Q.    Did you ever see any prior job analysis that was done

17    prior to the 2004 job analysis in this case?

18    A.    No.

19    Q.    And a lot of questions were asked on

16:14:41 20    cross-examination, Doctor, about did you ask Dr. Jacobs for

21    anymore information.  Do you remember that?

22    A.    Yes.

23    Q.    According to the SIOP principles and the uniform

24    guidelines, the documentation that you were referring to, is

16:14:54 25    that documentation that's only to be produced upon request

1     of a third party?

2     A.    No.

3     Q.    When is it supposed to be produced?

4     A.    At the time of the validation of the report.

16:15:05 5     Q.    So if I understand you correctly, like when you're

6     doing your own, you don't just put together a bare bones

7     validation report and wait for somebody to ask for more

8     information?

9             MS. AMBROSE-RUBRIGHT:  Objection.

16:15:15 10             THE COURT:  Sustained.  Disregard the question,

11    ladies and gentlemen.

12    Q.    And the questions were asked relating to determination

13    of adverse impact, and you were asked if you'd ever computed

14    adverse impact relating to age.  Do you remember that

16:15:35 15    question being asked of you on cross?

16    A.    Yes.

17    Q.    Are there rules for determining adverse impact for age

18    different from the rules for determining adverse impact for

19    race?

16:15:45 20    A.    It's the same calculation regardless of what group

21    you're looking at.

22    Q.    And you testified on cross-examination about mean

23    differences, do you remember that testimony?

24    A.    Yes.

16:15:53 25    Q.    And you said that you used it for minimum standards.

1   Or the testimony you gave was as to minimum standards.  Put

2   it in context.  When you're measuring for minimum standards,

3   how is that different from what is being done here?

4   A.    I think they're referring to minimum qualifications.

16:16:14  5   Q.    Minimum qualifications.  I'm sorry.

6   A.    That is the term we use.  Minimum qualifications in

7   the context of validation report would have been whether or

8   not the applicants met the time and service requirements.

9   And it was a pass or fail test.  There was no rank.  Did

16:16:37 10   they have the time and service requirements or not.

11   Q.    So that's much different than the examinations we have

12   here?

13   A.    Yes.

14   Q.    So does that analysis that counsel pointed to and

16:16:45 15   pointed out, is that even pertinent to the issues -- issue

16   in this case?

17          MS. AMBROSE-RUBRIGHT:  Objection.

18          THE COURT:  Sustained as to the -- yes, do you

19   want to rephase the question.

16:16:54 20   Q.    Sure.

21          Is that kind of analysis even applicable to the issues

22   of promotion in this case?

23   A.    No.

24   Q.    And when you were asked questions about power,

16:17:06 25   remember the power analysis?

1    A.    Yes.

2    Q.    And power goes -- if I understood your testimony, to

3    what type of statistical test you can use or should rely

4    upon?

16:17:18  5    A.    Repeat the question.

6    Q.    Sure.  Power analysis goes to how reliable the

7    statistic is that you are using?

8    A.    Yes.

9    Q.    And if I understand your testimony, those statistics

16:17:36 10   of low power are statistics that you should not use in

11   making decisions?

12   A.    That's correct.

13   Q.    And these statistics have low power?

14   A.    That's correct.

16:17:43 15         MS. AMBROSE-RUBRIGHT:  Objection.

16         THE COURT:  That's his opinion.  It's overruled.

17   Q.    And when you're dealing with the assessor ratings down

18   in Jefferson County when you're doing it where you have the

19   preliminary assessment ratings, those things, these

16:18:05 20   assessors are working off of videotaped presentations?

21   A.    Yes.

22   Q.    So they can go back and review those presentations as

23   many times as necessary to resolve any issues?

24   A.    Yes.

16:18:16 25   Q.    Is that possible to do anywhere with the oral

1   assessment exercises in this case?

2   A.    No.

3         MR. THOMPSON:  If I could have a minute, please,

4   Your Honor?

16:18:28  5         THE COURT:  You may.

6   Q.    Dr. Brink, relating to the job analysis that was done

7   by Yusko, did you have all that data when you just did the

8   follow-up job analysis, I guess, just a few years later?

9   A.    We had the data from the 2003 analysis on hand.

16:19:13  10   Q.    So you could determine how detailed and how thorough

11   that job analysis was at that time then?

12   A.    Yes.

13   Q.    And there were a lot of questions asked about adverse

14   impact on cross-examination.  Your opinion is there is

16:19:32  15   adverse impact on -- for -- against African-Americans at the

16   lieutenant rank?

17   A.    Yes.

18   Q.    And your opinion is, sir, that there is adverse impact

19   against Caucasian firefighters at the rank of captain?

16:19:45  20         MS. AMBROSE-RUBRIGHT:  Objection, Your Honor.

21   He's already given that opinion.

22         THE COURT:  I'll let him summarize his opinion

23   just finally in the interest of time.  Go ahead.

24   A.    Yes.

16:19:52  25   Q.    And your opinion is that there is adverse impact

1    against those firefighters over the age of 40 at the

2    lieutenant rank?

3    A.    Yes.

4    Q.    So going into the job analysis in all this detail, in

16:20:07 5    light of those facts, is appropriate then?

6             MS. AMBROSE-RUBRIGHT:  Objection.

7             THE COURT:  Sustained.

8         Excuse me.  I apologize, ladies and gentlemen.  I'll

9    allow the question based upon the earlier testimony.  You

16:20:22 10   can ask the question, sir.  I think it's -- yeah.  It ties

11   into what the opinion witness's opinion is.  Go ahead.  You

12   can ask the question one more time.  My apologies.

13   Q.    Then under these circumstances where there is a

14   determination you made of adverse impact, it is appropriate

16:20:40 15   to go into the job analysis and the test development and

16   actually dissect this test from start to finish then?

17   A.    It would actually be required by the uniform

18   guidelines, so yes.

19   Q.    Required to do so?

16:20:51 20   A.    Not just appropriate, but required according to

21   uniform guidelines.

22   Q.    And your testimony was, I think on cross-examination,

23   that adverse impact cannot be computed as to the test in

24   whole until all the promotions have been made.

16:21:04 25   A.    That's correct.

1308

1    Q.    Is there any way that Dr. Jacobs could have expressed

2    an opinion as to adverse impact prior to the completion of

3    the promotion process?

4                MS. AMBROSE-RUBRIGHT:  Objection.

16:21:20  5          THE COURT:  Well, all right.  Go ahead.  You can

6    render an opinion, sir.

7    A.    No.

8    Q.    Are you aware that that's exactly what he did in his

9    final report?

16:21:31 10          MS. AMBROSE-RUBRIGHT:  Objection.

11               THE COURT:  It's overruled.  Do you recall?

12   Q.    You can go to his report.  I think it's 1029, page 44.

13   A.    He said there was no adverse impact at any rank on any

14   of the exams.

16:21:47 15  Q.    That's fine.  No further questions?

16               THE COURT:  Any redirect of this witness -- I'm

17   sorry, recross.  My apologies.

18                    RECROSS-EXAMINATION OF KYLE BRINK

19   BY MS. AMBROSE-RUBRIGHT:

16:21:58 20  Q.    You said you were familiar with uniform guidelines, am

21   I correct?

22   A.    Yes.

23               THE COURT:  A little louder, counsel.

24   Q.    Is there any requirement in the uniform guidelines

16:22:06 25  that you video or audiotape assessment center exercises?

1      A.    No.

2      Q.    You also said you were familiar with the uniform

3      guidelines, and I assume the questions and answers that

4      accompany the uniform guidelines?

16:22:18  5    A.    Yes.

6      Q.    In the questions and answers, are you familiar with

7      the fact that there is a requirement to consider

8      alternatives but not document them?

9      A.    Are you asking it's not a requirement to document?

16:22:36 10    Q.    How about if I do it this way?  I'm showing you what's

11     marked as Defendant's Exhibit 1068-16 from the uniform

12     guidelines.  You are familiar with the questions and answers

13     that accompany the guidelines?

14     A.    Yes.

16:23:04 15    Q.    And in question 52, they're asking whether the

16     guidelines require consideration of alternative procedures

17     and alternative methods.  Do you see that question.

18     A.    Yes.

19     Q.    Is there anywhere in there that they discuss that the

16:23:20 20    consideration by the test developer has to be documented in

21     a final report?  Do you see that anywhere there?

22     A.    Would it be okay if I read my copy?  It's very

23     difficult for me to read the screen.  Do you have another

24     copy?

16:23:36 25    Q.    How about if I just give you my copy?

1310

1    A.    That would be fine.

2          MS. AMBROSE-RUBRIGHT:  Could I approach, Your

3    Honor?

4          THE COURT:  Yes, you may.

16:24:01  5    A.    In this question and answer it does not say that it

6    has to be documented.

7    Q.    Thank you, Dr. Brink, I have no other questions?

8          THE COURT:  All right, Doctor.  You may step

9    down, sir.  You're excused.

16:24:12  10          MR. THOMPSON:  Your Honor, I have one discretion.

11          THE COURT:  One question.  The recross was

12    extremely brief so I expect this to be very brief, please.

13          FURTHER REDIRECT EXAMINATION OF KYLE BRINK

14    BY MR. THOMPSON:

16:24:23  15    Q.    The SIOP, page 50?  Do you have that there?

16    A.    Yes, I do.

17    Q.    Go to page 50.  These are the SIOP principles, sir?

18    A.    Yes.

19    Q.    Would you read to the jury as to alternative measures

16:24:38  20    what the Society of Industrial Organizational Psychology of

21    which Dr. Jeanneret is a fellow says about documentation?

22    A.    The heading is search for alternative selection

23    procedures, and it says underneath that heading.  The

24    researcher should document any search for selection

16:24:55  25    procedures, including alternative combinations of these

1      procedures that are substantially equally valid and reduce

2      subgroup differences.

3                  MR. THOMPSON:   Thank you.  No further questions.

4                  THE COURT:      Please read back the last answer.

16:25:15  5  A.      The research should document any search for collection

6      procedures, including alternative combinations of these

7      procedures that are substantially equally valid and reduce

8      subgroup differences.

9                  THE COURT:  All right.  Thank you, Doctor.

16:25:32 10            Ladies and gentlemen of the jury, I'm going to -- I'm

11     going to adjourn for the day.  A couple things.

12            First of all, leave your notepads on your chairs.

13     Remember the admonitions I've given you.  During the evening

14     you're not to discuss the case among yourselves or with

16:25:46 15  anyone else.  Advise your family and friends of this

16     instruction.

17            Until the case has been completed, your verdict

18     rendered, you're simply not to discuss this case.  Do not

19     attempt to obtain in additional information regarding any of

16:25:57 20  the issues in this case on the internet or any Web sites

21     that may have been referenced here today.  None of that is

22     appropriate for your consideration.

23            Also being ladies and gentlemen, do not have any

24     contact with any individual who has anything -- in any way

16:26:12 25  shape or form touches about this case.  I'm going to ask you

1    to remain in the jury room for just a few minutes so I can

2    consult with counsel and see how we're going to proceed

3    tomorrow, being it may have some bearing on the balance of

4    our schedule this week.

16:26:24  5         I know at least one of my -- excuse me.  One of our

6    jurors has an issue regarding next week.  I'm mindful of

7    that.  It will be -- you will be -- your concerns and your

8    matter will be addressed.  We will adjust our schedule to

9    meet your family matter and needs in that regard.

16:26:39 10         So just give me about five minutes, ladies and

11   gentlemen, and the clerk will come back and speak with you

12   regarding when we will need for you to report tomorrow, and

13   maybe give you some further guidance as to how we're going

14   proceed.

16:26:50 15        Thank you very much, ladies and gentlemen.

16        Mr. Hink.

17             THE DEPUTY CLERK:  All rise.

18        (Jury out, 4:25.)

19             THE COURT:  All right, ladies and gentlemen, who

16:27:21 20  do the plaintiffs intend on calling?

21             MR. THOMPSON:  Tomorrow, Your Honor.

22             THE COURT:  You can -- you'll all be seated if

23   you would like, please.  Thank you.

24             MR. THOMPSON:  Your Honor, tomorrow we plan on

16:27:39 25  calling several of the remaining plaintiffs, that would

1     include Bruce Clough, that would include Brian rocks son,

2     David O'Neal, we plan on starting with Bradley Carr.  And we

3     would like to have Bruce Miller here tomorrow and if we have

4     any other witnesses that are out there as far as

16:27:59  5   follow-up-type witnesses we expect to try and work through

6     those very expeditiously tomorrow.

7          We have also advised the Court that we are planning on

8     reading the deposition of Steve nutting and chief Jim Clack

9     into the record on Friday.  We have conferred with counsel

16:28:15  10  already, many of the objections have been addressed.  There

11    are some for the Court to consider.  I will have those for

12    the Court tomorrow morning so it can look at those much

13    those depositions are not very long, and it will not require

14    an inordinate amount of time to go through those.  But most

16:28:31  15  of the objections have been dealt with between the parties

16    already.  So I expect to have that in your hands tomorrow

17    morning so you can review those.

18         THE COURT:  How many remaining plaintiffs do you

19    have?

16:28:40  20       MR. THOMPSON:  I believe we have seven or eight

21    of the original plaintiffs in there.  Ruth Miller would be

22    another.  We would expect Chief Green would be available to

23    us on Friday.  Bradley Carr and Greg Snyder will probably be

24    the longest witnesses of the remaining plaintiffs.

16:28:56  25       I assume that Brad Carr will start tomorrow afternoon

1    and probably will not be done with him by the end of the day

2    tomorrow.

3         But we expect to start with him anyway.  We should

4    hopefully be through most of our witnesses by the close of

16:29:08  5    the day Friday.  We expect to be at that point by the end of

6    the day Friday.

7         THE COURT:  All right.  Counsel for the

8    defendants, will you be ready -- let me just share with both

9    sides what I'm contemplating given the pace that we've been

16:29:25 10    moving, I am contemplating proceeding on Saturday.  There is

11    certain logistical problems that that poses, but I've asked

12    my clerk to confer with the powers that be, and it is

13    possible that we can proceed on Saturday.  And that's what

14    I'm contemplating doing, given the pace that we're

16:29:50 15    proceeding and given some of the challenges we've had to

16    face.  And I'm going ask the clerk to confer with the

17    jurors.  I'll perhaps confer with them tomorrow.  We have

18    one juror, if you recall, who has a husband who is having

19    surgery on December 16.

16:30:09 20         I suspect we do not know as of yet.  We hope to know

21    soon the time that surgery is scheduled.  I suspect she is

22    are going to be probably lost to us if the surgery is early

23    morning until such time as he is out of recovery.  We may or

24    may not be able to go forward at all on the 16th, and I

16:30:29 25    admitted to her and we discussed it during voir dire the

1    fact that her husband was having the surgery.

2         So I'm just advising you now that we may very well go

3    forward this Saturday and, if necessary, Saturday the 20th.

4    So that this case could be completed in a timely fashion.

16:30:45  5         So you should adjust your schedules, make sure your

6    witnesses are available.  I haven't made a final decision in

7    that regard.  But if we are not through with the plaintiffs'

8    witnesses by the close of business on Friday, my intention

9    is at least at this time to go forward on Saturday.  So that

16:31:02 10   whatever we have to deal with, procedural issues on

11   Saturday, whether it be motion practice, etcetera or

12   finalizing the testimony.  That is what I'm considering.

13        Counsel for the defendant, you can be heard, and then

14   I'll allow plaintiff again to be heard again after having

16:31:19 15   heard the witnesses that are going to testify.

16        Before we do that, Mr. Hink, let the jurors know they

17   can go home.  We will see them tomorrow morning at 9:00.

18   Thank you.

19        Give them my apologies for the delay.

16:31:32 20        What is the defendant's position, please.

21        MS. AMBROSE-RUBRIGHT:  Your Honor, with regard to

22   Mr. Nutting and Mr. Clack, as we already indicated to the

23   Court, we object to having the depositions read in their

24   entirety.  I indicated that to Mr. Thompson.  We did go over

16:31:47 25   potential objections.  And I would like to indicate to the

1   Court that I would like to withdraw my cross-examination of

2   both witnesses so that testimony should be very short, the

3   direct testimony of Mr. Thompson.

4           THE COURT:  I've already ruled that I would allow

16:32:01 5   the testimony, so I'll note your exception.  And I will read

6   it, but I don't think I'm likely to revisit my earlier

7   ruling.  Based on my earlier ruling, I suspect the

8   depositions may be read.

9       With regard to any other evidentiary issues that I

16:32:20 10  have to deal with before we adjourn this afternoon any other

11  issues before we conclude the day?

12          MR. ELFVIN:  No evidentiary issues, Your Honor.

13  I happen to be the chairman and district master of a Swedish

14  organization and Saturday the 13th is the annual Lucia

16:32:37 15  Celebration, so I need to make arrangements for Saturday to

16  have somebody else cover for me.

17          THE COURT:  Well, I suppose at this time I'm

18  going to confer with the jurors.  I may or may not know,

19  sir.  I apologize for the late notice, but we may not know

16:32:52 20  until as late as Friday, Friday morning.

21          MR. ELFVIN:  I just wanted to advise the Court.

22          THE COURT:  Friday morning is when I have to make

23  the final determination so I'm sure all of our schedules may

24  be impacted by if we have to go forward, on Saturday -- we

16:33:06 25  all have, I'm sure, commitments, conflicts, that might be

1    affected.  But this case and resolution of same takes

2    precedence over those other commitments.  Myself included.

3        Now, beyond that, at the close of business yesterday

4    there had been some discussion of possible resolution of

16:33:25  5    this case.

6        There has been -- I would reluctantly say at least

7    there has been a fair amount of the plaintiff's case

8    presented, including two very important witnesses, I'm sure,

9    two experts have testified.  I would hope, at this point in

16:33:40 10    the proceedings, each side would now have a better, at least

11    each side, both sides would have a better view of the

12    strengths and weaknesses of their case, their claims, and

13    the risk of this ongoing litigation.

14        As I said to counsel privately last night, this is a

16:33:58 15    piece of litigation which ultimately -- and I just -- let me

16    preface my remarks by saying nothing I say should be taken

17    as my view as to what the verdict in this case should be or

18    may be or what my view of the case is.  It should not be

19    taken by either side as that.

16:34:19 20        I'm not going to make the ultimate decision here, and

21    perhaps I will, but the jury will make a determination and a

22    finding as to the most important issues in this case.

23        But all that being said, this litigation, it strikes

24    me, whoever prevails, this is still going to be a no win

16:34:36 25    proposition for both sides.  It is going to lead to, no

1    matter who prevails, it is not going resolve the ongoing and

2    outstanding issues that have been highlighted in this Court.

3    So what I am suggesting to the parties is an encouragement,

4    trying to encourage both sides to keep an open mind and

16:34:59  5    explore some possible way of resolving this case.

6         As I've shared with the other side, or with both sides

7    in this case, the remedy, should the plaintiffs prevail,

8    what the remedy may be, how it would be implemented is a

9    matter of debate, whether it would bring to the plaintiffs

16:35:19 10    all that they wish from this litigation, again, is a matter

11    of debate and yet to be determined.

12         Conversely, from the defendant's perspective, there

13    has been substantial evidence presented here.  I think it's

14    fair to say -- that would, again, would support the

16:35:37 15    proposition that the examination -- and again I -- I offer

16    no opinion, but there has been substantial testimony as to

17    the -- what the plaintiffs believe is a substantial

18    weaknesses in the exam, and how it was presented.  What

19    jurors are going to do with this information and how they're

16:35:57 20    going to view it, again, I'm not going to speculate.

21         But irrespective of the outcome in this case,

22    irrespective of the verdict, it will not end here, when the

23    jurors render their verdict.  It will not end because there

24    will be an appeal by either side or both sides.  Both sides

16:36:16 25    can appeal the verdict.

1       That appeal will last two or three or four years

2    potentially.  The verdict could be affirmed, it could be

3    reversed, it could be affirmed in part, reversed in part.

4       I could be faced with making a determination as to one

16:36:34  5    part of the case, be it race.  I could be faced with a

6    determination as to age, one to the exclusion of the other.

7       So I don't see, ladies and gentlemen, a winner in this

8    litigation ultimately.  A verdict in favor of one side or

9    the other doesn't equal a victory in my humble opinion.

16:36:54 10       So there has been -- I've been made aware of some of

11    the negotiations here.  It appears there has been

12    considerable movement, at least in my humble opinion,

13    knowing what I know about the case and the history of same,

14    movement by both sides.  And there seems to be one

16:37:15 15    remaining -- I guess I'll say valley or chasm that cannot be

16    bridged.  And I would encourage you to see whether or not,

17    in light of today's testimony whether or not that gap could

18    not be closed or that -- however, whatever analogy you want

19    to use.  Because otherwise, everyone may leave here unhappy

16:37:39 20    in a week or two.  And everyone may leave here, I am sure

21    everyone will leave here, I think, with the issues in this

22    case still yet resolved, or unresolved because of the

23    appellate process and just the complex nature of this case

24    and the decision we're asking these eight jurors to make.

16:38:01 25       So you've all heard the testimony.  I think the

1    testimony today -- and I'm not commenting this in this

2    fashion to say that it favors one side or the other.  But it

3    just gives you some perspective about how challenging these

4    issues are.  And if you don't, both sides now, sit down and

5    reevaluate where you are and what you can do to remedy some

6    of the unhappiness with the past, but yet also with an eye

7    towards what you can do to plan for the future, which the

8    future is -- everyone here is still, in my humble opinion,

9    keeping in mind what I know about age, the years of service,

10   etcetera, relatively speaking, everyone here still many more

11   years or a number of years more yet to work in this

12   department, and to coexist with their employees.

13       So if you don't make the time now and make a genuine

14   effort, then it's going to continue.  This thing is going to

15   continue to be difficult and unresolved.

16       And I'll make myself available here this afternoon to

17   try to, again, work with the parties, to accommodate some

18   compromise.  And we've talked about it yesterday.  We sort

19   of put in place some general -- we talked about some general

20   concepts.  And so, if you now -- now is the time, ladies and

21   gentlemen.

22       And I apologize, but I have an obligation also to

23   these jurors.  I can't take another morning -- I can't take

24   another day and say, okay, don't come in until 10:30,

25   because when I do that that pushes back this schedule.  That

1321

1    pushes us into the holiday week and these jurors will not,

2    fairly -- I shouldn't say not fairly, they're less likely,

3    perhaps, to give this matter all the attention it deserves

4    because of, again, their own personal -- just their own

16:40:01 5    personal obligations.

6        So now is the time, ladies and gentlemen.  Take this

7    time to work through and discuss resolution of this case.

8    Otherwise, I cannot break this trial tomorrow.  We'll go

9    forward tomorrow with the testimony.  And whatever bridges

16:40:22 10    us -- whatever happens after tomorrow, where that bridges

11    us, we'll go through Friday, if need be, and then

12    potentially Saturday, as much as I am reluctant to do it,

13    this Court will incur extra costs, and that will be taxed to

14    the cost of this proceeding.

16:40:39 15        So whoever loses in this case, potentially, and

16    ultimately, may be responsible for all those costs, in

17    addition to all the other costs of this litigation.

18        So I know I'm rambling a bit.  I apologize if it

19    sounds like I'm lecturing, but I'm giving you my hope and my

16:40:59 20    honest belief, after having read all the record in the case,

21    the depositions, and rereading them.

22        There will be no winners, folks.  So take some time,

23    and try to see if you cannot bridge your differences and

24    reach an accommodation, address the past grievances and look

16:41:21 25    to the future.  If you want to make use of separate rooms,

1    we can accommodate you in that regard so we understand each

2    other I'll say until 6:00, unless I am apprised that the

3    parties are making some substantial steps or substantial

4    movement.

16:41:41  5        Because I have obligations to security here in the

6    building and closing the building, and again, there is other

7    logistical issues in keeping the building open late that

8    creates.

9        But I'm willing to do that.  Does either side have any

16:41:58 10   questions, counsel for the plaintiff, please?

11                MR. ELFVIN:  Just to follow up previously, Your

12   Honor, we have continued having what I can say small

13   discussions even during today.  We will take advantage of

14   the opportunity to continue any discussions that we can.  We

16:42:14 15   do understand there is a problem in the sense that I

16   understand the mayor is sick and unavailable to be brought

17   into the -- what I call the loop of this discussion.  That's

18   my only concern.

19                THE COURT:  I don't want to be harsh, counsel for

16:42:28 20   the defendant, but this is an important piece of litigation.

21   Now, we're all ill -- I mean people are ill from time to

22   time, and I'm sorry, this sounds a bit harsh, but if he

23   can't pick up the phone, given the importance of this to the

24   city and everybody involved here, you should be able to get

16:42:43 25   ahold of him by telephone.

1       I don't want to pry into his condition.  Pick up the

2  phone and say look, this is an important piece of

3  litigation.  You need to give us, if you're available, your

4  attention for five or ten or 15 minutes to talk about this

16:42:56 5  matter.

6           MS. AMBROSE-RUBRIGHT:  We have already made an

7  attempt.

8           THE COURT:  Because otherwise, the other option I

9  have is potentially to call this matter -- complete this

16:43:05 10  matter Thursday, Friday, schedule a settlement conference on

11  Saturday morning and require him to be here.  If he is the

12  person with authority, maybe he needs to be here in federal

13  court on Saturday to sit down with all these parties and

14  talk about resolving the case.  So hopefully, whatever the

16:43:22 15  condition may be, you don't have to tell me that, but

16  hopefully, he will have addressed it and perhaps recovered

17  sufficiently to help you help these parties.

18           So I'm not telling you what I'm going to do.  But if I

19  have to, in addition to going forward on Saturday, if the

16:43:40 20  parties are willing, I may convene a settlement conference

21  on Saturday and require parties with authority to be here

22  whether that be the mayor or whoever.  So take some time

23  now.  Try to address it.  Thank you very much.

24           THE DEPUTY CLERK:  All rise.

25           (Proceedings concluded at 4:45 p.m.)

1324

1                    I N D E X

2    DIRECT EXAMINATION OF KYLE BRINK          1138

3    BY MR. THOMPSON

4    VOIR DIRE EXAMINATION OF KYLE E. BRINK     1176

5    BY MR. THOMPSON

6    VOIR DIRE EXAMINATION OF KYLE E. BRINK     1180

7    BY MR. AMBROSE-RUBRIGHT

8    CROSS-EXAMINATION OF KYLE BRINK        1251

9    BY MS. AMBROSE-RUBRIGHT

10   REDIRECT EXAMINATION OF KYLE BRINK      1295

11   BY MR. THOMPSON

12   RECROSS-EXAMINATION OF KYLE BRINK      1308

13   BY MS. AMBROSE-RUBRIGHT

14   FURTHER REDIRECT EXAMINATION OF KYLE BRINK   1310

15   BY MR. THOMPSON

16

17

18

19

20

21

22

23

24

25

1325

```
1                    C E R T I F I C A T E

2

3            I certify that the forgoing is a correct

4      transcript from the record of proceedings in the

5      above-entitled matter.

6

7                 S/Caroline Mahnke
                  _____
8                 Caroline Mahnke, RMR, CRR      Date 12-10-08

9

10                S/Lori A. Callahan
                  _____
11                Lori A. Callahan, RMR, CRR     Date 12-10-08

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```