## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTERN DISTRICT OF OHIO
## EASTERN DIVISION

WILLIAM HOWE, et al,                )      CASE NO.: 5:06 CV 2779
                                    )
           Plaintiffs,              )
                                    )      JUDGE JOHN ADAMS
vs.                                 )
                                    )
CITY OF AKRON,                      )
                                    )
           Defendant.               )      **PLAINTIFFS' PROPOSED FINDINGS**
                                    )      **FACT AND CONCLUSIONS OF LAW**

NOW COME PLAINTIFFS, by and through counsel, and hereby propose the

following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT:

1.  The Akron, Ohio Fire Department has four (4) Battalions. [Stipulation 1, DN 152][1]

2.  Each Battalion is comprised of several fire stations. [Stipulation 2, DN 152]

3.  The Akron Fire Department has 13 fire stations, Stations #2 through #14. [Stipulation

    3, DN 152]

4.  In the Akron Fire Department, the "line" is comprised of those personnel assigned to

    any fire apparatus and/or med unit on a daily basis. [Stipulation 4, DN 152]

5.  An apparatus is a fire truck. [Stipulation 5, DN 152]

6.  The types of Fire trucks used by Akron's Fire Department are engine, ladder truck

    and tower. [Stipulation 6, DN 152]

---

[1] As used in the proposed findings of fact and conclusions of law, the following abbreviations and references will be used:  DN refers to "Docket Number"; PX refers to "Plaintiff's Exhibit"; and, names in brackets refer to the testimony of that witness at trial.

7. The Akron Fire Department also operates medical units, known as "med units." [Stipulation 7, DN 152]

8. A med unit is not a fire apparatus. [Stipulation 8, DN 152]

9. A minimum of 2 paramedics must be assigned each med unit. [Stipulation 9, DN 152]

10. The Akron Fire Department operates several "combo companies." [Stipulation 10, DN 152]

11. A combo med unit is a med unit that is combined with a fire apparatus operating from the same station house, using the same crew for each. [Stipulation 11, DN 152]

12. In combo med units, when a call is received by either unit, the other is taken out of service for the duration of the call. There are 2 other combo units. In a combo unit more than one apparatus is manned by a single crew. [Stipulation 12, DN 152]

13. The ranks of the Akron Fire Department are: Firefighter/Medic; Lieutenant, Captain, District Chief, Deputy Chief and Chief. All of the ranks except Deputy Chief and Chief are union members. [Stipulation 13, DN 152]

14. A fire company is an apparatus and its crew, which is generally an officer and 2 or 3 crew members. [Stipulation 14, DN 152]

15. The officer assigned to an apparatus is generally a Lieutenant. [Stipulation 15, DN 152]

16. The Akron Fire Department operates using 3, 24-hour shifts, designated as "A", "B", or "C" shift at stations, and a "D" shift which is the – 40 hour administrative staff. [Stipulation 16, DN 152; Howe]

17. There are several specialized units within the Akron Fire Department: Technical Rescue Operations Team, known as "TROT" assigned to Station 7; Hazardous Materials Team, referred to as "Hazmat", assigned to Station 4; Water-Rescue Dive Team, referred to as the "Dive Team"; assigned to Station 10 and Tactical EMS (TEMS) . Stations 4, 5, 7 and 10 operate as any other fire company in the City of Akron. [Stipulation 17, DN 152]

18. The Akron Fire Department also has several bureaus, including Fire Prevention Bureau, referred to as "FPB"; Hazmat/Rescue Bureau; Training Bureau; EMS Bureau; Bureau of Accounting and Services and Communications Bureau. No officer of the Akron Fire Department is required to possess any specialized certifications to hold rank. [Stipulation 18, DN 152; Howe]

19. No officer of the Akron Fire Department is required to be a paramedic (EMT-P) to hold rank. [Stipulation 19, DN 152; Bunner]

20. The requirement to become an EMT-P for all entering firefighters was put in place for persons hired after 1985.   Before then, the only medic training firefighters needed, at a minimum, was an EMT-B (EMT basic). [Howe; Carr; Shumaker]

21. All new firefighters/medics must become State of Ohio certified paramedics as a condition of continued employment.  [Stipulation 33, DN 152]

22. Promotional examinations for the ranks of the Akron Fire Department Lieutenant and Captain were conducted in December, 2004. [Stipulation 21, DN 152; Howe; Jacobs]

23. There were two versions of the source materials for the Captain's examination. One version of the materials was missing two pages and the actual materials used could not be determined. [Snyder]

24. EB Jacobs LLC was the consultant hired by the City of Akron to develop, administer and score the 2004 Lieutenant and Captain, Akron Fire Department promotional examinations. [Stipulation 22, DN 152; Jacobs; Salmon; Doty]

25. Each promotional examination included a technical job knowledge examination consisting of 100 multiple-choice questions. [Stipulation 23, DN 152; Jacobs; Doty; PX 30, 31]

26. The Akron Fire Department's 2004 promotional examinations were not empirical and did not correlate test scores with performance. [Jacobs; Jeanneret]

27. Dr. E.B. Jacobs, an industrial psychologist developed the City's 2004 promotional exams. [Jacobs].

28. At no time during the development or administration of the promotional exams did Dr. Jacobs visit Akron. [Jacobs]

29. The foundational basis of a promotional examination is job analysis. [Jacobs]

30. Dr. Jacobs did not conduct a job analysis in connection with the promotional examinations. However, he did read a job description. [Jacobs]

31. Although it was represented to the applicants that the assessors would be officers within the department, assessor number 99 was an employee of E.B. Jacobs. [Jacobs]

32. Although assessor 99 has testing experience, he has no experience with fire departments. Dr. Jacobs also lacks fire department experience.[Jacobs]

33. The assessment scores were rescored in February, 2005 because at least ten candidates had larger than expected discrepancies. [Hinish, Jacobs]

34. Dr. Harold Cheatham works for E.B. Jacobs from time to time. He never came to Akron and he did not interview any firefighters or officers in connection with the 2004 promotional examinations. [Jacobs]

35. In order to reduce the disparate impact of written examinations, E.B. Jacobs proposed weighting the assessments more heavily. [Jacobs]

36. Joe Hinish works for E.B. Jacobs and was project manager for the 2004 promotional examinations for the City of Akron's fire department promotions. [Jacobs]

37. E.B. Jacobs did not maintain a project log for this project. Without proper documentation the project could not be re-created or validated. [Hinish; Jacobs; Jeanneret]

38. E.B Jacobs asked Akron for the essential functions of the job two weeks after the job analysis was finished. [Jacobs]

39. The promotional examinations were based on a stream-lined analysis a truncated version and not based on a full-blown job analysis. [Jacobs]

40. The City selected six "subject matter experts" ("SME") for each rank. Dr. Jacobs is unaware of the criteria the City used to select these SMEs. [Jacobs]

41. The City selected SME's based upon availability without regard to any criteria related to knowledge or experience. [Combs]

42. Captains in the AFD function more like a battalion chief in other departments around the country. [Jacobs]

43. If a job analysis is defective, then the validity of any examination is compromised. [Jacobs]

44. There were no questions on the 2004 promotional examinations from the rules and regulations of the City of Akron Division of Fire.  [Stipulation; Jacobs]

45. The Written Work Sample exercises for the ten candidates re-scored by assessor 99 and another unidentified assessor are missing.  [Jacobs]

46. The Lieutenant promotional examination also included two oral assessment exercises: a subordinate conference and incident command. The Lieutenant exam also included a written work sample exercise. [Stipulation 24, DN 152; PX 32, 33]

47. The Captain promotional examination also included 3 oral assessment exercises, consisting of a subordinate conference, group exercise and incident command. [Stipulation 25, DN 152; Howe; Jacobs; Johnson; PX 34, 35, 36]

48. Some of the scores were so different on the written work sample portion of the lieutenant's test that they threw those scores out and rescored those portions.  This was not reflected in the final report of E.B. Jacobs.  [Jacobs; Hinish]

49. Defendant took no precautions to check and make sure that the test scores were input correctly.  In some instances the differences between recorded scores and panel scores were very different, such as for firefighter Small who was given "4s" by the panel and received scores of "6s with a 7" on the scoring sheet. [Hinish;  DX 1104 Small Score Sheet]

50. The eligibility lists for each rank were established by the City of Akron Civil Service Commission on April 4, 2005. [Stipulation 26, DN 152; Doty; Salmon]

51. Passing the exam means that you were put on the eligibility list and then given a seniority score for length of service. [Jacobs; Jeanneret]

52. The eligibility list for each rank remained active for 2 years. [Stipulation 27, DN 152; Salmon; Howe]

53. Twenty-eight persons were promoted in rank order from the Lieutenant's eligibility list. [Stipulation 28, DN 152]

54. Three African-Americans were promoted from the Lieutenant's eligibility list; Twenty-five Caucasians were promoted from the Lieutenant's eligibility list. [Stipulation 29, DN 152; Johnson; Jacobs]

55. Twelve persons were promoted from the Captain's eligibility list. [Stipulation 30, DN 152]

56. Five African-Americans were promoted from the Captain's eligibility list; seven Caucasian persons were promoted from the Captain's eligibility list. [Stipulation 31, DN 152]

57. The uniform guidelines on testing provide for what's known as four-fifths rule. The 4/5ths Rule is one index that is used, as well as several statistical tests that may appropriate to apply in this circumstance. [Johnson; Brink; Jacobs; Jeanneret]

58. The 4/5[th] rule is described as a "rule of thumb." It is incorporated in the Uniform Guidelines on Employee Selection adopted by the EEOC, DOL, OFCCP, DOJ and other federal agencies. Other statistical tests are used to give us further information about what's the likelihood that this outcome that we've observed is really a real difference going on. [Jacobs; Johnson; Brink; Jeanneret]

59. Eighty-one (81) white candidates took the 2004 Lieutenant's exam.  Sixty-nine of those candidates scored 70 or higher. Twelve did not attain the minimum passing score of 70%. Therefore the pass rate for whites was 85 percent. [Jeanneret]

60. Twenty African-Americans took the 2004 Lieutenant's exam.  Fifteen of those candidates passed, five did not. Therefore their pass rate was 75 percent. [Jeanneret]

61. Performing statistical tests on pass rates on the underlying test does not answer whether or not there was an adverse impact of the selection process. [Johnson, Brink]

62. For the two years the eligibility lists were in use, in terms of actual promotions from the eligibility list, thirty-six percent were promoted in the case of whites and twenty percent in the case of African-Americans for Lieutenant.  This reflects a violation of the four-fifths rule. The violation has an adverse impact ratio of 0.56. [Johnson; Brink; Jacobs; Jeanneret]

63. When applying the four-fifths rule, greater differences in selection rates may not constitute adverse impact where the differences are based on small numbers and are not statistically significant. [Jeanneret]

64. Following a four-step process prescribed by the Uniform Guidelines on Employee Selection ("UGES") to determine adverse impact, we find:  Adverse impact in this case at the Lieutenant's selection level based upon race against African-Americans; On the basis of age against those persons over 40 in the Lieutenant's exam; and, On the basis of race against Caucasians at the captain's level. [Johnson; Brink; Jacobs; Jeanneret]

65. The UGES have a series of Questions and Answers published to assist in their use, including when addressing small sample sizes.  Any given observed set of data which will flip to 1.0 or greater at the N plus one level would cause other statistical tests to be needed.  Where there is no change in the adverse impact on any of the three bases that were calculated to have adverse impact under four-fifths rule, then there is an adverse impact.  In this case only when the shifting of the numbers from the observed to reach N plus 3 did any of the adverse impacts actually "flip" to 1.0 or more. [Jacobs; Jeanneret]

66. The adverse impact was not eliminated in the age calculations until you reached N plus 4. [Jacobs; Jeanneret]

67. Dr. Robert Johnson ("Johnson") from the University of Miami is Coral Gables, Florida was qualified as an expert witness and testified on behalf of Plaintiffs. [Johnson]

68. Johnson has extensive experience in the teaching and use of statistics in both the academic setting and has testified as an expert witness in both the Southern and Northern Districts of Ohio.  [Johnson; PX 142]

69. Johnson investigated the comparative promotion rates of individuals seeking promotion in the AFD at both the Lieutenant and Captain levels. [Johnson]

70. Johnson is familiar with and has used the Uniform Guidelines on Employee Selection ("UGES") in the past. [Johnson]

71. Under UGES the promotion rates are tested to determine whether or not there is an observable difference in violation of the 4/5ths rule. [Johnson]

72.   The rate of promotion for each group being investigated is determined and then the rates are compared to determine whether the ratio falls below .8 or 80%. [Johnson]

73.   The 4/5ths rule is a statistical test that was used by each expert in this case.  The 4/5ths rule is a way to condense all of the data in this case. [Johnson]

74.   Johnson reviewed the data provided by the Plaintiffs and from E.B. Jacobs the consultant to the AFD for the promotional exams. [Johnson]

75.   Johnson's review and calculations addressed determining any adverse impact on: a) African-Americans at the Lieutenant level; b) persons 40 and over at the Lieutenant level; and, c) Caucasians at the Captain level.  The level is the promotional examination administered on behalf of the AFD. [Johnson]

76.   Johnson calculated the proportions for African-Americans related to Caucasians for promotions to Lieutenant and found the proportions .15 for African-Americans selected and .31 for Caucasians selected.  [Johnson]

77.   Johnson calculated the proportions for candidates selected 40 and over versus candidates selected under age 40 for promotions to Lieutenant and found the .19 for 40 and over and .33 for under 40 with a proportion of Lieutenants selected of .58. [Johnson]

78.   Johnson calculated the proportions for African-Americans related to Caucasians for promotions to Captain and found the proportions .56 for African-Americans and .22 for Caucasians.  [Johnson]

79.   Johnson calculated the proportion for adverse impact on the basis of race African-American at the Lieutenant's level with .15 divided by .31 to come to the proportion

of .49 which is less than .80 or 4/5ths for African-Americans at the Lieutenant promotional level. [Johnson]

80. Johnson calculated the proportion for adverse impact on the basis race Caucasian at the Captain's level with .22 divided by .56 to come to the proportion of .39 which is less than .80 or 4/5ths for Caucasians at the Captain promotional level. [Johnson]

81. Johnson calculated the proportion for adverse impact on the basis of age, those candidates 40 and over compare to those candidates under 40 years of age, at the Lieutenant's level with .19 divided by .33 to come to the proportion of .58 which is less than .80 or 4/5ths for persons 40 and over at the Lieutenant promotional level. [Johnson]

82. All of the experts testifying in this case agreed with Dr. Johnson's calculations of adverse impact under the 4/5ths rule. [Johnson, Jacobs, Brink, Jeanneret]

83. The 4/5ths rule is a rule of thumb which is to be sensitive to the sample size or number of selections and the impact that sample size has on the calculations. Johnson considered how the calculations of adverse impact under UGES would be affected consistent with the Questions and Answers Interpreting UGES.  In applying these interpretations none of the violations of the 4/5ths rule changed applying the N+1 standard found in Question 21. [Johnson]

84. Johnson also testified about the issues created by using ordinal data or forced rankings rather than interval data based upon actual scores received.  Due to the use of ranked scoring the amount of error in the scoring would make the persons ranked with very close scores indistinguishable in terms of achievement on the tests. [Johnson]

85.  The testing in this case is considered 'high stakes' testing. [Johnson, Jeanneret, Brink]

86.  In reviewing a high stakes test the amount of error in the scoring and the reliability of the test itself is important. [Johnson]

87.  Dr. Johnson reviewed the data outputs from E.B. Jacobs on the item analysis for the test, and included items which had even relatively low reliability scores of .15. There were 26 questions out of 100 on the test which were poor discriminators in terms of good performers and bad performers on the test. [Johnson]

88.  The tests were found to fall short of the required reliability for high stakes tests of .90, and an ideal level of .95.  The tests fell short of this standard. [Johnson]

89.  The scoring by panel members in the assessments was supposed to be independent and reflect a random assignment.  The panel scores yielded statistically significant differences in scoring at the 95% level of confidence. [Johnson]

90.  The standard error of estimate was calculated using a regression analysis by Dr. Johnson with respect to the Lieutenant's examination process.  The result was a 2.5 point standard error was found. [Johnson]

91.  The application of the 4/5ths rule in this case reflected a simpler and understandable means of analyzing the selection data on the promotional tests here and the results were consistent with the guidelines. [Johnson]

92.  Dr. Kyle Brink [Brink] testified as an expert witness for Plaintiffs.  The Court accepted Brink's credentials and background as an expert. [Brink, PX 143]

93.  Brink is an industrial organizational psychologist (I/O).  Brink reviewed the E.B. Jacobs testing materials consistent with the work he does for the Jefferson County Personnel Board in Alabama. [Brink]

94.  The job analysis done by E.B. Jacobs did not meet the required professional standards to provide a basis for examining the content validity of the 2004 promotion exams. [Brink]

95.  A proper job analysis was short cut by E.B. Jacobs by using non-AFD materials to generate the job elements, duties and characteristics without ever considering what Lieutenants or Captains in the AFD were required to do. [Brink]

96.  Brink is familiar with safety force job analysis and the requirements of UGES. [Brink]

97.  The Akron Fire Department provides emergency service including Fire and EMS with the majority of calls for service being emergency medical service calls. [Stipulation 32, DN 152]

98.  In connection with the 2004 promotional examinations in the Akron Fire Department, E.B. Jacobs promulgated a candidate preparation guide. [Jacobs; Hinish]

99.  E.B. Jacobs conducted a candidate orientation and gave applicants a preparation guide for the for the 2004 examination. [Hinish]

100.   Neither the test of general knowledge for Lieutenant nor for Captain were drawn from the Rules and Regulations of the AFD.  [Stipulation at trial]

101.   The Rules and Regulations are issued to each firefighter and officer and are the basis of discipline within the AFD. [Combs]

102.    The sample incident command contained in the prep guide was similar to what applicants for promotion were expected to face in the incident command exercise on the examination. [Hinish]

103.    Although testifying to the "power" and reliability of the test scores, Defendant's expert did not know whether or not the scores which were tossed out were use to compute the inter-rater reliability statistics. [Jeanneret]

104.    While relying on the Fisher's exact test, Dr. Jeanneret conceded that the Fisher's Exact test had a chance of being wrong 80 percent of the time in this instance. Dr. Jeanneret did not do any computations on "power" in reviewing the statistics and was unfamiliar with the professional peer-reviewed publications on this topic. [Jeanneret]

105.    Dr. Jeanneret recalled that the Chi-square test was criticized for having a 70 percent chance of being wrong, but did not do any computations on the "power" of this statistical test. [Jeanneret]

106.    While noting that one hundred–twelve people started the lieutenant's process, Dr. Jeanneret did not include any calculations in his report or analysis related to the total persons starting the selection process in his statistical analysis. [Jeanneret]

107.    Firefighters on the promotional list, who were not selected for promotion, are not unqualified. [Combs; Howe; Carr; Jacobs; Johnson; Brink]

108.    The pay differential for a fire Lieutenant was 16% with 4% raises in year 1, 6% in year 2 and 6% in year 3. [Howe]

109.    The Lieutenant position had a base pay range of $49,545 to $55,203 and was advertised by the AFD. [Howe, PX 25]

110.    The pay differential from Lieutenant to Captain is also 16% spread over three years. [Howe; PX 26]

111.    The Captain position had a base pay range of $57,470.40 to $64,105.60 and was advertised by the AFD in September of 2004. [Howe; PX 26]

112.    Many of the Plaintiffs were critical of the conduct of the assessment centers due to the differences in conduct by panel members and panels. [Howe; O'Neal; Hull; Snyder]

113.    Even though the Civil Service Commission rules allow applicants to challenge portions of a testing procedure there were no appeals or questions allowed related to the assessment centers conducted in December 2004. [Howe; Doty; Salmon]

114.    The panel ratings for Howe on the Captain's assessment exercises showed the variations in scoring by panel. [Howe; PX 98, 99]

115.    The AFD Dive Team requires specialty training for each portion of the certifications including dry suit, weapons, night diving and requires continuing re-certification. [Reed]

116.    The AFD Dive Team works under the direction and supervision of a Dive Master. [Reed]

117.    OSHA regulations require Hazmat refresher training yearly to maintain certification at the operations level.  The AFD has not given refresher training sufficient to maintain operations level certifications for all firefighters since 2003. [Gauer]

118.    Lt. William Howe ("Howe") is a named Plaintiff and is employed as a member of

the   Akron Fire Department ("AFD").  Howe is a 23 year veteran of the AFD and

anticipated working an additional six (6) years as of the trial in this case. [Howe]

119.    Howe prepared for and took the entire examination process for Captain in 2004.

Howe was placed on the List of Eligibles for promotion in April 2005, but not

selected.  Howe's racial identification is Caucasian. [Howe; Stipulation]

120.    Firefighter Mike Reed ("Reed") is a named Plaintiff and is employed as a

member of the AFD.  Reed had 20 years of service with the AFD at the time of trial,

and had bought 5 years of military service credit in the pension system.  Reed

anticipated retiring in approximately eight (8) years. [Reed]

121.    Reed prepared for and took the entire examination process for Lieutenant in

2004.  Reed was placed on the List of Eligibles for promotion in April 2005, but not

selected.  Reed's racial identification is Caucasian and he is over the age of 40.

[Reed; Joint Exhibit 1; Stipulation]

122.    Firefighter Brenda Chapman ("Chapman") is a named Plaintiff and is employed

as a member of the AFD.  Chapman had 32 years of service with the AFD at the

time of trial.  Chapman anticipated retiring in approximately four (4) years.

[Chapman]

123.    Chapman's normal assignment is to teach in the firefighter training academy.

Chapman prepared for and took the entire examination process for Lieutenant in

2004.  Chapman was placed on the List of Eligibles for promotion in April 2005, but

not selected.  Chapman's racial identification is African-American and she is over the

age of 40.  [Chapman; Joint Exhibit 1; Stipulation]

124.     Lieutenant James Feeman ("Feeman") is a named Plaintiff and is employed as a member of the AFD.  Feeman had 27 years of service with the AFD at the time of trial.  Feeman anticipated retiring in approximately seven (7) years. [Feeman]

125.     Feeman prepared for and took the entire examination process for Captain in 2004.  Feeman was placed on the List of Eligibles for promotion in April 2005, but not selected.  Feeman's racial identification is Caucasian and he is over the age of 40.  [Feeman; Joint Exhibit 1; Stipulation]

126.     Firefighter Michael Harvey ("Harvey") is a named Plaintiff and was employed as a member of the AFD until August of 2005 when Harvey retired.  Harvey had 26 years of service with the AFD at the time of trial.  Harvey would have stayed longer had he received a promotion. [Harvey]

127.     Harvey prepared for and took the entire examination process for Lieutenant in 2004.  Harvey did not make the List of Eligibles for promotion in April 2005.  Harvey's racial identification is African-American and he is over the age of 40.  [Harvey; Joint Exhibit 1; Stipulation]

128.     Lieutenant Leslie Gaiser ("Gaiser") is a named Plaintiff and is employed as a member of the AFD.  Gaiser had 23 years of service with the AFD at the time of trial.  Gaiser anticipated retiring in approximately six (6) years. [Gaiser]

129.     Gaiser prepared for and took the entire examination process for Captain in 2004.  Gaiser was placed on the List of Eligibles for promotion in April 2005, but not selected.  Gaiser's racial identification is Caucasian and he is over the age of 40.  [Gaiser; Joint Exhibit 1; Stipulation]

130.    Lieutenant John Triola ("Triola") is a named Plaintiff and is employed as a member of the AFD.  Triola had 27 years of service with the AFD at the time of trial. Triola anticipated retiring in approximately six (6) years. [Triola]

131.    Triola prepared for and took the entire examination process for Captain in 2004. Triola was placed on the List of Eligibles for promotion in April 2005, but not selected.  Triola's racial identification is Caucasian and he is over the age of 40. [Triola; Joint Exhibit 1; Stipulation]

132.    Firefighter William Roy Wilkinson ("Wilkinson") is a named Plaintiff and is employed as a member of the AFD.  Wilkinson had 16 years of service with the AFD at the time of trial.  Wilkinson anticipated retiring no earlier than nine (9) years after trial. [Wilkinson]

133.    Wilkinson prepared for and took the entire examination process for Lieutenant in 2004.  Wilknison was placed on the List of Eligibles for promotion in April 2005, but not selected.  Wilkinson's racial identification is Caucasian and he is over the age of 40.  [Wilkinson; Joint Exhibit 1; Stipulation]

134.    Firefighter Jeffrey Layne ("Layne") is a named Plaintiff and is employed as a member of the AFD.  Layne had 11 years of service with the AFD at the time of trial. Layne anticipated retiring in approximately fourteen (14) years. [Layne]

135.    Layne prepared for and took the entire examination process for Lieutenant in 2004.  Layne was placed on the List of Eligibles for promotion in April 2005, but not selected.  Layne's racial identification is Caucasian and he is over the age of 40. [Layne; Joint Exhibit 1; Stipulation]

136.     Firefighter James Farina ("Farina") is a named Plaintiff and is employed as a member of the AFD.  Farina had 18 years of service with the AFD at the time of trial.  Farina anticipated retiring in approximately eleven (11) years. [Farina]

137.     Farina prepared for and took the entire examination process for Lieutenant in 2004.  Farina was placed on the List of Eligibles for promotion in April 2005, but not selected.  Farina's racial identification is Caucasian and he is over the age of 40. [Farina; Joint Exhibit 1; Stipulation]

138.     Firefighter James Schueller ("Schueller") is a named Plaintiff and is employed as a member of the AFD.  Schueller had 20 years of service with the AFD at the time of trial.  Schueller anticipated retiring in approximately six to eleven (6-11) years. [Schueller]

139.     Schueller prepared for and took the entire examination process for Lieutenant in 2004.  Schueller was placed on the List of Eligibles for promotion in April 2005, but not selected until November, 2006.  Schueller's racial identification is Caucasian and he is over the age of 40.  [Schueller; Joint Exhibit 1; Stipulation]

140.     Schueller testified that his promotion was delayed due to the rank ordering used on the test results and the lack of job relatedness of the test. [Schueller]

141.     Firefighter Jerry Elie ("Elie") is a named Plaintiff and is employed as a member of the AFD.  Elie had 23 years of service with the AFD at the time of trial.  Elie anticipated retiring in approximately ten (10) years. [Elie]

142.     Elie prepared for and took the entire examination process for Lieutenant in 2004.  Elie was not placed on the List of Eligibles for promotion in April 2005, but had passed and qualified on other promotional exams where he was not selected.

Elie's racial identification is African-American and he is over the age of 40.  [Elie; Joint Exhibit 1; Stipulation]

143.    Firefighter Frank Poletta ("Poletta") is a named Plaintiff and is employed as a member of the AFD.  Poletta had 9 years of service with the AFD at the time of trial. Poletta anticipated retiring in approximately twenty-six (26) years. [Poletta]

144.    Poletta prepared for and took the entire examination process for Lieutenant in 2004.  Poletta was placed on the List of Eligibles for promotion in April 2005, but not selected.  Poletta's racial identification is Caucasian and he became over the age of 40 during the time that the List of Eligibles was in effect.  [Poletta; Joint Exhibit 1; Stipulation]

145.    Firefighter Kerry Briggs ("Briggs") is a named Plaintiff and is employed as a member of the AFD.  Briggs had 10 years of service with the AFD at the time of trial. Briggs anticipated retiring in approximately sixteen (16) years. [Briggs]

146.    Briggs prepared for and took the entire examination process for Lieutenant in 2004.  Briggs was placed on the List of Eligibles for promotion in April 2005, but not selected.  Briggs's racial identification is Caucasian and he became over the age of 40 during the time that the List of Eligibles was in effect.  [Briggs; Joint Exhibit 1; Stipulation]

147.    Lieutenant Jeffrey Derrenberger ("Derrenberger") is a named Plaintiff and is employed as a member of the AFD.  Derrenberger had 24 years of service with the AFD at the time of trial.  Derrenberger anticipated retiring in approximately five (5) years. [Derrenberger]

148.     Derrenberger prepared for and took the entire examination process for Captain in 2004.  Derrenberger was placed on the List of Eligibles for promotion in April 2005, but not selected.  Derrenberger's racial identification is Caucasian and he is over the age of 40.  [Derrenberger; Joint Exhibit 1; Stipulation]

149.     Lieutenant David Hull ("Hull") is a named Plaintiff and is employed as a member of the AFD.  Hull had 23 years of service with the AFD at the time of trial.  Hull anticipated retiring in approximately eleven (11) years. [Hull]

150.     Hull prepared for and took the entire examination process for Captain in 2004.  Hull was placed on the List of Eligibles for promotion in April 2005, but not selected.  Hull's racial identification is Caucasian and he is over the age of 40.  [Hull; Joint Exhibit 1; Stipulation]

151.     Lieutenant David O'Neal ("O'Neal") is a named Plaintiff and is employed as a member of the AFD.  O'Neal had 17 years of service with the AFD at the time of trial.  O'Neal anticipated retiring in approximately eleven (11) years. [O'Neal]

152.     O'Neal prepared for and took the entire examination process for Captain in 2004.  O'Neal was placed on the List of Eligibles for promotion in April 2005, but not selected.  O'Neal's racial identification is Caucasian and he is over the age of 40. [O'Neal; Joint Exhibit 1; Stipulation]

153.     Firefighter Bruce Clough ("Clough") is a named Plaintiff and is employed as a member of the AFD.  Clough had 18 years of service with the AFD at the time of trial.  Clough anticipated retiring in approximately seven (7) years. [Clough]

154.     Clough prepared for and took the entire examination process for Lieutenant in 2004.  Clough was placed on the List of Eligibles for promotion in April 2005, but not

selected.  Clough's racial identification is Caucasian and he became over the age of 40 during the time that the List of Eligibles was in effect.  [Clough; Joint Exhibit 1; Stipulation]

155.     Lieutenant Jerome Crawford ("Crawford") is a named Plaintiff and is employed as a member of the AFD.  Crawford had 30 years of service with the AFD at the time of trial.  Crawford died during the pendency of this case in August of 2008. [Crawford]

156.     Crawford prepared for and took the entire examination process for Captain in 2004.  Crawford was placed on the List of Eligibles for promotion in April 2005, but not selected.  Crawford's racial identification was Caucasian and he was over the age of 40.  [Crawford; Joint Exhibit 1; Stipulation]

157.     Crawford died in August of 2008 and his executor and spouse, Cynthia Crawford, was substituted as a party plaintiff in this case on December 2, 2008. Crawford's testimony was given by deposition and read at trial. [Order, DN 187]

158.     Lieutenant Bradley Robson ("Robson") is a named Plaintiff and is employed as a member of the AFD.  Robson had over years of service with the AFD at the time of trial.  Robson anticipated retiring in approximately seven (7) years. [Robson]

159.     Robson prepared for and took the entire examination process for Captain in 2004.  Robson was placed on the List of Eligibles for promotion in April 2005, but not selected.  Robson's racial identification is Caucasian and he is over the age of 40. [Robson; Joint Exhibit 1; Stipulation]

160.   Lieutenant Michael Hausch ("Hausch") is a named Plaintiff and is employed as a member of the AFD.  Hausch had over 20 years of service with the AFD at the time of trial.  Hausch anticipated retiring in approximately seven (7) years. [Hausch]

161.   Hausch prepared for and took the entire examination process for Captain in 2004.  Hausch was placed on the List of Eligibles for promotion in April 2005, but not selected.  Hausch's racial identification is Caucasian and he is over the age of 40. [Hausch; Joint Exhibit 1; Stipulation]

162.   Lieutenant Bradley Carr ("Carr") is a named Plaintiff and is employed as a member of the AFD.  Carr had 20 years of service with the AFD at the time of trial.  Carr anticipated retiring in approximately fourteen years. [Carr]

163.   Carr prepared for and took the entire examination process for Captain in 2004.  Carr was placed on the List of Eligibles for promotion in April 2005, but not selected.  Carr's racial identification is Caucasian and he is over the age of 40.  [Carr; Joint Exhibit 1; Stipulation]

164.   Carr reviewed the records of the AFD related to the tests and created a number of summaries related the scoring differences observed between panels and candidates. [Carr]

165.   Carr serves currently as one of the Lieutenants supervising the dispatch of fire apparatus and companies to emergency calls for the AFD. [Carr]

166.   As the dispatch supervisor for B shift, Carr's primary job is to oversee fire activities on the line, make sure that the right companies are getting dispatched, make sure that there is are no problems on the fire ground.   [Carr]

167.   Lt. Carr has not received Hazmat training since 2003.  Thus his Hazmat certification status dropped down to "awareness" level.  [Carr]

168.   The consolidation rating form was used by the assessors during the grading. They listed comments and the numbers in the square for the six dimensions on which applicants were graded. [Carr]

169.    Ten consolidated rating forms for the written work sample for Lieutenants were missing. Fifty-five promotional rating forms for the lieutenants were also missing. [Carr]

170.   Lt. Carr made a public records request to the City of Akron for all records pertaining to the promotional examinations. [Carr]

171.   In total, Lt. Carr made three public record requests.  It took the City over 1 month to respond to the first request.  [Carr]

172.   Based on a review of the records Carr prepared summaries of the differences in scores.  For the Captains promotional exam, there were: 129 two-point differences; 49 three-point differences; 11 four-point differences and, 1 five-point difference. [Carr]

173.   For Lieutenant there were;  566  two-point scoring differences;  237 three-point differences;  84 four-point differences; 24 five-point differences; and 9 six-point differences. [Carr]

174.   Lieutenant Gregory Snyder ("Snyder") is a named Plaintiff and is employed as a member of the AFD.  Snyder had 20 years of service with the AFD at the time of trial.  Snyder anticipated retiring in approximately five or six (5 or 6) years. [Snyder]

175.    Snyder prepared for and took the entire examination process for Captain in 2004. Snyder ranked 13 on the List of Eligibles for promotion in April 2005, but not selected.  Snyder's racial identification is Caucasian and he is over the age of 40. [Snyder; Joint Exhibit 1; Stipulation]

176.    The Captain's list expired after the promotion of the individual ranked number 12 on the list. [Snyder]

177.    Although Lieutenant Snyder placed 13th on the promotional list, he ranked number 1 on the examination's technical section and had served as an acting Captain. [Snyder]

178.    Snyder's current assignment with the AFD is as the benefits officer.  At the time of trial Snyder had a life expectancy based upon materials he worked with in the AFD of 21 years following his planned retirement. [Snyder]

179.    An individual losing a promotion not only lost the 16% increase in salary, but also would lose approximately $5,400 per year in pension benefits for the rest of their life. [Snyder]

180.     All firefighters are eligible to elect to participate in the DROP program once they have 25 years of service, but they must actually retire within eight (8) years of entering the DROP program.  Under the DROP program an individual's retirement is based upon the firefighter's pay history at the time of election.  [Howe; Snyder]

181.    Promotional opportunities in the AFD occur approximately every 6 to 7 years at the Lieutenant and Captain level. [Howe; Combs; Carr; Snyder]

182.    The Lieutenant's Technical knowledge examination consisted of 100 multiple choice questions. [Howe; Jacobs; PX 38]

183.   The Captain's Technical knowledge examination consisted of 100 multiple choice questions. [Howe; Jacobs; PX 38]

184.   In addition to the technical knowledge portion each promotional examination process contained 3 exercises at each rank.  For Lieutenant candidates one written work sample exercise, a subordinate conference and an incident command scenario. [Howe; Jacobs; PX 32, 33]

185.   The Written Work Sample required the Lieutenant candidates to write a memorandum.  Testimony showed that the Written Work Sample was not related to the job of Lieutenant. [Howe; Carr; Chapman; Elie]

186.   In addition, the Written Work Sample rating panelists created so great a variation in the scoring of the Written Work Sample that E.B. Jacobs had an internal employee re-score at least 10 samples and sent these samples to an additional rater who did not participate at the AFD.  These were labeled as "Assessor 99" or "panel 99."  E.B. Jacobs did not disclose this in his report or any of the results given to the city of Akron.  [Hinish; Jacobs; Jeanneret]

187.   The content of the tests as developed by E.B. Jacobs were not related to the jobs being tested for in any significant way.  The tests sought information on approximately 15-20% of the duties required for the promotions.

188.   In 2004, the Defendant City of Akron used a facially neutral promotional process that discriminated against Plaintiffs Jeffrey Layne, Jerry Elie, Jeffrey Schueller, Bruce Clough, Michael Reed, Kerry Briggs, William Wilkinson, Frank Poletta, James Farina, Michael Harvey, and Brenda Chapman on the basis of age 40 and over in making selections for promotion to Lieutenant by relying on a promotional

examination which had a disparate impact on the above identified Plaintiffs because of their age.

189.    The Defendant City of Akron failed to provide any evidence that its employment practices in making selections for promotions to Lieutenant in 2004 were based on reasonable factors other than age.

190.    In 2004, the Defendant City of Akron used a facially neutral promotional process that discriminated against Plaintiffs Jerry Elie, Michael Harvey, and Brenda Chapman on the basis of race (African-American) in making selections for promotion to Lieutenant by relying on a promotional examination which had a disparate impact on the above identified Plaintiffs because of race in violation of federal and state law.

191.    In 2004, the Defendant City of Akron used a facially neutral promotional process that discriminated against Plaintiffs William Howe, Bradley Carr, David Hull, David O'Neal, Leslie Gaiser, Michael Hausch, Gregory Snyder, Jeffrey Derrenberger, John Triola, Bradley Robson, Cynthia Crawford (as executrix of the estate of Jerome Crawford), and James Feeman,  on the basis of race (Caucasian) in making selections for promotion to Captain by relying on a promotional examination which had a disparate impact on the above identified Plaintiffs because of their race.

192.    Plaintiffs presented evidence on alternative selection methods and devices which Akron could have employed that would have eliminated or lessened any adverse impact of the Lieutenants and/or Captains examination process. [Clack; Nutting; PX 1, 3, and 4]

193.    These alternatives are intended to alleviate disparate impact. [Clack; Nutting; Brink; PX 1, 3. 4]

194.    As a result of the discrimination to which Plaintiffs were subjected, they have been injured and suffered both monetary and non-monetary losses.

## II.    CONCLUSIONS OF LAW:

1. This Court has jurisdiction to hear and determine the federal claims asserted by Plaintiffs.  State claims are heard pursuant to the Court's supplemental jurisdiction. 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2. All legal claims were properly determined by a jury.  The Court will determine equitable claims, injunctive relief, and attorney fees and costs.   42 U.S.C. §2000e-5(g) and (k); and 42 U.S.C. §1981a, and Ohio Revised Code §4112.17.

3. This Court is bound by the facts as determined by the jury.  *Gutzwiller v. Fenik,* 860 F.2d 1317 (6th Cir. 1988), *Id.*

4. Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e-et seq.) is intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race.  A central purpose of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination, and to effectuate "make-whole" relief.  *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976).

### A.    FUNCTIONS OF JUDGE AND JURY

5. Claims for equitable relief available under Title VII, are not entitled to be tried to a jury, but are tried to the Court .  *Jensen v. Bd. of Cty. Commissioners for Sedgwick Cty.*, 636 F.Supp. 293, 296 (D.Kan. 1986); 42 U.S.C. §2000e-*et seq.*

6. When an issue is common to both legal and equitable claims in the same proceeding, the legal claim must be tried first to a jury. Once the right to a jury trial attached to a claim, it extends to all factual issues necessary to resolving that claim. *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2nd Cir. 2001).

7. Where jury and non-jury claims overlap, the jury's factual findings are binding on the court in determining the non-jury issues. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1332-33 (6th Cir. 1988); *In re Lewis*, 845 F.2d 624, 628-629 (6th Cir.1988). ("We therefore find that the district court erred in not applying the federal law, set forth below, which holds that a judge deciding an equitable issue is bound by the jury's factual findings on an adjoining legal claim.").

## B. ADVERSE IMPACT – RACE

8. Disparate impact claims penalize employment practices that are "fair in form but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

9. To establish a *prima facie* case of disparate impact, a plaintiff must: (1) identify the particular employment practice; (2) show a disparate impact on a protected group; and (3) prove that the employment practice caused the disparity through relevant statistical analysis. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Shollenbarger v. Planes Moving & Storage*, 2008 FED App. 0631N (6th Cir. 2008); *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

10. To find an adverse impact, it is not necessary to find that the employer intended to discriminate against the Plaintiffs. The focus is on the consequences or results of the employment practice. *Howard v. City of Southfield*, 1996 U.S. App. LEXIS 25290 (6th Cir. 1996), citing *Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir.

1995).  *Chavis v. Progressive Step Corp.*, 2008 U.S. Dist. LEXIS 30153 (N.D. Ohio, 2008).

11. Once Plaintiffs have established a *prima facie* case of disparate impact, the burden shifts to the employer to articulate and demonstrate a legitimate business justification for the challenged practice.  42 U.S.C. § 2000e-2(k)(1)(A)(i); *Shollenbarger v. Planes Moving & Storage*, 2008 FED App. 0631N (6th Cir. 2008).

12. The employer must prove that the identified practice bears a manifest relationship to the employment in question.  The employer bears the burden of proving that the challenged practice is job-related.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).  *Albermale Paper Co. v. Moody*, 422 U.S. 405 (1975).  42 U.S.C. § 2000e-2(k).

13.  A procedure is job related if it measures important skills, abilities, and knowledge which are necessary for the successful performance of the job.  29 C.F.R. §1607.14.

14.  It is not uncommon for plaintiffs to use statistical evidence to establish a *prima facie* case of disparate impact.  *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

## C.    DISPARATE IMPACT - AGE DISCRIMINATION

15.  Claims that stress disparate impact involve employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another.  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 239 (2005).

16.  Employers are prohibited from discriminating against any employee with respect to compensation, terms, conditions, or privileges of employment because of that individual's age.  29 U.S.C. §621, *et seq.* ("ADEA"); ORC §4112.02.

17. To find adverse impact on the basis of age, it is not necessary to find that the City of Akron intended to discriminate against the Plaintiffs. The focus is on the consequences or results of the employment practice or decision-making process at issue. Cf. *Howard v. City of Southfield*, 1996 U.S. App. LEXIS 25290 (6th Cir. 1996), citing *Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995). *Chavis v. Progressive Step Corp.*, 2008 U.S. Dist. LEXIS 30153 (N.D. Ohio, 2008).

18. The Plaintiffs must prove adverse impact by showing that older workers (40 and older) have been disproportionately harmed. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387 (6th Cir. 2008); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

19. To establish a *prima facie* case of adverse impact, Plaintiffs must: (1) Identify the particular employment practice; (2) Show an adverse impact on a protected group, (those age 40 and older); and, (3) Prove that the employment practice caused the disparity. *Adams v. Lucent Techs., Inc.*, 284 Fed. Appx. 296, 303 (6th Cir. 2008), citing, *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).

## D. REASONABLE FACTOR OTHER THAN AGE

20. The law exempts employers from liability if they can show that their employment practice or practices are based on Reasonable Factors Other than Age. This analysis applies to Plaintiffs' claims under the Federal Age Discrimination in Employment Act, and the Plaintiffs' claims pursuant to Ohio Revised Code § 4112.14. 29 U.S.C. §623(f)(1); *Smith v. City of Jackson*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005); *Meacham v. Knoll Atomic Power Laboratory, Inc.*, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008); *Barker v. Scovill, Inc.*, 6 Ohio St. 3d 146, 148-149 (1983).

21.  If the Plaintiffs prove by a preponderance of the evidence that adverse impact existed with respect to age under the Age Discrimination in Employment Act and Ohio Revised Code § 4112.14, then the City of Akron must prove, by a preponderance of the evidence, that the adverse impact on Plaintiffs who are 40 years old or older, is based on a Reasonable Factor Other than Age ["RFOA"].  29 U.S.C. §623(f)(1).

22.  RFOA is an affirmative defense which a defendant must plead and prove.  *Trans World Airlines v. Thurston*, 469 U.S. 111 (1985).

23.  Plaintiffs' State claims under Ohio Revised Code §§4112.02(A) and 4112.99, are subject to the same analysis used with respect to the race discrimination adverse impact claims. Thus, the business necessity test is applicable.

24.  The Defendant City of Akron has failed to prove its affirmative defense that the adverse impact on Plaintiffs who are 40 years old or older is based on a Reasonable Factor Other than Age.  29 U.S.C. §623(f)(1).

### E.    ALTERNATIVE SELECTION DEVICE - DISPARATE IMPACT

25.  If the Defendant City of Akron establishes that the examinations are job related, the Plaintiffs must prove by a preponderance of the evidence that (1) There was a legitimate promotional examination which would have resulted in less adverse impact on African-American firefighters and Caucasian Fire Lieutenants who took the test; and, (2) The alternative promotional examination would have resulted in less adverse impact than the tests the City administered.  42 U.S.C. § 2000e-2(k).

26. A suitable alternative test is one that would have substantially promoted safe, efficient, or successful job performance, but with less disparate impact.  *Id.*

27.  As a matter of law, the City failed to prove by a preponderance of the evidence that the 2004 promotional examinations were job related.  *Id.*  See also, 29 C.F.R. §1607.15.

### F.  ADVERSE IMPACT

28. The Uniform Guidelines on Employee Selection ("UGES") interpret the Civil Rights Act and include the 4/5ths Rule.   The UGES are entitled to deference on evaluating employee selections, including promotions.  29 C.F.R. §1607 *et seq*.  *Zamlen v. Cleveland*, 906 F.2d 209 (6th Cir. 1990).

29. The testimony at trial showed that the tests did not comply with the UGES.  29 C.F.R. §1607.5.

30.  The 4/5ths Rule provides that a selection rate for any group that is less than 4/5ths (or 80%) of the selection rate for the group with the highest rate is considered as evidence of adverse impact.   29 C.F.R. §1607.4(D).

31.  A greater than 4/5ths rate may be considered as a lack of evidence of adverse impact. This statistic is considered a "rule of thumb." It is not an absolute, bright line test for adverse impact.  29 C.F.R. §1607.4(D); *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 995 (1988).

32.  A violation of the 4/5th Rule does not require a finding that there was an adverse impact.  Additionally, compliance with the 4/5th Rule does not require a finding that there was no adverse impact.  29 C.F.R. §1607.4(D).

33.  Because the number of promotions and number of applicants may affect the proper determination of a violation of the 4/5ths Rule, determining the weight it should be given should take into account the sample size.  Questions and Answers 21 – 24,

UGES Interpretation and Clarification (Questions and Answers), 45 F.R. 29350 (May 2, 1980).

34. Caution should be used when applying the Rule to small samples.  Smaller differences in selection rates may constitute adverse impact where the differences are significant in both statistical and practical terms.  Questions and Answers 21 – 24, UGES Interpretation and Clarification (Questions and Answers), 45 F.R. 29350 (May 2, 1980).

35. Plaintiffs and Defendant may rely on alternative statistical analyses to prove or disprove an adverse impact.  *Isabel v. City of Memphis*, 404 F.3d 404 (6th Cir. 2005).

36. OSHA regulation 1910.120(e)(8) requires Hazmat refresher training yearly to maintain certification at the operations level. 29 CFR §1910.120(e)(8).

37. Content validity evidence can be utilized to show "job relatedness." It links the content of the examination to the performance of tasks that are part of the job at issue.  Content validity is recognized under the UGES.  29 C.F.R. §1607.

38. Defendant City of Akron's 2004 promotional to Lieutenant discriminated against Plaintiffs Jeffrey Layne, Jerry Elie, Jeffrey Schueller, Bruce Clough, Michael Reed, Kerry Briggs, William Wilkinson, Frank Poletta, James Farina, Michael Harvey, and Brenda Chapman on the basis of age in violation of the ADEA (29 U.S.C. Sec. 626), ORC §§ 4112.14, .4112.02(A), and 4112.99.

39. Based on the evidence, and the jury's findings, the Court finds that Defendant City of Akron failed to prove that its employment practices in making selections for promotions to Lieutenant in 2004 were based on reasonable factors other than age.

40. Based on the evidence, and the jury's findings, Defendant City of Akron's 2004 promotional process for promotion to Lieutenant discriminated against Plaintiffs Jerry Elie, Michael Harvey, and Brenda Chapman on the basis of race (African-American) in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e-*et seq.),* ORC §§4112.02(A), and 4112.99.

41. Based on the evidence, and the jury's findings, Defendant City of Akron's 2004 promotional process for promotion to Captain discriminated against Plaintiffs William Howe, Bradley Carr, David Hull, David O'Neal, Leslie Gaiser, Michael Hausch, Gregory Snyder, Jeffrey Derrenberger, John Triola, Bradley Robson, Cynthia Crawford (as executrix of the estate of Jerome Crawford), and James Feeman, on the basis of race (Caucasian) in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e, *et seq.)*, ORC §§4112.02(A), and 4112.99.

### G.    REMEDIES

42. Section 706(g) of Title VII (42 U.S.C. §2000e-5(g)) vests broad equitable discretion in the federal courts to order such affirmative relief as may be appropriate, which may include, but is not limited to, promotions of employees, or any other relief as the court deems appropriate. *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976).

43. It is generally proper, absent unusual circumstances, to award relief that would "make whole" the wronged party, including instatement, promotion, back pay, and any seniority or pension adjustments. *Id. See also, Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 761 (6th Cir. 2004). *(*"We have held that victims of discrimination are presumptively entitled to instatement or reinstatement [or promotion]; *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996); *Shore v. Federal*

*Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985), and that reinstatement

[promotion] is the preferred equitable remedy in cases where discrimination has

been proved.").  *Id.* (numerous other citations omitted); See also, *Farber v. Massillon*

*Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990); *Few v. Yellow Freight*, 845 F.2d 123 (6th

Cir. 1988).  This would include commensurate other equitable adjustments, such as

pension, just as the front pay award did.[2]

44.  Plaintiff Michael Harvey is retired, and seeks only the equitable remedy of front pay

(the jury award, as awarded, including pension adjustment).  *Rasimas v. Michigan*

*Dep't of Mental Health*, 714 F.2d 614 (6th Cir. 1983).

45.  Plaintiff Jeff Shueller, who was promoted, but was promoted late, towards the end

of the promotion cycle, is seeking approximately 1 year of backpay and

commensurate pension adjustment.  *Rasimas v. Michigan Dep't of Mental Health*,

714 F.2d 614 (6th Cir. 1983).

46.  Plaintiff Jerome Crawford, who is deceased and represented by his wife Cynthia

Crawford, is entitled to posthumous promotion and back pay, with pension

adjustment.  *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614 (6th Cir.

1983).

---

[2] These arguments are also covered in additional filings (Motions for Promotion, Injunctive Relief for New Promotional System, and Posthumous Promotion for Jerome Crawford).  In this case, the preferred remedy of promotion should include pension adjustments, in order for the entire remedy to be truly "make whole."  See *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764-766 (1976) (courts should fashion as complete a remedy as possible where discrimination is proved, including seniority and similar adjustments).  It is undisputed that no one in this case needs to "bump" another (See *Fuhr, supra* 364 F.3d at 761*)* individual and all promotions can be accommodated by Defendant City of Akron.  The Court is respectfully referred to the City's statements to the state court during the TRO hearing (transcript in evidence), in which it claimed all Plaintiffs had an adequate remedy in seeking promotion.

47.  All other Plaintiffs shall receive promotions effective May 1, 2005, approximately when the first promotions by the City of Akron were made.  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 749 (1976).

48. Plaintiffs have succeeded in obtaining relief under Title VII, and the ADEA and are entitled to recover attorney's fee and costs unless special circumstances would render such an award unjust. Cf. *Newman v. Piggy Park Enterprises, Inc.*, 390 U.S. 400 (1968); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978).  [Plaintiffs' counsel will be filing their attorney fee petitions after final entry of judgment.]

49.  Under Fed. Civ. Rule 54(d) and 42 U.S.C. §1988 Plaintiffs are entitled to costs and fees associated with the prosecution of this case, including expert fees, and upon entry of judgment are directed to present their bill of costs and application for attorney fees.

50.  Title VII also vests broad discretion in this Court to award pre-judgment interest, which, in federal courts, is considered generally part of the make-whole remedy, absent any unusual circumstances.  See: *Loeffler v. Frank,* 486 U.S. 549, 557-558 (1988) ("award of prejudgment interest …is an element of complete compensation in a Title VII case"); *West Virginia v. United States*, 479 U.S. 305, 311 (1987) (Prejudgment interest serves to thereby achieve "full compensation for the injury those damages are intended to redress"); *Tiemeyer v. Community Mutual Ins. Co.*, 8, F.3d 1094, 1102 (6th Cir. 1993) ("Awards of prejudgment interest are compensatory, not punitive").

51.  Any award of prejudgment interest should be calculated from the time of accrual of the date of the wrong committed.  In this case it would be the examinations

themselves, as both were shown to be discriminatory.  *Reed v. Mineta*, 438 F.3d 1063, 1066 (10th Cir. 2006) ("As a general rule, district courts 'should calculate interest on back pay and past damages based on the date of the adverse employment action,'" citing *Thomas v. Tex. Dep't of Crim. Justice*, 297 F.3d 361, 372-373 (5th Cir. 2002) and *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).[3]

52.  Plaintiffs shall receive post-judgment interest from the date of the verdict judgment entry pursuant to 28 U.S.C. §1961.  Such post-judgment interest shall apply to any award of attorney fees and costs retroactive to the date of the verdicts herein.

Respectfully submitted,

*/s/ Dennis R. Thompson*
Dennis R. Thompson #0030098
tmpsnlaw@sbcglobal.net

*/s/ Christy B. Bishop*
Christy B. Bishop #0076100
Bishopchristy@gmail.com
2719 Manchester Road
Akron, Ohio 44319
330-753-6874
330-753-7082 (facsimile)

*/s/ Bruce B. Elfvin*
Bruce B. Elfvin #0015964
bbe@elfvinbesser.com
Barbara K. Besser #0017624
bkb@elfvinbesser.com
Stuart Torch #0079667
stuart.torch@elfvinbesser.com

---

[3] Because this case involves both state and federal claims, this Court has discretion to apply the higher rate.  Ohio, pursuant to R.C. 1343.03 had a 10% per annum rate, which changed June 2, 2004, a month after the first promotions off  the eligibility lists in this case.  Federal law follows 28 U.S.C. 1961 for both prejudgment and post-judgment interest calculations. See *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984) ("the matter of prejudgment interest [rate] remains essentially one for the discretion of the trial judge.").  Plaintiffs will be filing a motion following this Court's final order.

4070 Mayfield Road
Cleveland, Ohio  44121
216-382-2500
216-381-0250 (facsimile)

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

A copy of the foregoing was sent to Patricia Rubright and Michael Defibaugh,

Attorneys for Defendant, via electronic notification, this 16th day of January, 2009.

*/s/  Bruce B. Elfvin*
One of the Attorneys for Plaintiffs