UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| WILLIAM HOWE, et al., | ) | CASE NO. 5:06 CV 2779 |
|  | ) |  |
| Plaintiffs, | ) | JUDGE JOHN R. ADAMS |
|  | ) |  |
| v. | ) | ORDER |
|  | ) |  |
| CITY OF AKRON, | ) | (Resolves Doc. 483) |
|  | ) |  |
| Defendant. | ) |  |

On July 28, 2011, Plaintiffs rested their case in this bench matter.  Plaintiffs then sought the admission of Exhibit 208, a document containing back pay computations performed by Bradley Carr.  The Court orally excluded the exhibit on two grounds.  First, the production of the exhibit was not consistent with Plaintiffs' discovery obligations.  Second, the Court concluded that the exhibit contained information that went beyond that appropriate for a lay witness.  This order will serve to supplement the Court's reasoning regarding the production of Exhibit 208. The exhibit is EXCLUDED.

**I.      Background**

On January 28, 2011, this Court conducted a telephone status conference to discuss how this matter would proceed to retrial on damages.  During that conference, Plaintiffs indicated that they would likely alter their strategy from the initial trial and rely upon a newly named expert to support their claims for damages.  This expert, David Kelley, was named for the first time in "Plaintiffs' Supplemental Initial Disclosures," a document filed on October 11, 2010, after this

1

Court resolved post-judgment motions from the initial trial in this matter. During the January 28, 2011 conference, the Court strongly indicated that if Plaintiffs were inclined to essentially start discovery anew, then it was likely that the matter would be certified for an interlocutory appeal as the Court was not inclined to allow a full year of discovery on the sole issue of damages.  On February 22, 2011, Plaintiffs filed their position statement in this matter regarding retrial.  In that statement, Plaintiffs asserted as follows:

> Plaintiffs have decided to proceed with the damages trial without using an expert witness on the individual damages, relying on existing evidence, updated pay records, pension adjustments, and *Plaintiffs' own testimony*.

Doc. 323 at 2 (emphasis added).  Thus, it is apparent that Plaintiffs asserted that they would not rely upon an expert in an effort to avoid this matter being sent to the Sixth Circuit prior to retrial. The Court then put on its trial order on April 5, 2011.  Based upon the above representation, the schedule chosen by the Court did not incorporate any timeline for the disclosure of expert reports or expert discovery.  In essence, the Court truncated the period of discovery, allowing roughly ninety (90) days because Plaintiffs indicated that no experts would be utilized.

Despite the above-quoted representation, it is clear from Plaintiffs' depositions that they never intended to rely upon their *own testimony* to establish damages.  This choice of strategy is particularly troubling given not only the above-representations to the Court and opposing counsel, but also the history of this litigation.  Plaintiffs attempted to engage in similar tactics during the original trial of this matter when they sought to introduce expert testimony through Bradley Carr and Gregory Snyder.  In excluding that evidence, the Court noted as follows:

> Plaintiffs Carr and Snyder will be strictly forbidden from testifying about any analysis performed by them, i.e., anything that the Court would deem at a later date to be in that vein. They are not experts, and their testimony will be extremely limited. Specifically, their testimony will be limited to the data they have relied upon in making their data extrapolations.

2

…

In addition, plaintiff Carr's lieutenant summaries and the updated captain summaries of the data will be excluded and not considered by the jury because of their untimely production, which occurred after the Final Pretrial held on November 18, 2008.

Doc. 189 at 2.

For the purposes of retrial, through the latter half of May 2011 and the first half of June 2011, each Plaintiff was deposed.  Those depositions reveal that Plaintiffs were again relying upon calculations performed by Gregory Snyder.  In fact, nearly every Plaintiff conceded that Gregory Snyder was solely responsible for the damage calculations and that no Plaintiff had engaged in his/her own independent calculation of damages.

Throughout each deposition, Akron's counsel attacked the validity of Snyder's calculations.  Counsel attempted to demonstrate that Snyder's chosen methodology inflated Plaintiffs' damages.  In fact, several Plaintiffs conceded that certain portions of Snyder's formula had the effect of inflating their damages.  In particular, Plaintiff Bradley Carr admitted during his deposition that Snyder's formula had overstated his damages.

The Court notes that beyond the challenges raised during Plaintiffs' depositions, the Court had the opportunity to review Snyder's computations.  Those computations were included in Plaintiffs' trial exhibits, along with being introduced at many of the depositions.  It is abundantly clear from those exhibits that Snyder had performed the work of an expert witness. Snyder had attempted to calculate front pay and pension loss and even attempted to incorporate mortality tables and life expectancy tables into his calculations.  Snyder's calculations ranged into the millions in total damages.  Snyder attempted to not only calculate the percentage increases he would receive, but also attempted to add "terminal pay" to the award and applied a percentage increase to that amount as well.  In addition, without any special training, Snyder

attempted to calculate his additional "pension loss" that allegedly flowed from his back pay calculations.  Snyder was unable to explain why he chose the life expectancy table he utilized, but admitted he was unaware of the table used by his pension fund.  Snyder further admitted that he made no adjustments for health conditions when using his self-chosen life expectancy table. Snyder's deposition makes clear that his chosen formula required specialized knowledge.  The purported methodology is far beyond the knowledge of a layperson and would require specialized knowledge or expertise to correctly utilize.  Snyder's deposition also made clear that he lacked the expertise to utilize his own formula.  Moreover, no expert report was produced as would be required under Fed.R. Civ.P. 26, and Plaintiffs never sought leave to amend the Court's scheduling order to allow a period for expert discovery.

## II.    Trial Proceedings

As noted above, all 23 Plaintiffs were deposed prior to retrial in this matter.  Every Plaintiff testified to relying upon Snyder's calculations.  Moreover, nearly every Plaintiff asserted that he or she had never conducted his or her own independent calculations.  However, upon trial beginning, it became clear that Plaintiffs had abandoned Snyder's calculations in favor of calculations performed by Bradley Carr.  The Court also learned that Carr's calculations were provided to Akron for the first time on June 17, 2011, the final day of discovery in this matter. In an effort to remedy any prejudice to Akron resulting from this untimely disclosure, the Court ordered Carr to be deposed during the first day of trial in lieu of going forward with witness testimony.  That same day, the Court entered an order compelling the deposition and explaining in a preliminary manner the facts that gave rise to the need for the deposition.

On July 27, 2011, the Court conducted a voir dire of Carr to further develop the issues surrounding his formula and Plaintiffs' choice to change to the use of that formula.  Carr's voir

dire reveals several facts that compel the Court to conclude that Plaintiffs made a conscientious choice to change their trial strategy after all 23 of them had been deposed.  The Court is compelled to reach this conclusion for several reasons.

First, Carr admitted under questioning from the Court that he performed his alternative calculations only *after* his deposition.  In fact, Carr admitted that the questions asked by Akron during the deposition prompted a need for him to do an alternative calculation in an attempt to justify the prior calculations performed by Snyder.  Carr, however, testified that neither he nor any of the Plaintiffs intended on using this new formula prior to July 7, 2011.  Specifically, Carr contends that this Court's order promoting Plaintiffs required a change in methodology.  The Court cannot accept this proffered reason in light of the known facts.

This Court previously described the two methods for calculating damages utilized by Plaintiffs.

> Method A's formula involves the following. Plaintiffs compute the average salary of all Lieutenants or Captains promoted off of the prior examination. A Plaintiff that was a Lieutenant candidate then would compare his actual salary for a particular year with the average salary for others promoted from the examination. This method appears to represent an effort to simplistically compare Plaintiffs with promoted firefighters.

> Method B's formula involves the following. Plaintiffs lay out their salary by paycheck for the period of time that the Court has held governs back pay. Plaintiffs then incorporate step increases into each paycheck at the appropriate time. In other words, for year one, Plaintiffs incorporate the roughly 4% increase they would have received upon promotion, and at year two and three, Plaintiffs similarly incorporate further increases.

Doc. 448 at 1-2.  Snyder created Method A.  Carr created Method B.

As this Court previously explained, Snyder's formula became unworkable when this Court ordered that back pay would commence on April 5, 2007.  Doc. 448 at 3-4.  The use of Snyder's formula was dependent upon the ability to compare Plaintiffs with firefighters that were

promoted in 2005.  As this Court found that back pay would not stretch back to 2005, Snyder's formula would dramatically overstate the back pay under the law of this case.  As such, this Court gave its preliminary view that "[a]s the use of [Snyder's formula] only became problematic on July 13, 2011, it somewhat explains the shift by Plaintiffs."  Doc. 448 at 3. Unfortunately, the Court's preliminary views were in error.  Carr's voir dire made clear that it was not the Court's order altering the date of back pay that caused the shift in methodologies. Instead, Carr swore under oath that the promotion of Plaintiffs required them to abandon Snyder's formula.

As detailed above, Snyder's formula for back pay involved comparing Plaintiffs' actual pay with the average pay of firefighters that were promoted in May of 2005.  This Court ordered Plaintiffs to be promoted in 2011.  There is no question that the promotions eliminated the need to calculate front pay.  In fact, Carr admitted that he had to edit his spreadsheets to eliminate front pay calculations.  However, there is absolutely no legal rationale to support any argument that Snyder's *back pay* methodology was altered by the order of promotion.  As such, the Court cannot accept the reason proffered by Plaintiffs for altering their damage calculations.

The Court has also fully considered whether it is conceivable that Carr misspoke and meant that the change in methodology occurred when the Court established the date back pay would commence.  However, Plaintiffs' witness list for this retrial was filed *prior to* the Court order that established the date back pay would commence.  Accordingly, it cannot be argued that the date that back pay would commence caused the shift in methodologies.

As the proffered reason for altering methodologies, Plaintiffs' promotions, has no basis in fact, it must be rejected.  In the Court's view, that leaves but one alternative:  Plaintiffs made a strategic trial decision to alter their damage theory after every deposition in this matter was

6

completed.  In other words, Plaintiffs engaged in a classic bait-and-switch maneuver.  Plaintiffs baited Akron into conducting discovery on Snyder's calculations.  Then, without warning or notice, Plaintiffs switched their method for computing damages.  To effectuate this switch, Plaintiffs provided a 486 page document containing this new methodology to Defendants on the day discovery closed.  No explanation accompanied this document.  The next occasion that Akron saw a similar document occurred when trial exhibits were exchanged on July 15, 2011.  The Court acknowledges that Plaintiffs filed their initial exhibit list on July 13, 2001.  That exhibit list included Exhibits 149 and 150 that were labeled "Carr Documents – Promotional Wage Loss."  That list, however, did not include Exhibit 208.  Even the exchange of trial exhibits did not reveal that Plaintiffs had switched their methodology.  If Plaintiffs are to be believed, a Court order from either July 7 (promotion order) or July 13 (back pay commencement order) required a shift in methodologies.  However, Plaintiffs still produced trial exhibits from **both Carr and Snyder.**  As a result, when trial began in this matter, Akron still had no way of even *knowing* Plaintiffs' chosen methodology, let alone an opportunity to conduct discovery on that methodology.  If Plaintiffs had made a genuine decision to alter their methodologies based upon a Court order, it strikes the Court as quite odd that they would still mark as exhibits the computations done under the methodology they were forced to abandon.  These facts again compel rejection of any argument that Plaintiffs' hands were forced by the Court and that they had no choice but to change their methodology on the eve of trial.

Plaintiffs argue that no prejudice accrued to Defendants based upon the untimely production of these documents and their unannounced shift in methodologies.  In support, Plaintiffs rely upon *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006).  In *Jordan*, the

Sixth Circuit concluded that sanctioning Jordan for non-compliance with Fed.R. Civ.P. 26 was

improper under the facts of that case.  The Court noted in a footnote as follows:

> Such inappropriateness is underscored by the facts that Cleveland had all the
> information relevant to the computation of damages in its possession, that it made
> no opportunity to confer with Jordan to access any damages information before
> bringing its motion in limine and that it had a full opportunity during Jordan's
> deposition to question him about damages.

*Id.*. at 601 n.22 (citation omitted).  Reliance on *Jordan* is misplaced.  In stark contrast to the facts

of *Jordan*, Akron did not have all of the information relevant to Plaintiffs' computation of

damages at the time of the depositions in this matter.  In fact, Akron solely had information in its

possession that ultimately turned out to be useless.  Countless hours were spent in depositions

examining Plaintiffs about Snyder's calculations and their propriety.  Every one of those

questions lost all value when Plaintiffs chose to alter their theory of damages and provide no

notice of that choice.

Beyond all the wasted time and expense caused by Plaintiffs' shift in theory, it has

become apparent that allowing the deposition of Carr during this retrial did not serve to alleviate

prejudice to Akron.  As noted above, nearly every Plaintiff denied during their depositions that

he or she had engaged in **<u>any</u>** independent calculation of his or her own damages.  Instead, nearly

all Plaintiffs testified that had relied entirely on Snyder to calculate their damages.  In stark

contrast, during this retrial and after this Court indicated its initial thoughts on the propriety of

relying upon Carr, many Plaintiffs testified that they had in fact done their own calculations in

order to verify Carr's calculations.  As a result, although Akron was permitted a discovery

deposition for Carr to inquire about his formula, Akron was deprived of its ability to depose the

remaining 22 Plaintiffs and fully inquire about the calculations purportedly done by each

individual Plaintiff.  In addition, the Court finds much of this testimony to lack credibility.

Plaintiff Bruce Clough candidly admitted during his testimony that he viewed Snyder and Carr as his expert.  While certainly not dispositive in any legal sense, Clough's statement sheds light on the facts surrounding this matter.  As Plaintiffs admitted during their depositions to wholly relying on Snyder, and Clough admitted to viewing both Snyder and Carr as *de facto* experts, it is difficult to believe that Plaintiffs engaged in any form of independent calculations  -- despite their representations during trial testimony.[1]  Further, from the Court's perspective, more and more Plaintiffs testified to performing their own calculations only *after* this Court expressed its initial views about Carr's calculations and Exhibit 208.

Throughout these retrial proceedings, Plaintiffs' damages have been a moving target. Some of the movement was no doubt caused by the Court's order of promotion – such an event eliminated front pay.  However, every other shift in damages is attributable to action or inaction by Plaintiffs.   Without legal justification, Plaintiffs shifted their entire methodology for calculating damages.  Even if this Court were to somehow excuse that fact, the remaining glaring discovery issues compel the exclusion of Exhibit 208.

As detailed above, the calculations were first provided on the final day of discovery. However, it is not as though that same document moved forward and became a trial exhibit. Instead, that document was further altered before trial began.  The Court again acknowledges that front pay was removed based upon a Court order.  However, other corrections were made when errors were discovered.  As a result, Akron has not known the final numbers claimed as damages by some Plaintiffs until as late as the Sunday before this Monday trial began.  In large part, this late disclosure mimics the late and untimely disclosures that occurred during the initial trial of this matter that led to the exclusion of evidence offered by Carr.  Then, like now, Carr

---

[1] As described above, Plaintiffs similarly relied on Carr and Snyder for certain statistical analyses during the initial trial of this matter.  Then, like now, the remaining Plaintiffs relied upon those analyses without performing any analyses of their own.

provided updated documents for the first time after a final pretrial.  In that regard, Plaintiffs have demonstrated a pattern of conduct that involves updating vital exhibits all the way up to the date of trial.  Whether this is a strategic choice or simply poor trial preparation, it is improper and prejudicial.  Such conduct leaves Akron with no opportunity to meaningfully review and challenge the propriety of Plaintiffs' trial exhibits.  Consistent with the Court's order before the first trial of this matter, discovery that is not turned over in a timely matter must be excluded.

A portion of Plaintiffs' opposition also appears to suggest that their discovery abuses are justified because Akron engaged in a similar pattern of untimely disclosure.  In support, Plaintiffs discuss at length Akron's failure to timely provide damage calculations performed by its witness, Mark McLeod.  If and when necessary, the Court will resolve the admissibility of any documents offered that were produced by McLeod.  What is abundantly clear, however, is that Plaintiffs cannot justify their discovery abuses by pointing to abuses by Akron.  Even if this Court were to conclude in this order that Akron abused the discovery process, it would not somehow lessen the abuses engaged in by Plaintiffs.  Each party to this litigation had an independent obligation to engage in the discovery process in this matter in conformance with the Civil Rules and Court orders.  It is abundantly clear that Plaintiffs failed to fulfill their obligation.

Given the untimely disclosure of Carr's computations, the constant editing of those computations all the way through the eve of trial, the fact that this conduct is remarkably similar to conduct that led to the exclusion of evidence before the first trial, and the Court's finding that Plaintiffs' shift in methodologies was not supported by any legitimate reason, Carr's computations must be excluded.  To the extent necessary, the Court relies upon Fed.R. Civ.P. 37,

excluding the evidence as a discovery sanction, and its own inherent authority to exclude this evidence as a sanction for Plaintiffs' conduct.

Fed.R. Civ.P. 37(b)(2) allows this Court to prohibit a party from "introducing designated matters into evidence" when they have failed to comply with discovery orders.  This Court quite clearly ordered Plaintiffs to disclose their theory of damages during the discovery period in this matter.  Instead, Plaintiffs introduced a theory and abandoned that theory at the close of discovery.  As a result, Plaintiffs evaded any discovery depositions on their actual theory of damages.  Moreover, as this matter was set for retrial on damages only, Plaintiffs evaded being deposed on the *sole relevant* issue that remained in this matter.

The Court considered lesser sanctions before excluding Carr's computations.  In fact, as noted above, the Court attempted to alleviate the prejudice to Akron by allowing Carr to be deposed at the onset of this retrial.  However, as retrial progressed, it became clear Akron was not only prejudiced by an inability to depose Carr.  With each Plaintiff's testimony, it has become clear that Plaintiffs not only changed their methodology, but that many Plaintiffs alleged that they calculated their own damages for the first time during the week of trial.  As a result, Akron was placed in a position of having deposition testimony in which Plaintiffs admitted to not calculating their damages and now having trial testimony that is **dramatically** different.[2] Thus, Plaintiffs' discovery abuses prevented any meaningful trial preparation by Akron. Accordingly, there can be no remedy short of exclusion that would alleviate the prejudice to Akron.

### III.    Conclusion

---

[2] As noted above, the Court has significant doubts that these independent calculations were in fact performed at any time prior to the Court expressing its doubts during trial about the admissibility of Carr's testimony and exhibits. Instead, the evidence suggests that Plaintiffs did nothing more than allegedly *verify* the calculations of Carr.

Exhibits 208 will not be considered by the Court in any manner.  Furthermore, any testimony given that it exclusively relied upon that Exhibit will also not be considered in any manner.  Additionally, as the Court has concluded that Plaintiffs' tactical decision to alter their methodology eliminated any value in Akron's retrial preparation, the Court must consider whether exclusion of the Exhibit is a sufficient penalty to remedy the harm that flows from Plaintiffs' conduct.

On August 9, 2011, this Court ordered Plaintiffs to deposit $200,000 with the Court registry based upon the Court's prior oral statements about the likelihood that would fees would be imposed.  On August 12, 2011, Plaintiffs moved for reconsideration of that order.  Doc. 483. The motion is GRANTED IN PART.  At this time, the Court will STAY its prior order. Furthermore, the parties are placed on notice that the Court is contemplating an award of attorney fees pursuant to 28 U.S.C. §1927 which provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Each party may file a position statement on the propriety of such an award by no later than August 26, 2011.

IT IS SO ORDERED.


 August 12, 2011           ____/s/ Judge John R. Adams_____
Date                        JUDGE JOHN R. ADAMS
                            UNITED STATES DISTRICT COURT